**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Pacifica of the Valley Corporation,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11060 (TMH) |

**DEBTOR'S MOTION FOR THE ENTRY OF (I) AN ORDER (1) APPROVING AUCTION SALE FORMAT AND BIDDING PROCEDURES; (2) APPROVING PROCESS FOR DISCRETIONARY SELECTION OF STALKING HORSE BIDDER AND BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST AND BEST BIDDER; AND (5) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF ALL CLAIMS, LIENS AND ENCUMBRANCES**

Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley, the debtor and debtor in possession ("Pacifica" or "Debtor") in the above-captioned chapter 11[2] case (the "Chapter 11 Case"), hereby files this motion (the "Motion") for entry of an order, pursuant to §§ 105(a), 363, 365, 503, 507, 1107, and 1108, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1, substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

a. approving a process by which interested parties may bid (a "Bid") to purchase substantially all of the Debtor's assets (collectively, the "Purchased Assets"), including the assignment and assumption of Assumed Executory Contracts, together with the payment of Cure Costs (as such terms are defined below);

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number, is: Pacifica of the Valley Corporation d/b/a Pacifica Hospital of the Valley (7312). The Debtor's mailing address is 9449 San Fernando Road, Sun Valley, CA 91352.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. All references to the Local Rules are to Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

b. approving a process by which, at the Debtor's election, a stalking-horse bidder may be selected from among those parties making a Bid, and bidding protections may be granted to such stalking horse bidder without further order of the Court;

c. setting bid procedures to establish guidelines for parties interested in making initial Bids and overbids to such initial Bids;

d. if multiple Qualified Bids (as defined below) are received, authorizing the Debtor, in consultation with the Committee, to schedule an auction of the Purchased Assets; and

e. scheduling a sale hearing for the Court to approve the highest and best Qualified Bid.

In support of this Motion, the Debtor relies upon and refers this Court to the *Declaration of Precious Mayes in Support of Emergency First Day Motions* [Docket No. 16] (the "First Day Declaration").[3] In further support of the Motion, the Debtor respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. The Debtor operates a 231-bed safety net hospital and serves thirteen zip codes, including subacute patient referrals from hospitals more than 400 miles away. The Debtor offers complete service lines, including, 24/7 Emergency, acute care, ICU, locked Behavioral Health, d/p Subacute Skilled Nursing Facility, Outpatient Surgery and Rehab, and in/outpatient ancillary services.

2. Since the filing of the Debtor's Chapter 11 Case, the Debtor, in consultation with its advisors, has analyzed strategic options and determined that a sale of substantially all of the Debtor's assets is in the best interest of the estate and will yield the maximum value to stakeholders under the circumstances. Among other things, the Debtor's decision is driven by its liquidity issues as set forth in the First Day Declaration.

[3] Any capitalized terms used but not defined herein shall have the meaning ascribed in the First Day Declaration.

3. The Debtor requests the Court to approve the proposed bidding procedures (the "Bidding Procedures"),[4] attached to the Bid Procedures Order as Exhibit 1, and the expedited sale timeline set forth below, which is necessary given its liquidity constraints.

4. The Debtor submits that the Bidding Procedures provide clear direction and guidelines to prospective bidders will that maximize the prospects for a successful auction and will ensure that the highest and best price is paid for the Purchased Assets. The proposed Bidding Procedures will also create organization and stability for the Debtor and its employees, suppliers, and patients.

5. For these reasons, and the reasons more fully set forth below, the Debtor submits that approval of the proposed Bidding Procedures are in the best interests of the Debtor and its estate and respectfully requests that the Court grant the Motion.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtor confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

[4] Unless otherwise defined herein, all capitalized terms have the definitions set forth in the Bidding Procedures. The terms of the Bidding Procedures shall control to the extent the descriptions in this Motion conflict with the terms of the Bidding Procedures.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are §§ 105, 363, and 365; Bankruptcy Rules 2002, 6004, 6006, and 9008; and Local Rules 2002-1 and 6004-1.

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. Case Background

9. On July 4, 2026 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the commencement of its case, the Debtor has been operating its business as a debtor in possession pursuant to §§ 1107 and 1108.

10. A detailed description of the Debtor's business and facts precipitating the filing of the Debtor's chapter 11 proceeding is set forth in the First Day Declaration.

11. On July 20, 2026, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in this chapter 11 case. [Docket No. 78].

### B. Facts Relevant to Motion

12. As set forth in the First-Day Declaration, the Debtor appointed Peter Chadwick, of Berkeley Research Group ("BRG"), as its Chief Restructuring Officer.

13. Also, on August 21, 2026, the Debtor filed an application to retain Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as investment banker to the Debtor [Docket No. 166].

14. Since then, the Debtor and the special restructuring committee of the board, consulting with its advisors, have analyzed the Debtor's restructuring options and determined that

a sale of the Purchased Assets is in the best interest of the Debtor, the estate, patients, and stakeholders.

## PROPOSED SALE AND BIDDING PROCEDURES

15. The Debtor submits that conducting an Auction in accordance with Bidding Procedures will obtain the highest or otherwise best offer for the Purchased Assets. The Debtor seeks approval of the following sale timeline:

| **Date** | **Event** |
|---|---|
| September 29, 2026 | Hearing on Sale Procedures Motion |
| September 30, 2026 | Entry of Order Approving Bid Procedures and Service of approved Bidding Procedures, Auction and Sale Notice |
| October 8, 2026 | Circulate Cure Notice |
| October 16, 2026 | Assumption Objection Deadline |
| Mid/Late October 2026 | Bid Deadline for Qualified Bids |
| Mid/Late October 2026 | Auction |
| Mid/Late October 2026 | Sale Hearing |

16. A summary of the significant Bidding Procedures is set forth below. If there exists any omission or discrepancy between the following summary and the actual terms of the Bidding Procedures, the actual terms of the Bidding Procedures shall control.

### A. Requirements to Participate in the Auction

17. The Bidding Procedures provide that only Qualified Bidders may participate in the Auction. To be a Qualified Bidder, a party wishing to submit a Bid must first become a Potential Bidder, which requires that an interested party execute, or shall be currently subject to a confidentiality agreement in form and substance satisfactory to the Debtor. Upon qualifying as a

Potential Bidder, a party may receive due diligence information from the Debtor, including access to the Debtor's on-line data room and potentially other nonpublic information relating to the Debtor's assets.

18. The Bidding Procedures set forth the requirements for a Potential Bidder to become a Qualified Bidder, including (without limitation) that a Potential Bidder: (a) at the Debtor's request, after consultation with the Committee, submit an Indication of Interest to purchase the Purchased Assets to the Debtor, which includes (1) the proposed structure of the transaction, purchase price and any material terms; (2) a description of the acquiring entity and relevant experience; (3) proposed plans for the assets following consummation of the sale transaction; (4) evidence of financial capacity and wherewithal to consummate the transaction and operate the Purchased Assets; (5) evidence of ability to comply with any necessary regulatory approvals to operate the Purchased Assets; (6) authority and approval to complete the transaction; (7) a detailed description of the due diligence information and / or investigation the Potential Bidder may require to submit a Bid; (8) a proposed timetable for consummating the transaction, including any necessary regulatory approvals; and (9) contact information for the Potential Bidder; (b) submit a Bid by the Bid Deadline to the Bid Deadline Recipients identified in the Bidding Procedures (including the Debtor, BRG, Houlihan Lokey, and the Committee); (c) provide a clean and marked-up copy of the proposed asset purchase agreement (which form shall be consistent with the form of the Draft APA posted in the Debtor's on-line data room); (d) provide a copy of the draft Sale Order marked to reflect any amendments and modifications compared to the form of the Sale Order posted in the Debtor's on-line data room; (e) deliver a Deposit by wire transfer in an amount equal to 10% of the proposed Purchase Price; (f) demonstrate that it has the financial wherewithal and ability to consummate the Sale; (g) state that the Bid is not conditioned on any due diligence, financing, or other contingencies

other than entry of the Sale Order, and any other contingencies solely to the extent set forth in the Qualified APA; (h) unless a Stalking Horse Bidder has been identified and disclosed no later than two business days prior to the Bid Deadline, state whether the Potential Bidder is willing to serve as a stalking horse bidder and specify any requested bidding protections, including a break-up fee and/or expense reimbursement in an amount not to exceed in the aggregate 2.5% of the proposed Purchase Price of such Bid; (i) provide a detailed description of how the Potential Bidder intends to treat current employees of the Debtor and any applicable union contract(s); (j) contain a detailed description of how the Qualified Bidder intends to satisfy any regulatory approvals necessary to operate the Purchased Assets; (k) agree to close the transaction with the Debtor through the use of an interim management agreement or the equivalent agreement pursuant to which applicable regulatory and other approvals will be obtained after the closing; (l) identify with particularity which executory contracts and unexpired leases the Qualified Bidder wishes the Debtor to assume and assign to it; and (m) disclose any connections to the Debtor and affiliated persons. The Bidding Procedures further provide that a Bid shall contain cash consideration of no less than is necessary to satisfy (i) the Break-Up Fee, and (ii) the Debtor's administrative claims (unless such administrative claimant has agreed to an alternative form of consideration) and which administrative claim amount shall be provided to Potential Bidders no less than three (3) business days prior to the Bid Deadline.

19. A Bid that satisfies each of the Bid Requirements (including but not limited to those mentioned in the foregoing paragraph), as determined by the Debtor in its reasonable discretion, in consultation with the Committee, shall constitute a "Qualified Bid," and such Potential Bidder submitting such Bid will be deemed a "Qualified Bidder." No later than one business day prior to the Auction, the Debtor shall (i) advise each Potential Bidder that submitted a Bid if that Bid has

been determined to be a Qualified Bid by the Debtors, in consultation with the Committee, and (ii) file and serve on each Potential Bidder a notice indicating if there are multiple Qualified Bids, in which case the Auction shall be conducted, as further described below. In the event that the Debtor does not receive more than one Qualified Bid, the Debtor may, after consultation with the Committee, (i) cancel the Auction or (ii) not hold the Auction and name the sole Qualified Bidder as the Winning Bidder for the Purchased Assets.

**B. Discretionary Stalking Horse Designation and Bidding Protections**

20. To increase the competitive nature of the sale process, the Bidding Procedures provide that, at any time but not later than twenty-four (24) hours prior to the commencement of the Auction, the Debtor, in its discretion, after consultation with the Committee, may designate a Qualified Bidder which indicated a willingness to serve as a stalking horse bidder as the "Stalking Horse Bidder" and award it so-called stalking horse protections, including a break-up fee and/or expense reimbursement in an amount not to exceed in the aggregate 2.5% of the proposed Purchase Price of such Bid (the "Break-Up Fee"). The Bidding Procedures provide that any Break-Up Fee, to the extent payable, shall only be paid from proceeds received by the Debtor at the closing of a sale or the transfer of the Purchased Assets to a party other than the Stalking Horse Bidder. The designation of stalking horse status and the award of stalking horse protections may occur without further notice or order of the Court other than the filing of a notice on the Bankruptcy Court docket no later than twenty-four (24) hours prior to the commencement of the Auction. The Debtor shall have no obligation to designate any Qualified Bidder as the Stalking Horse Bidder. If such designation is made, the Debtor shall notify all other Potential Bidders.

**C. Credit Bid**

21. Any party with a valid, properly perfected prepetition or post-petition security interest in any of the Purchased Assets that is not subject to any pending written objection[5] as to the validity, extent, or priority, may credit bid (any such bid, a "Credit Bid" and any party submitting a Credit Bid, each a "Credit Bidder") for such Purchased Assets in connection with the sale in accordance with and pursuant to § 363(k), except as otherwise limited by the Bankruptcy Court for cause; *provided*, *however*, that no Credit Bidder may Credit Bid unless (x) all secured creditors with a valid and perfected security interest in the Purchased Assets subject to the Credit Bid that rank equal or senior to the security interest of the Credit Bidder in the Purchased Assets consent in writing to such Credit Bid or (y) the Credit Bid expressly provides for the cash payment in an amount sufficient to satisfy any such valid and perfected security interests in the Purchased Assets that are equal or senior in priority to the security interests of the Credit Bidder at the closing of the sale. Such Credit Bidder must submit a Credit Bid by the Bid Deadline.

22. If there is a pending written objection (a "Credit Bid Challenge") as of the time of commencement of the Auction as to the amount, validity or perfection of the security interest in any of the Purchased Assets held by a Credit Bidder that submitted a Qualified Bid, such Credit Bidder shall be required to bid at the Auction in cash and pay the Purchase Price in cash (but only to the extent of the disputed amount) into an escrow account (the "Credit Bid Escrowed Funds") with an escrow agent reasonably acceptable to the Debtor, the Committee, and the Credit Bidder (the "Credit Bid Escrow Agent"), pursuant to an escrow agreement in form and substance reasonably acceptable to the Debtor, the Committee, and the Credit Bidder (the "Credit Bid Escrow Agreement"), unless the Credit Bidder obtains an Order of the Bankruptcy Court modifying this

[5] For the avoidance of doubt, a written objection may be in the form of a letter to counsel for Credit Bidder or a pleading filed with the Bankruptcy Court.

provision. The Credit Bid Escrowed Funds shall be applied or returned to such Credit Bidder in accordance with the following terms:

a) If the Credit Bidder is the Back-Up Bidder, the Credit Bid Escrow Agent shall return all Credit Bid Escrowed Funds within two (2) business days after the earlier of (i) the closing of the sale to the Winning Bidder, or (ii) the Outside Back-Up Date.

b) If the Credit Bidder is the Winning Bidder, the Credit Bid Escrowed Funds shall remain in escrow pending entry of a Final Order resolving the Credit Bid Challenge (by judgment or settlement) and providing for disposition of the Credit Bid Escrowed Funds.

23. Any dispute arising under or related to a Credit Bid Challenge or the Credit Bid Escrow Agreement, including without limitation, the amount of a Credit Bid, shall be subject to the exclusive jurisdiction of the Bankruptcy Court. As a condition of its appointment, the Credit Bid Escrow Agent shall consent to the jurisdiction of the Bankruptcy Court for purposes of any dispute regarding the release or distribution of the Credit Bid Escrowed Funds and shall comply with any order of the Bankruptcy Court directing the release, retention, or distribution thereof. In the event of any dispute regarding the amount of a Credit Bid, the dispute shall be resolved or adjudicated by the Bankruptcy Court prior to commencement of the Auction and all parties in interest may be heard in connection therewith.

**D. Auction**

24. If the Debtor receives more than one Qualified Bids, the Debtor will conduct an Auction in mid to late October 2026, at such time and location as noticed by the Debtor, in accordance with the Bidding Procedures.

25. The Auction shall be governed by the following procedures:

(a) only Qualified Bidders, in person and through duly-authorized representatives, may bid at the Auction, and every Qualified Bidder must have at least one (1) such duly-authorized representative with authority to bind the Qualified Bidder at the Auction;

(b) only such authorized representatives of each of the Qualified Bidders, the Debtor, the Committee, and their respective legal and financial advisors shall be permitted to attend the Auction;

(c) prior to the commencement of the Auction, representatives of the Debtor, and/or the Committee may have discussions with each Qualified Bidder with respect to the terms and conditions of such Qualified Bids, and the Debtor will have selected, in consultation with the Committee, a Qualified Bid to become the opening bid at the Auction (the bid submitted by such Qualified Bidder shall be referred to as the "Opening Bid" and the Qualified Bidder shall be referred to as the "Opening Bidder");

(d) the Debtor, after consultation with the Committee, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, and (ii) disclosed to each Qualified Bidder at the Auction;

(e) bidding shall commence at the amount of the Opening Bid. The Opening Bid shall be announced by the Debtor at or before the commencement of bidding at the Auction. Other Qualified Bidders may then submit successive bids in bidding increments in the amount of $200,000 (each, a "Overbid") which shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Qualified Bids. To the extent a Stalking Horse Bidder submits an Overbid, such Stalking Horse Bidder shall have the right (but not the obligation) to increase its Opening Bid by using, as a credit, the amount of the Break-Up Fee when determining whether any Stalking Horse Bidder has topped the previous Bid by the required amount;

(f) Qualified Bidders shall have the right to submit additional bids that include modifications to their Qualified APA at the Auction, consistent herewith, provided that any such modifications to the Qualified APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtor than any prior bid by such party (as determined by the Debtor, following consultation with the Committee). The Debtor, in consultation with the Committee, reserves the right to separately negotiate the terms of any Qualified Bids at the Auction, provided the terms are fully disclosed at the time such Qualified Bid is formally submitted;

(g) the bidding will be transcribed by a certified court reporter employed by the Debtor to ensure an accurate recording of the bidding at the Auction;

(h) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed sale and is not in violation of § 363(n); *provided*, *however*, that a Qualified Bidder may be authorized to submit a joint bid with

another Qualified Bidder only with the Debtor's written consent, in consultation with the Committee. Any collusion by a Qualified Bidder with another Qualified Bidder or other interested party shall, at the election of the Debtor (in consultation with the Committee) disqualify such Qualified Bidder(s) from the ability to continue bidding at the Auction and/or being selected as the Winning Bidder and/or constitute a waiver of the right of such Qualified Bidder(s) to obtain a good faith purchaser finding under § 363(m); and

(i) absent irregularities in the conduct of the Auction, the Debtor will not consider any Potential Bids made after the Auction is closed.

**E. Representations and Warranties**

26. Except as explicitly set forth in the Winning Bid APA (as defined below), the Purchased Assets will be transferred on an "as is, where is" basis, with all faults, and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate, whether written, verbal, express, implied, or by operation of law.

**F. Acceptance of the Winning Bid**

27. Upon the conclusion of the Auction (if such Auction is conducted), the Debtor, in the exercise of its reasonable, good-faith business judgment and after consultation with the Committee, shall identify (i) the Winning Bid, which is the highest and best Qualified Bid submitted at the Auction; and (ii) the next highest and best Qualified Bid (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder").

28. Each of the Winning Bidder and the Back-Up Bidder shall be required to execute a definitive Qualified Bid conformed to the provisions of the Winning Bid and the Back-Up Bid, as applicable, as soon as practicable but, in no event, later than the start of the Sale Hearing. For the purposes of these Bidding Procedures, the definitive agreement executed by the (i) Winning Bidder shall be defined as the "Winning Bid APA" and (ii) Back-Up Bidder shall be defined as the "Back-Up Bid APA".

29. The Back-Up Bidder must keep the Back-Up Bid open and irrevocable until the earlier of (i) 5:00 p.m. (Eastern Time) on the date which is thirty (30) days after the entry of the

Sale Order (the "Outside Back-Up Date"), or (ii) the date of closing of the sale to the Winning Bidder. If the Winning Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Winning Bidder, the Back-Up Bidder will be deemed to be the new Winning Bidder, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

30. Within two business days after the conclusion of the Auction, the Winning Bidder and the Back-Up Bidder shall each deposit with the Debtor an additional amount in cash such that, when combined with their existing Deposit, each such bidder's aggregate Deposit equals ten percent (10%) of the Purchase Price reflected in the final bid of the Winning Bidder and of the Back-Up Bidder, respectively (such additional amounts shall be included in the definition of the "Deposit").

31. If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid as the winner of the Auction (conditioned upon approval by the Bankruptcy Court) only when (a) such bid is declared the Winning Bid; (b) definitive documentation has been executed in respect thereof; and (c) any additional Deposit required as a result of a bid submitted at the Auction (as required by the Bidding Procedures) has been provided to the Debtor. Such acceptance is also conditioned upon approval by the Court of the Winning Bid and (if applicable) the Back-Up Bid.

**THE SALE HEARING**

32. As part of this Motion, the Debtor asks this Court to schedule a sale hearing (the "Sale Hearing") on a date in mid to late October, as will be noticed by the Debtor. The Debtor will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was properly conducted, and the Winning Bidder and the Back-Up Bidder were

properly selected, in accordance with the Bidding Procedures; (b) the Auction was fair in substance and procedure; (c) each of the Winning Bid and the Back-Up Bid was a Qualified Bid; (d) the closing of the sale in accordance with the Winning Bid (or if applicable, the Back-Up Bid) will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Debtor; and (e) each of the Winning Bidder and the Back-Up Bidder are deemed to be purchasers of the Purchased Assets in good faith as set forth in § 363(m).

33. At the Sale Hearing, the Debtor shall request the Bankruptcy Court to enter an order approving the Winning Bid and, if applicable, the Back-Up Bid (the "Sale Order"). Except to the extent revised by the Debtor in its discretion, after consultation with the Committee and the Winning Bidder, the proposed Sale Order presented to the Bankruptcy Court at the Sale Hearing shall be in the form submitted as part of the Winning Bid.

34. At the Sale Hearing, the Debtor shall also request, as part of the Sale Order, authorization from the Bankruptcy Court to accept the Back-Up Bid as the Winning Bid, and consummate such bid, if the Winning Bid is not consummated when and as required by its terms without further order of the Bankruptcy Court. The Debtor shall promptly give notice to the Back-Up Bidder if the Winning Bid is terminated and the Back-Up Bidder has been selected as the replacement Winning Bidder and shall provide the Back-Up Bidder a reasonable period within which to close as set forth in the Back-Up Bid APA.

35. After approval of the sale and entry of the Sale Order, the California Department of Public Health, the California State Board of Pharmacy, and the California Office of Health Care Affordability (collectively, the "California Regulatory Authorities") must also approve the sale to the Winning Bidder. To commence this approval process, the Debtor and Winning Bidder shall

submit the Winning Bid APA to the California Regulatory Authorities for review. It may take two months for the California Regulatory Authorities to complete their approval process.

36. However, the Winning Bidder shall agree to close the sale transaction with the Debtor through the use of an Interim Management Agreement, sale leaseback, and/or such other agreements and such applicable regulatory and other approvals will be obtained after the closing.

## RETURN OF DEPOSITS

37. Upon closing of the sale with the Winning Bidder (or Back-Up Bidder, if applicable), the Deposit of the Winning Bidder or Back-Up Bidder shall be credited to the Purchase Price. The Deposit of the Winning Bidder or Back-Up Bidder will be forfeited to the Debtor if the Winning Bidder or Back-Up Bidder fails to enter into the required definitive documentation or to consummate the applicable sale transaction in accordance with these Bidding Procedures and the terms of the applicable transaction documents with respect to the Winning Bid and Back-up Bid as shall be set forth in the Winning Bid APA and Back-Up Bid APA or as otherwise ordered by the Bankruptcy Court.

38. The Deposits of any Qualified Bidders other than the Winning Bidder and the Back-Up Bidder will be returned within two (2) business days after the conclusion of the Sale Hearing; provided, that, the Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within two (2) business days after the earlier of (i) the closing of the sale to the Winning Bidder, or (ii) the Outside Back-Up Date.

## NOTICE PROCEDURES

39. The Debtor proposes that any objections to the sale (other than an Assumption Objection (defined herein) which shall be governed by the procedures set forth below) (a "Sale Objection"), must be filed with the Court on or before the Sale Objection Deadline set forth in the

Bidding Procedures Order and also: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; and (d) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Bid Deadline Recipients. If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the Debtor requests that the objecting party be barred from objecting to the sale and not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party. The Debtor also requests that the Court approve the form of the notice of sale procedures (the "Procedures Notice") substantially in the form to be filed by the Debtor before the hearing on this Motion. The Debtor will serve a copy of the Procedures Notice on the Bid Deadline Recipients and all parties which have requested to receive notice under Bankruptcy Rule 2002 (the "Procedures Notice Parties").

40. The Debtor proposes to file with the Court and serve the Procedures Notice within one (1) business day following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties. The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to Dentons US LLP, Attn: Tania M. Moyron, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90017 or by emailing tania.moyron@dentons.com or calling (213) 623-9300.

41. The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and sale, and Sale Hearing to the Debtor's creditors and other parties in interests as well as to those who have expressed an interest or are likely to express an interest in

bidding on the Purchased Assets. Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed notice procedures.

**ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROCEDURES RELATED THERETO**

42. As part of the sale, the Debtor also seeks to assume and assign certain of their executory contracts and unexpired leases (collectively, the "Assumed Executory Contracts") pursuant to § 365.

43. The Assumed Executory Contracts will be those contracts and leases that the Debtor believes may be assumed and assigned as part of the orderly transfer of the Purchased Assets; provided, that, the Winning Bidder may choose to exclude (or to add) contracts or leases to the list of Assumed Executory Contracts, subject to notice to the counter-parties to any Assumed Executory Contracts which are added.

44. The Debtor will file with the Court and serve a cure notice, substantially in the form to be filed with the Court on or before October 8, 2026 (the "Cure Notice"), (along with a copy of this Motion) upon each counterparty to the Assumed Executory Contracts. The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts (including the Cure Amount (defined below)) must be filed and served. The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts"). To the extent there is a contract subsequently added to the list of contracts to be assumed by the Winning Bidder pursuant to the Winning Bid APA selected at the Auction, this Motion constitutes a separate motion to assume and assign that contract to the Winning Bidder pursuant to § 365; each such contract will be listed in the Winning Bid APA, and will be given a separate Cure Notice filed and served by overnight

delivery within five (5) business days of the conclusion of the Auction and announcement of the Winning Bidder.

45. The inclusion of a contract, lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtor and its estate or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.

46. If a Contract or Lease is assumed and assigned pursuant to Court order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined below), the Assumed Executory Contract counterparty will receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any. If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtor proposes that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified by the Debtor in the Cure Notice, and set forth any reason why the counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to the Winning Bidder.

47. If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (including to a Cure Amount) (an "Assumption Objection"), the Debtor proposes that the counterparty must file the objection and serve it so as to be actually received on or before 5:00 p.m. (prevailing Eastern Time) on October 16, 2026 (unless the Cure Notice was served on such counterparty less than twenty (20) days prior to October 16, 2026, in which case, any Assumption Objection must be served no later than twenty (20) days after service

of the Cure Notice) (the "Assumption Objection Deadline"), provided, however, any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of its Assumed Executory Contract solely with respect to the Winning Bidder's ability to provide adequate assurance of future performance under such Assumed Executory Contract. After receipt of an Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount or otherwise resolve the objection with the counterparty. In the event that the Debtor and the counterparty cannot resolve an Assumption Objection, and the Court does not otherwise make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure Amount, the Debtor shall segregate from the sale proceeds a portion of the disputed Cure Amount, in an amount set by the Court or otherwise agreed by the parties, pending the resolution of any such Cure Amount disputes by the Bankruptcy Court or mutual agreement of the parties.

48. The Winning Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under § 365(b) in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Winning Bidder from performance of any and all of its obligations pursuant to the Winning Bid APA. The Debtor proposes that the Bankruptcy Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to § 365(b) at the Sale Hearing. Cure Amounts disputed by any counterparty will be resolved by the Bankruptcy Court at the Sale Hearing or such later date as may be agreed to or ordered by the Bankruptcy Court.

49. Except to the extent otherwise provided in the Winning Bid APA, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to § 365(k).

## ARGUMENT

### A. APPROVAL OF THE BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND STAKEHOLDERS.

50. Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under § 363.

51. With respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f).

52. Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings; "[c]ompetitive bidding yields higher offers and thus benefits

the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*; *see also Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor's fiduciary duties included maximizing and protecting the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate and, therefore, are appropriate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide benefit to debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (such sale procedures "encourage bidding and to maximize the value of the Assets").

53. Here, the Bidding Procedures are designed to maximize value of the sale proceeds and to ensure that there is continuity of culturally competent care in the hands of a new operator. The Debtor, with the assistance of its advisors, has structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Purchased Assets. Additionally, the Bidding Procedures will allow the Debtor to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtor, its estate, creditors, and all parties in interest.

**B. IF A STALKING HORSE BIDDER IS SUBSEQUENTLY DESIGNATED, THE BREAK-UP FEE HAS A SOUND BUSINESS PURPOSES AND IS NECESSARY TO PRESERVE THE VALUE OF THE DEBTOR'S ESTATE.**

54. The Debtor submits that the potential Break-Up Fee if a Stalking Horse Bidder is subsequently designated is a normal and oftentimes necessary component of sales outside the ordinary course of business under § 363. In particular, such a protection encourages a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See*, *e.g.*, *Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid, for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

55. A proposed bidding incentive, such as a Break-Up Fee, should be approved when it is in the best interests of the estate. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*

*(In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of § 503(b) govern in the bankruptcy context).

56. In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662 (where the Court heard testimony that the average breakup fee in the industry is 3.3%). Break-up fees in the same general range as the proposed Break-Up Fee have been routinely approved by courts in this District in the context of bankruptcy sales. *See, e.g, In re Am. Eagle Del. Holding Co., LLC,* Case No. 22-10028 (JKS) (Bankr. D. Del. Mar. 8, 2022) (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re Makeup Liquidating Holdings, LLC,* Case No. 22-10050 (CSS) (Bankr. D. Del. Feb. 18, 2022) (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Sequential Brands Grp., Inc.,* Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (approving a breakup fee of 3.65% of the purchase price); *In re Knotel, Inc.,* Case No. 21-10146 (MFW) (Bankr. D. Del. Case 22-10367 Mar. 11, 2021) (approving a break-up fee of 3% of the purchase price); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 118 (Bankr. D. Del. 2005) (court approved break-up fee that equaled 4.7% percent of the purchase price).

57. The Debtor submits that the Bidding Procedures, including the proposed Break-Up Fee to any Stalking Horse Bidder, satisfy all three of the useful functions set forth above: (1) to

attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional bidders. The proposed Break-Up Fee of up to 2.5% of the purchase price is well within, and below, the percentage parameters that have been approved by many other courts. Thus, the Debtor believes that the proposed Break-Up Fee if a Stalking Horse Bidder is selected would fairly and reasonably compensate any Stalking Horse Bidder for taking actions that will benefit the Debtor's estate. The Break-Up Fee would compensate such a Stalking Horse Bidder for diligence and professional fees incurred in negotiating the terms of any Stalking Horse APA on an expedited timeline.

58. Additionally, the Debtor does not believe that the Break-Up Fee will have a chilling effect on the sale process. Rather, any Stalking Horse Bidder will increase the likelihood that the best possible price for the Purchased Assets will be received, by permitting other qualified bidders to rely on the diligence performed by any Stalking Horse Bidder, and moreover, by allowing qualified bidders to utilize any Stalking Horse APA as a platform for negotiations and modifications in the context of a competitive bidding process. Any Stalking Horse Bidder would only be designated after consultation with the Committee.

59. Finally, any Break-Up Fee will be paid only if, among other things, the Debtor enters into a transaction for the Purchased Assets with a bidder other than any Stalking Horse Bidder. Accordingly, no Break-Up Fee will be paid unless a higher and better offer is received and consummated. In sum, the potential Break-Up Fee is reasonable under the circumstances and will enable the Debtor to maximize the value for the Purchased Assets while limiting any chilling effect in the sale process.

### C. THE PROCEDURE FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IS APPROPRIATE.

60. Section 365(a) provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts should approve the assumption under § 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

61. Pursuant to § 365(f)(2), a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

62. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, and should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

63. Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

64. The Debtor and the Winning Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Winning Bidder to perform under the contracts or leases. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Winning Bidder to provide adequate assurance of future performance under the contracts or leases, as required by § 365(b)(1)(C).

65. In addition, the Debtor submits that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with § 365. To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Winning Bid APA. Except as otherwise limited by § 365, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to § 365(f)(1).

66. Accordingly, the Debtor submits that the cure procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**D. APPROVAL OF THE SALE IS WARRANTED UNDER § 363**

67. As discussed above, § 363(b)(1) provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

**i. The Sale of the Assets is Authorized by § 363 as a Sound Exercise of the Debtor's Business Judgment.**

68. In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtor has determined in its business judgment that the sale of the Purchased Assets by public auction will enable it to obtain the highest and best offer for these assets (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors.

69. Sections 363 provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although § 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co*., 124 BR. 169, 176 (D. Del. 1991); *see also Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

70. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)). As long as the sale appears to enhance a debtor's estate, court approval of a debtor's decision to sell should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

71. Applying § 363, the proposed sale of the Purchased Assets should be approved. As set forth above, the Debtor has determined that the best method of maximizing the recovery of the Debtor's creditors would be through the sale of the Purchased Assets. As assurance of value, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court. Consequently, the fairness and reasonableness of the consideration to be paid by the Winning Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the

best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

**ii. The Sale of the Debtor's Assets Free and Clear of Liens and Other Interests is Authorized by § 363(f).**

72. The Debtor further submits that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to § 363(f), with any such liens attaching to the sale proceeds of the Purchased Assets to the extent applicable. Section 363(f) authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits the sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by § 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

73. Because § 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met*."); In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio*

*Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of § 363(f) is met).

74. At least one of the tests of § 363(f) is satisfied with respect to the transfer of the Purchased Assets. Additionally, at least § 363(f)(2) will be met in connection with the sale transaction proposed because each of the parties holding liens on the Purchased Assets will consent or, absent any objection to this motion, will be deemed to have consented to the sale. Any lienholder also will be adequately protected by having its liens, if any, in each instance against the Debtor or its estate, attach to the sale proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the sale, subject to any claims and defenses the Debtor may possess with respect thereto. Accordingly, § 363(f) authorizes the transfer and conveyance of the Purchased Assets free and clear of any such claims, interests, liabilities, or liens.

75. Although § 363(f) provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). Courts have interpreted "any interest" expansively to include not only *in rem* interests in property, but also other obligations that are "connected to or arise from the property being sold" or that could "potentially travel with the property being sold." *In re Gardens Regional Hospital and Medical Center, Inc.*, 567 B.R. 820, 825 (Bankr. C.D. Cal. 2017) (California Attorney General imposed conditions are an "interest in property" that can be stripped off the assets through a sale under § 363); *In re La Paloma Generating, Co.*, 2017 WL 5197116, *4 (Bankr. D. Del. Nov. 9, 2017) (holding that emission surrender obligations created by California regulations and statutes and enforced by the California

Air Resources Board are an interest in property which can be cut off by a § 363 sale); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 285, 288 (3d Cir. 2001) (holding that plaintiff's interests in travel vouchers that were issued to settle employment discrimination are an interest under § 363 because they arise from the property being sold); *PBBPC, Inc. v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860, 867-870 (1st Cir. B.A.P. 2013) (holding that debtor's assets could be sold free and clear of Commonwealth of Massachusetts's right to treat a purchaser of substantially all of the assets of chapter 11 debtor as a "successor employer" to which debtor's experience rating could be imputed to determine purchaser's unemployment insurance contribution); *In re ARSN Liquidating Corp. Inc.*, 2017 WL 279472, *5 (Bankr. D.N.H. Jan. 20, 2017) (Nat'l Council on Compensation Ins. violated sale order by imputing debtor's workers' compensation experience rating to buyer in setting buyer's workers' compensation experience rating); *In re Vista Marketing Group Ltd.*, 557 B.R. 630, 635-39 (Bankr. N.D. Ill. 2016) (free and clear language in sale order prevented a state sanitary district from asserting claim against asset purchaser for connection fee surcharge that was calculated based entirely on debtor's use of the district's sewer facilities); *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 641 (N.D. Ala. 2016) (sale under § 363 cuts off Coal Act obligations despite language in Act imposing successor liability on buyer); *In re Christ Hospital*, 502 B.R. 158, 76-79 (Bankr. D.N.J. 2013) (section 363 sales cut off tort claims against purchaser of nonprofit hospital); *In re Tougher Indus.*, 2013 WL 1276501 at **6-9 (Bankr. N.D.N.Y. Mar. 27, 2013) (holding that debtor's assets could be sold free and clear of New York State Department of Labor's right to use the debtor's experience rating to access the buyer's tax liability as successor to the debtor); *In re Grumman Olson Indus. Inc.*, 467 B.R. 694, 702–03 (S.D.N.Y 2012) ("Section 363(f) can be used to sell property free and clear of claims that could otherwise be assertable against the

buyer of the assets under the common law doctrine of successor liability"); *WBO P'ship v. Va. Dep't of Med. Assistance Servs. (In re WBO P'ship)*, 189 B.R. 97, 104–05 (Bankr. E.D. Va. 1995) (holding that Commonwealth of Virginia's right to recapture depreciation is an "interest" as that term is used in § 363(f)).

76. In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id*. at 289 (*citing* 3 Collier on Bankruptcy, ¶ 363.06[1] (L. King, 15th rev. ed. 1988)). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co*., the scope of § 363(f) is not limited to *in rem* interests. 99 F.3d 573, 581-582 (4th Cir. 1996) (holding that coal mine operators could sell their assets free and clear of their obligations to a benefits plan and fund under the Coal Act). Thus, debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at 258 (*citing Leckie*, 99 F.3d at 582).

77. Courts have consistently held that a buyer of a debtor's assets pursuant to a § 363 sale takes such assets free from successor liability resulting from pre-existing claims. *See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp*., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under § 363(f)). The purpose of an

order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtor's pre-sale conduct. Under § 363(f), the purchaser is entitled to know that the Purchased Assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the sale should state that the Winning Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Purchased Assets.

### iii. The Winning Bidder Should be Afforded All Protections Under § 363(m) as a Good Faith Purchaser.

78. Section 363(m) protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under § 363(b) is later reversed or modified on appeal. Specifically, § 363(m) states that:

> The reversal or modification on appeal of an authorization under [§ 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "codifies Congress's strong preference for finality and efficiency" in bankruptcy proceedings. *In re Energytec, Inc*. 739 F.3d 215, 218-19 (5th Cir. 2013). Also, under § 363(m), "[w]hen a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal." *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc).*, 163 F.3d 570, 576 (9th Cir. 1998); *In re Ewell*, 958 F.2d 276, 282 (9th Cir. 1992) ("Because the Buyer was a good faith purchaser, under 11 U.S.C. § 363(m) the sale may not be modified or set aside on appeal unless the sale was stayed pending appeal.").

79. The selection of the Winning Bidder will be the product of arms' length, good faith negotiations in an anticipated competitive purchasing process. The Debtor intends to request at the Sale Hearing a finding that the Winning Bidder is a good faith purchaser entitled to the protections of § 363(m).

### E. RELIEF FROM THE 14-DAY WAITING PERIOD UNDER BANKRUPTCY RULES 6004(H) AND 6006(D) IS APPROPRIATE

80. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

81. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy*, ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, *Collier* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

82. The Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## **CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Bid Procedures Order: (i) granting the Motion; and (ii) granting such other and further relief as the Court may deem proper.

[*Signature page to follow*]

Dated: September 9, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*<u>/s/ Laura Davis Jones</u>*
Laura Davis Jones (DE Bar No. 2436)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice*)
Samuel R. Maizel (*pro hac vice*)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: tania.moyron@dentons.com
samuel.maizel@dentons.com

John D. Beck (*pro hac vice*)
Geoffrey Miller (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
Email: john.beck@dentons.com
geoffrey.miller@dentons.com

*Counsel to Debtor and Debtor in Possession*