## **EXHIBIT 2**

DIP Term Sheet

## DIP FINANCING TERMS

These terms and conditions ("***DIP Terms***") for a SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY (the "***DIP Facility***") are among SIMPLY INTERIOR HOMES ACQUISITIONCO, LLC (f/k/a SOFT GOODS, LLC), a Delaware limited liability company ("***SIH Acquisition***"), SIMPLY INTERIOR HOMES, LLC (f/k/a SOFT GOODS OPERATING, LLC), a Delaware limited liability company ("***SIH OpCo***"), the other DIP Borrowers (as defined below) party hereto, GREAT ROCK CAPITAL PARTNERS MANAGEMENT, LLC, as Administrative Agent, and each lender party hereto.

On June 8, 2026 (the "***Petition Date***"), the Debtors (as defined below) filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (such court, together with any other court having exclusive jurisdiction over the Chapter 11 Cases from time to time and any Federal appellate court thereof, the "***Bankruptcy Court***") and commenced cases, jointly administered under Case No. 26-10922 (collectively, the "***Chapter 11 Cases***"), and have continued in the possession and operation of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The DIP Facility is provided in the Chapter 11 Cases. Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in that certain Credit and Guaranty Agreement, dated as of February 21, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition Credit Agreement***") by and among Great Rock Capital Partners Management, LLC, in its capacity as administrative agent (the "***Prepetition Agent***") for the lenders from time to time party thereto (the "***Prepetition Lenders***", and together with the Prepetition Agent, the "***Prepetition Secured Parties***"), SIH Acquisition, SIH OpCo, certain of the DIP Borrowers (as defined below), and the other parties party thereto.

| | |
|---|---|
| DIP Borrowers: | SIH Acquisition, SIH OpCo, SIH BECKHAM BUYER LLC, a Delaware limited liability company, SIH-BB Holdings LLC, a Delaware limited liability company, SIH-DMD Holdings, LLC, a Delaware limited liability company, SIH-HSD Holdings, LLC, a Delaware limited liability company; and SIH-SR HOLDINGS, LLC, a Delaware limited liability company (collectively "***DIP Borrowers***" or "***Debtors***", and each a "***DIP Borrower***" or "***Debtor***"). |
| DIP Agent & DIP Lenders: | Great Rock Capital Partners Management, LLC, will act as sole and exclusive administrative agent (in such capacity, the "***DIP Agent***") for GRC SPV Investments, LLC and Wingspire Capital, LLC as the lenders under the DIP Facility (as defined below) (the "***DIP Lenders***" and together with the DIP Agent, the "***DIP Secured Parties***"), and will perform the duties customarily associated with such role and consistent with the Pre-Petition Credit Agreement. |
| DIP Facility: | A postpetition superpriority senior secured, debtor-in-possession financing and other financial accommodations in the aggregate principal amount of $15,000,000 consisting of (a) $5,000,000 of revolving new money credit commitments (the "***New Money DIP Commitments***" and the loans extended thereunder, the "***New Money DIP Loans***") made available to the DIP Borrowers to draw upon entry of the Interim DIP Order in accordance with the Approved DIP Budget, Interim DIP Order and DIP Loan Documents; and (b) a roll up of the "Obligations" outstanding under (and as defined in) the Prepetition Credit Agreement (the "***Prepetition Secured Obligations***") as of the Petition Date, in |

the amount of $3.00 of Prepetition Secured Obligations (as defined above) for every $1.00 of the New Money DIP Loans funded with such rolled up loans not to exceed $10,000,000 in the aggregate (the "**Roll-Up Loans**" and together with the New Money DIP Loans, the "**DIP Loans**", and the DIP Loans together with all other fees, premiums, expenses and charges arising under the DIP Loan Documents, the "**DIP Obligations**"), in each case with such Roll-Up Loans automatically deemed funded, exchanged and converted on a cashless basis into and immediately constituting legal, valid, binding and non-avoidable DIP Obligations upon each funding of New Money DIP Loans in accordance with the terms hereof, with a corresponding dollar-for-dollar reduction in the remaining Prepetition Secured Obligations (with such reduction being without prepayment premium). For avoidance of doubt, the Prepetition Secured Obligations shall only be converted into Roll-Up Loans for the first $3,333,333 of New Money DIP Loans funded and any further reborrowing of New Money DIP Loans shall not result in the roll up of any additional Prepetition Secured Obligations.

Any New Money DIP Loans repaid or prepaid may be reborrowed subject to the terms and conditions herein and in the other DIP Loan Documents. Voluntary and mandatory prepayments of DIP Loans shall be applied first to the New Money DIP Loans until paid in full and second to the Roll-Up Loans until paid in full, in each case on a pro rata basis within the applicable class of DIP Loans. Upon repayment in full of all DIP Obligations, the proceeds of any DIP Collateral shall be applied to the Prepetition Secured Obligations remaining after giving effect to the reduction on account of the Roll-Up Loans.

The proceeds of the DIP Facility shall be used to, among other things, provide working capital for the DIP Borrowers during the DIP Borrowers' Chapter 11 Cases subject, in each case, to the terms and conditions of the DIP Orders, these DIP Terms and the other DIP Loan Documents, including the then applicable Approved DIP Budget (as defined below).

Maturity Date:    The maturity date shall be September 30, 2026 (the "**Scheduled Maturity Date**").

The DIP Facility (and the New Money DIP Commitments thereunder) shall terminate upon the earliest to occur of (i) the Scheduled Maturity Date, (ii) the date of acceleration or termination of the DIP Facility in accordance with the terms of these DIP Terms and the DIP Orders, (iii) the effective date of any Plan (as defined below); (iv) the entry of an order for the conversion of the Debtors' bankruptcy cases to cases under Chapter 7 of the Bankruptcy Code; (v) the entry of an order for the dismissal of the Debtors' bankruptcy cases; or (vi) at the election of the DIP Lenders, the date on which any Event of Default is continuing (the "**Maturity Date**").

The DIP Borrowers hereby promise to pay and shall repay to the DIP Agent for the ratable account of the DIP Lenders on the Maturity Date the aggregate outstanding principal amount of all DIP Loans and all other obligations under the DIP Facility.

2

| | |
|---|---|
| <u>Closing Date:</u> | The date of the entry of the Interim DIP Order (or as soon as reasonably practicable thereafter) and satisfaction of the conditions precedent to initial borrowing set forth in these DIP Terms and the other DIP Loan Documents (the "***Closing Date***"). |
| <u>Carve Out:</u> | The carve out shall be as set forth in the Final DIP Order (the "***Carve Out***"). |
| <u>Interest Rates and Fees:</u> | As set forth on <u>Annex I</u> attached hereto. |
| <u>Default Rate:</u> | 3.00% per annum over the rate of interest otherwise applicable, which shall accrue at any time an Event of Default has occurred and is continuing. |
| <u>Documentation Principles:</u> | The definitive documentation with respect to the DIP Facility shall be based on these DIP Terms, the DIP Orders and any other loan documents executed in connection herewith (these DIP Terms, the DIP Orders, and any such other loan documents, the "***DIP Loan Documents***"). The mandatory prepayments, representations, warranties, conditions to borrowing, affirmative, negative and financial covenants and events of default set forth or referred to in these DIP Terms shall be applicable to the DIP Borrowers and their subsidiaries. The operational and administrative provisions related to borrowings, termination of commitments, the intra-lender provisions and payments and repayments shall be as set forth in the Prepetition Credit Agreement unless otherwise set forth in these DIP Terms or mutually agreed by the DIP Agent, DIP Lenders and DIP Borrowers, and such provisions of the Prepetition Credit Agreement are hereby incorporated by reference. (collectively, the "***DIP Loan Documentation Principles***"). These DIP Terms shall constitute a DIP Loan Document unless superseded by a credit agreement and other replacement DIP Loan Documents in form and substance acceptable to the DIP Lenders. |
| | All orders in the Chapter 11 Cases (a) approving or authorizing the DIP Facility on an interim basis (the "***Interim DIP Order***") or final basis (the "***Final DIP Order***", and together with the Interim DIP Order, the "***DIP Orders***"), or (b) approving the use of the Debtors' cash management system, in each case, shall be in form and substance reasonably acceptable to the DIP Lenders and all motions related thereto shall be in form and substance acceptable to the DIP Lenders. |
| <u>Collateral; Priority; Adequate Protection:</u> | Any and all obligations arising under or in connection with the DIP Facility, including for reasonable fees, costs and expenses described herein of the DIP Agent and the DIP Lenders (including, without limitation, (a) reasonable and documented fees and expenses of counsel to the DIP Agent and DIP Lenders, and (b) reasonable and documented fees and expenses of DIP Agent Advisors (as defined below) to the DIP Agent) and reimbursable under the DIP Loan Documents, all DIP Obligations and guarantees, in each case, shall, subject and subordinate only to the Carve Out and the relative priorities set forth on <u>Annex II</u> attached hereto, at all times be entitled to, among others: (i) joint and several superpriority administrative expense claim status in the Chapter 11 Cases; (ii) a perfected first-priority priming lien on and security interest in all tangible and intangible prepetition and postpetition assets and real property of the DIP Borrowers, whether existing on the Petition Date or thereafter acquired, and the |

3

proceeds, products, rents, and profits thereof, including, without limitation, all claims and causes of action (including commercial tort claims) and the proceeds thereof and supporting obligations in respect thereof (excluding Avoidance Actions); (iii) upon entry of the Final DIP Order, a perfected first-priority priming lien on and security interest in avoidance actions under chapter 5 of the Bankruptcy Code or any analogous state law and the proceeds thereof ("*Avoidance Actions*"), (the items in clauses (ii) and (iii), collectively, the "***DIP Collateral***"). Subject to the foregoing, each DIP Borrower hereby grants to DIP Agent, as security for the DIP Obligations, a security interest in, and lien on, the DIP Collateral. The DIP Agent is authorized by the Debtors to file UCC-1 financing statements (if it elects to do so) with respect to the foregoing security interests.

All the above-described pledges, security interests and mortgages shall be (a) created on terms, and pursuant to documentation reasonably satisfactory to the DIP Lenders and the DIP Borrowers and otherwise consistent with the Documentation Principles, and none of the DIP Collateral shall be subject to any other liens or claims (except for the Carve Out and certain mutually agreed permitted prior liens (the "***Permitted Prior Liens***")), and (b) perfected upon entry of the applicable DIP Order, or, in the case of Avoidance Actions, upon entry of the Final DIP Order, without the need to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar documents or instruments; provided, that the DIP Agent shall be permitted to make any or all such filings in its discretion.

The DIP Orders shall provide usual and customary adequate protection to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, including, without limitation, (a) replacement liens on all of the DIP Collateral (the "***Adequate Protection Liens***"), subordinate only to the Carve Out, the liens in favor of the DIP Facility ("***DIP Liens***"), and subject to the relative priorities set forth on Annex II attached hereto, (b) a super-priority administrative claim (the "***Adequate Protection Claims***"), subject only to the Carve Out and the claims of the DIP Facility, and subject to the relative priorities set forth on Annex II attached hereto, (c) the payment of the reasonable and documented out-of-pocket fees and expenses (including advisor fees) of the agent and the lenders under the Prepetition Credit Agreement, and (d) other adequate protection customary for debtor in possession financings of this type (whether set forth herein or otherwise), including, without limitation, subject to entry of the Final DIP Order, stipulations and approval of waivers of rights under sections 506(c) and 552(b) of the Bankruptcy Code and waiver of marshalling.

| | |
|---|---|
| Cash Collateral: | The Prepetition Agent shall consent to the use of cash collateral during the Chapter 11 Cases consistent with the terms hereof, including, without limitation Mandatory Prepayments below. |
| Cash Management / Cash Dominion: | The DIP orders shall provide the DIP Agent on behalf of the DIP Lenders with automatically perfected liens and security interests in the deposit and securities accounts (subject to the Carve Out) of the DIP Borrowers without any further action (including, without limitation, entering into any lockbox or deposit account control agreements or other action to take possession or control of any such DIP Collateral); provided, that, upon the request of the DIP Agent and |

4

138102.00007/157888992v.2

|                          | subject to the Carve Out, the DIP Borrowers shall obtain full dominion or springing (as elected by DIP Agent) account control agreements in favor of the DIP Agent on behalf of the DIP Lenders. |
|--------------------------|---|

Mandatory
Prepayments:

The DIP Facility will be repaid during the Chapter 11 Cases through (a) daily cash sweeps of all collections and cash on hand in each "Blocked Account" (as defined in the Prepetition Credit Agreement) constituting a collections account, and (b) the proceeds of the liquidation of the assets and/or any debt or equity raises. All DIP Obligations shall come due and on the Maturity Date.

The proceeds of the foregoing mandatory prepayments shall be applied *first*, to the New Money DIP Loans (and all interest and fees in respect thereof) until repaid in full; *second*, to the Roll-Up DIP Loans (and all interest and fees in respect thereof) until paid in full; and *third*, to the Prepetition Secured Obligations (and all interest and fees in respect thereof) to the extent remaining after giving effect to the Roll-Up, until paid in full, in each case in accordance with the terms of the DIP Terms and other DIP Loan Documents.

DIP Budget:

The DIP Lenders shall receive, and the DIP Borrowers agree to deliver to the DIP Lenders, a 13-week cash flow forecast, prepared by the DIP Borrowers and certified by Adam Zalev in his capacity as the chief restructuring officer (the "*CRO*") of the DIP Borrowers, detailing cash receipts, cash disbursements, inventory levels, accounts receivable, professional fees incurred and forecast to be incurred by each professional, and other details on a weekly basis for such period, in form and substance acceptable to the DIP Lenders in their sole discretion (the "*Initial DIP Budget*" and together with each subsequent rolling 13-week cash flow forecast prepared and delivered to the DIP Lenders, in each case consistent with the form and level of detail set forth in the Initial DIP Budget, commencing on June 18, 2026 and every week thereafter (on each Thursday) in accordance with the terms hereof, the "*DIP Budget*", and any such DIP Budget that has been approved by the DIP Lenders, the "*Approved DIP Budget*").

The DIP Borrowers shall be permitted to make borrowings of New Money Loans consistent in all material respects with the then applicable Approved DIP Budget and the other terms and conditions set forth herein.

Conditions
Precedent to Initial
Borrowing:

Usual and customary conditions precedent for facilities of this type and consistent with the DIP Loan Documentation Principles, including, among others, (a) entry of the Interim DIP Order and other DIP Loan Documents (subject to waiver by the DIP Lenders in their sole discretion), in each case, in form and substance acceptable to the DIP Lenders, and entry of other first-day orders in form and substance reasonably acceptable to the DIP Lenders; (b) delivery of (i) the Initial DIP Budget and (ii) all financial reporting required to be delivered to the administrative agent under the Prepetition Credit Agreement as of the Closing Date; (c) the relief obtained in the Debtors' first day orders shall be consistent in all material respects with the Approved DIP Budget and DIP Orders, including without limitation, the entry of an order approving the Debtors' retention of the Liquidator (as defined below); and (d) no Event of Default shall have occurred.

138102.00007/157888992v.2

| | |
|---|---|
| <u>Conditions Precedent to all Borrowings:</u> | (a) Delivery of a certificate of the CRO certifying the Debtors' compliance with the Approved DIP Budget; (b) accuracy of representations and warranties contained herein; (c) absence of any events that with the passage of time or giving of notice would constitute an Event of Default (each a "Default") and Events of Default; (e) the proceeds of the DIP Loans made shall be disbursed in accordance with the Approved DIP Budget; (f) delivery of a borrowing notice to the DIP Agent; and (g) for borrowings in excess of amounts provided in the Approved DIP Budget, the prior written consent of the DIP Lenders to such borrowing. |
| <u>Representations and Warranties:</u> | Each Debtor represents and warrants that: |

Each Debtor and each of its subsidiaries (a) is a Person duly incorporated, organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation (to the extent such concept exists in such jurisdiction), (b) has all requisite organizational power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) in the case of each Debtor, subject to the entry of the DIP Orders and the terms thereof, execute, deliver and perform its obligations under the DIP Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, including bankruptcy laws, orders, writs and injunctions applicable thereto and, (e) except as already disclosed in writing to the DIP Lenders on or prior to the date hereof, has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Subject to the entry of the DIP Orders and the terms thereof, the execution, delivery and performance by each Debtor of each DIP Loan Document to which such Person is a party, (a) have been duly authorized by all necessary corporate or other organizational action, and, (b) except as already disclosed in writing to the DIP Lenders on or prior to the date hereof, do not (i) contravene the terms of any of such Person's Organizational Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (x) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (iii) violate any Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

These DIP Terms have been duly executed and delivered by each Debtor that is a party hereto. These DIP Terms constitute a legal, valid and binding obligation of each Debtor party hereto, enforceable against each Debtor that is a party hereto in accordance with their terms.

6

The DIP Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions the Debtors believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

Since December 31, 2025, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Except for the existence of the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrowers, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Debtor or any of its subsidiaries or against any of their properties or revenues that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Each Debtor and its subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all Real Property and personal property necessary for the ordinary conduct of its business, free and clear of all Liens, except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

As used herein, "***Material Adverse Effect***" shall mean a material adverse effect on (a) the business, financial condition or results of operations of the DIP Borrowers, taken as a whole, as reasonably determined by the DIP Lender; (b) the rights and remedies, taken as a whole, of the DIP Lender under the DIP Loan Documents; or (c) the ability of the DIP Borrowers, taken as a whole, to perform their payment obligations under the DIP Loan Documents; provided that, for the avoidance of doubt, it is understood and agreed that the following shall be disregarded in determining whether a "Material Adverse Effect" has occurred: the effect of (x) the filing of the Chapter 11 Cases, the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of the cases under chapter 11 of the Bankruptcy Code, (y) any actions required to be taken under the DIP Loan Documents or the DIP Orders and (z) any matters (including, for the avoidance of doubt, any litigation) disclosed in schedules to the DIP Loan Documents and/or publicly disclosed in any first day pleadings or declarations in the Chapter 11 Cases.

**Affirmative Covenants; and Negative Covenants:**

Each Debtor agrees with the DIP Agent and each DIP Lender that it shall comply with the below covenants and agreements (and by any applicable deadline set forth below).

1.   The Debtors shall deliver to the DIP Agent, for further distribution to the DIP Lenders, on or before 5:00 p.m. (New York time) on June 18, 2026 and on every Thursday thereafter, of the DIP Budget along with explanations as to changes from the prior DIP Budget.

2.   The Debtors shall deliver to the DIP Agent, for further distribution to the DIP Lenders, on or before 5:00 p.m. (New York time) every Thursday (commencing on June 18, 2026), a budget variance report tested on a

7

trailing (i) two (2) week cumulative basis for the first two (2) weeks following the Petition Date, (ii) three (3) week cumulative basis for the third week following the Petition Date, and (iii) four (4) week cumulative basis thereafter (including identification of (x) budget variances related to line item "Total Receipts", line item "Total Disbursements" and line item "Total Professional Disbursements" of the DIP Borrowers, and (y) any variances between the actual amounts and those set forth in the Approved DIP Budget), such other information related to any budget variances as the DIP Lenders may request and weekly bank account statements as of the reporting date from each account maintained by the DIP Borrowers. DIP Agent and DIP Lenders shall be permitted to communicate directly with the CRO regarding any of the foregoing.

3.  The Debtors shall continue to retain Reflect Advisors LLC (pursuant to that certain Engagement Letter, dated as of May 8, 2026 without amendment or modification except as consented to in writing by the DIP Lenders) and the CRO throughout the Chapter 11 Cases. In the event the CRO ceases to serve in such capacity for any reason, the Debtors shall promptly engage a replacement chief restructuring officer, which replacement chief restructuring officer and the terms of its engagement letter shall each be required to be acceptable to the DIP Lenders.

4.  Any engagement (including the terms of such engagement) of an investment banker or financial advisor (each an "*FA*") by Debtors shall be subject to the prior written approval of the DIP Lenders.

5.  Any liquidator engaged by the Debtors in connection with the liquidation process (the "*Liquidator*") and the terms of its engagement letter shall each be subject to the prior written approval of the DIP Lenders. In the event such Liquidator ceases to serve in such capacity for any reason, the Debtors shall promptly engage a replacement liquidator, which replacement liquidator and the terms of its engagement letter shall each be subject to the prior written approval of the DIP Lenders.

6.  The Debtors shall take all commercially reasonable actions requested by the DIP Agent in connection with opposing, responding to or addressing any of the following events (each, a "*Live Comfortably Trigger Event*"): (a) Live Comfortably delivers to any Debtor a notice of termination of the TSA, (b) Live Comfortably fails to remit the proceeds of collections to any Debtor as and when required pursuant to the terms of the TSA, and (c) Live Comfortably asserts, joins, commences, supports, or prosecutes any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or any of their respective officers.

7.  The Debtors shall deliver to the DIP Lenders promptly, (x) such additional information regarding the business, legal, financial or corporate affairs of the Debtors or any of their subsidiaries, or compliance with the terms of the DIP Loan Documents and (y) such

8

other information that the DIP Agent or any DIP Lender reasonably determines is required by regulatory authorities under the Beneficial Ownership Regulation and applicable Anti-Money Laundering Laws, including Title III of the USA Patriot Act and the Proceeds of Crime Act, in each case, as the DIP Agent or any DIP Lender may from time to time reasonably request in writing;

8. The Debtors shall deliver to DIP Agent promptly (but in any event no later than five (5) Business Days) after any Debtor has obtained knowledge of the occurrence of any Default or Event of Default;

9. The Debtors shall maintain, preserve and protect all of their material properties and equipment necessary in the operation of their business or for the dual track liquidation/going concern sale described herein, in good working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted. The Debtors shall maintain with insurance companies that Debtors believe (in the good faith judgment of their management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to their properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as Debtors) as are customarily carried under similar circumstances by such other Persons. The DIP Borrowers shall cause DIP Agent to be named as additional insured with respect to their general liability and umbrella liability policies and lender's loss payee with respect to their property and casualty policies.

10. The Debtors shall maintain proper books of record and accounts, with entries that are full, true and correct in all material respects, in a manner to allow financial statements to be prepared, in conformity with GAAP and which reflect all material financial transactions and matters involving the assets and business of the Debtors.

11. The Debtors shall comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to them or to their businesses or properties; and

12. The Debtors shall not incur any indebtedness or liens after the date hereof other than under the DIP Facility, indebtedness not in excess of $500,000 in the aggregate, or indebtedness or liens approved in writing by the DIP Lenders. The Debtors shall not make any investments, non-ordinary course dispositions, acquisitions, fundamental changes, debt repayments, dividends or other restricted payments without the prior written consent of the DIP Lenders.

Milestones: Each Debtor covenants and agrees with the DIP Agent and each DIP Lender that it shall comply with the below milestones (collectively, the "*Milestones*", each of which may be extended with the prior written consent of the DIP Lenders

9

which may be provided by email of the DIP Agent Counsel) in respect of a dual track liquidation and going concern sale process:

1. **Entry of Interim DIP Order**. No later than June 10, 2026, the District of Delaware Bankruptcy Court (the "***Bankruptcy Court***") shall have entered the Interim DIP Order in the Chapter 11 Cases, which Interim DIP Order shall be in form and substance acceptable to the Debtors and the DIP Lenders;

2. **Assumption of Liquidation Consulting Agreement.** Within one (1) day of the Petition Date, the Debtors shall have filed a motion (the "***Liquidation Motion***") seeking, (i) on an interim basis, authority to continue liquidation sales pursuant to that certain Consulting and Marketing Services Agreement, dated June 7, 2026, between Debtors Simply Interior Homes Acquisition Co, LLC and Simply Interior Homes, LLC and SB360 Capital Partners, LLC (the "***Consulting Agreement***") and, (ii) on a final basis, approval of the assumption of the Consulting Agreement for the Liquidator;

3. **Entry of Final DIP Order**. No later than July 6, 2026, the Bankruptcy Court shall have entered the Final DIP Order in the Debtors' Chapter 11 Cases, which Final DIP Order shall be in form and substance acceptable to the Debtors and the DIP Lenders;

4. **File Plan and Disclosure Statement**. No later than July 22, 2026, the Debtors shall (a) file a chapter 11 plan (the "***Plan***") and disclosure statement (the "***Disclosure Statement***") providing for, among other things, (i) the establishment of a liquidating trust (the "***Liquidating Trust***") including the (x) funding of such Liquidating Trust with all assets (to the extent not already disposed of during the Liquidation Process) belonging to the Debtors and their estates, (y) appointment of a trustee of the Liquidating Trust and counsel to the same, and (z) establishment of a payment priority waterfall in substantially the same priorities as provided herein from the DIP Lenders' and Prepetition Lenders' respective collateral (first, to the New Money DIP Loans until paid in full, second, to the Roll-Up Loans until paid in full, and third, to the Prepetition Secured Obligations until paid in full) and (ii) the establishment of a litigation trust (the "***Litigation Trust***") including the (x) funding of such Litigation Trust with claims and causes of action belonging to the Debtors and their estates and not released under the terms of the Plan or under the DIP Orders, (y) appointment of a trustee of the Litigation Trust and counsel to the same, and (z) establishment of a payment priority waterfall from the DIP Lenders' and Prepetition Lenders' respective collateral in substantially the same priorities as provided herein (first, to the New Money DIP Loans until paid in full, second, to the Roll-Up Loans until paid in full, and third, to the Prepetition Secured Obligations until paid in full); provided, that, both the Plan, Disclosure Statement and any supplements or amendments to either shall be in form and substance acceptable to the DIP Lenders and (b) file a motion to schedule a combined hearing to approve the adequacy of the Disclosure Statement and confirmation of the Plan, to approve the

10

form and procedure for solicitation of votes on the Plan (the "***Solicitation Motion***");

5. **Approval of Solicitation Motion**. No later than August 12, 2026, the Bankruptcy Court shall have entered an order approving the Solicitation Motion and scheduling the combined hearing (consistent with these Milestones) to approve adequacy of the Disclosure Statement and confirm the Plan, which order shall be in form and substance reasonably acceptable to the Debtors and the DIP Lenders;

6. **Disclosure Statement Hearing and Plan Confirmation**. No later than September 18, 2026, or such later date as the Bankruptcy Court may schedule, the Bankruptcy Court shall hold a combined hearing to approve the adequacy of the Disclosure Statement and confirm the Plan and the Debtors shall have obtained the entry of an order confirming its Plan and approving the adequacy of the Disclosure Statement (the "***Confirmation Order***") which order shall be in form and substance acceptable to the Debtors and the DIP Lenders; and

7. **Plan Effective Date**. The conditions precedent to the effectiveness of the Plan, including establishment of the Liquidation Trust and Litigation Trust, shall have been met no later than September 21, 2026.

| | |
|---|---|
| Financial Covenants: | The Debtors agree to comply with the following financial covenant:<br><br>DIP Budget and Variance Covenant: The DIP Borrowers shall be required to adhere to the then applicable Approved DIP Budget (subject to variances permitted below) which shall be tested on every Thursday (commencing on June 18, 2026) following the Petition Date. The DIP Loan Documents will require that (a) operating disbursements of the DIP Borrowers shall not exceed a 10% increase with respect to "Total Disbursements" line item; and (b) total receipts of the DIP Borrowers shall not decrease by more than, with respect to the "Total Receipts" line item in the (i) first testing period looking back one (1) week, 15%, (ii) second testing period looking back two (2) weeks, 15%, (iii) third testing period looking back three (3) weeks, 12.5% and (iv) fourth testing period looking back four (4) weeks, 10%. For the avoidance of doubt, for purposes of calculating variances, "Total Disbursements" shall not include disbursements made by the Debtors in payment of the Debtors' or DIP Lenders' professional fees. |
| Events of Default: | The occurrence of any of the following in the Chapter 11 Cases without the consent of the DIP Lenders shall constitute an "***Event of Default***" hereunder (provided that Events of Default, if capable of being cured, may be cured by the Debtors during the "Remedies Notice Period" as provided in the applicable DIP Order): |

1. failure to pay principal, interest, fees or expenses under the DIP Facility when due;

2. any material breach or failure by any Debtor to comply with the material terms of the Interim DIP Order or the Final DIP Order, as applicable;

11

138102.00007/157888992v.2

3. inaccuracy of representations or warranties in these DIP Terms or any other DIP Loan Document in any material respect when made or breach of covenants contained in these DIP Terms (including the Milestones) or any other DIP Loan Document, with such Event of Default occurring upon the delivery of written notice from the DIP Agent of such Event of Default ;

4. actual (or asserted in writing by either Borrower) invalidity or impairment of any DIP Loan Documents or the liens or guarantees thereunder;

5. there is entered against any Debtor or any subsidiary a final judgment or order for the payment of money which could reasonably be expected to result in a Material Adverse Effect, and, in each case, such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days;

6. the occurrence of a Change of Control (as defined below);

7. any seizure, expropriation or nationalization by or on behalf of any governmental, regulatory or other authority of the whole or the greater part of the assets of the Borrower, which has or would be reasonably likely to have a Material Adverse Effect;

8. unless otherwise approved in writing by the DIP Lenders, the bringing of a motion, taking of any action or the filing of a Chapter 11 Plan or disclosure statement attendant thereto by any of the Debtors in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to these DIP Terms; (B) to grant any Lien upon DIP Collateral; or (C) except as provided in the Final DIP Order, to use cash collateral of the DIP Lenders or the Prepetition Agent and the Prepetition Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lenders;

9. (A) the filing of a chapter 11 Plan or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 Plan or disclosure statement, by a Debtor that, without the prior written consent of the DIP Lenders, does not propose to repay in full in cash the DIP Obligations and the Prepetition Secured Obligations then owing under the Prepetition Loan Documents or any of the Debtors shall seek, support or fail to contest in good faith the filing or confirmation of any such chapter 11 Plan or entry of any such order, (B) the entry of any order terminating any Debtor's exclusive right to file a chapter 11 Plan, or (C) the expiration of any Debtor's exclusive right to file a chapter 11 Plan;

10. the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the DIP Lenders, any Prepetition Lender or any of the DIP Collateral or against the Prepetition Agent, any

12

Prepetition Lender or any Collateral (as defined in the Prepetition Credit Agreement);

11. (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or liquidation of the Debtors; or (B) solely with respect to DIP Collateral, the sale without the DIP Lenders' consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed chapter 11 Plan or otherwise that does not result in payment in full in cash of all of the DIP Obligations and all Prepetition Secured Obligations then owing under the Prepetition Loan Documents at the closing of such sale or initial payment of the purchase price or effectiveness of such chapter 11 plan, as applicable;

12. the dismissal of any Chapter 11 Case or conversion to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the dismissal or conversion of any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise, in each case, without the consent of the DIP Lenders;

13. any Debtor shall file a motion (without consent of the DIP Lenders) seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay (A) to allow any creditor (other than the DIP Agent) to execute upon or enforce a lien on any DIP Collateral with a fair market value (as reasonably determined by the Debtors) in excess of $100,000 or (B) approving any settlement or other stipulation not approved by the DIP Lenders with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, which involves payments of $100,000 or more;

14. the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations or the Prepetition Secured Obligations owing under the Prepetition Loan Documents;

15. entry of any order of the Bankruptcy Court authorizing any claims or charges, other than DIP Obligations, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the DIP Agent and the Lenders under this Agreement and the other DIP Loan Documents or the Prepetition Agent and the Prepetition Lenders under the Prepetition Credit Agreement and the other Prepetition Loan Documents, or there shall arise or be granted by the Bankruptcy Court (x) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (y) any lien on the DIP Collateral having a priority senior to or pari passu with the liens

13

and security interests granted in the DIP Order or DIP Loan Documents or the Prepetition Loan Documents, except, in each case, as provided in the Loan Documents or in the DIP Orders then in effect;

16. the DIP Order shall cease to create a valid and perfected lien on any material portion of the DIP Collateral or to be in full force and effect, shall have been reversed, stayed, vacated, or subject to stay pending appeal, without prior written consent of the DIP Lenders;

17. if, unless otherwise approved by the DIP Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days;

18. failure of the DIP Borrowers to use the proceeds of the New Money DIP Loans as set forth in and in compliance with the Approved DIP Budget (subject to permitted variances), these DIP Terms and the DIP Orders;

19. entry by the Bankruptcy Court of an order authorizing Live Comfortably LLC (or any affiliate thereof) ("**Live Comfortably**") to terminate that certain Transition Services Agreement, dated as of February 21, 2025 (the "**TSA**"), by and between Live Comfortably LLC and debtor Soft Goods, LLC, or otherwise terminate the TSA; or

20. entry by the Bankruptcy Court of an order modifying the automatic stay or otherwise permitting the licensor or sub-licensor (including, for the avoidance of doubt, Live Comfortably in respect of any license or other rights with respect to the use of intellectual property pursuant to the TSA (as defined below) or otherwise) under any material intellectual property license or sub-license held by a Debtor, as licensee or sub-licensee, to terminate such license.

A "**Change of Control**" shall be deemed to occur if: (a) there is a sale or other disposition of all or substantially all of the assets of any Loan Party (other than as a result of the dual track liquidation/going concern sale described herein); or (b) SIH Acquisition shall cease to own, directly or indirectly, 100% of the Equity Interests of the other Debtors.

| | |
|---|---|
| <u>Cure; Remedies Notice Period:</u> | As set forth in the applicable DIP Order. |
| <u>Investigation Rights:</u> | As set forth in the applicable DIP Order. |
| <u>DIP Agent and DIP Lender Advisors:</u> | The DIP Agent and DIP Lenders, as applicable, shall be entitled to retain (a) a financial advisor and other third-party consultants under and in accordance with the DIP Facility, and (b) counsel, including Paul Hastings LLP, as restructuring counsel to the DIP Agent, Parker, Hudson, Rainer & Dobbs LLP, as restructuring counsel to DIP Lenders, and Young Conaway Stargatt & Taylor, LLP, as |

14

Delaware counsel to the DIP Agent (together, the "***DIP Agent Counsels***", and together with the DIP Agent FA, the "***DIP Agent Advisors***").    Each DIP Borrower shall provide, and shall cause its management and advisors to provide, their reasonable cooperation during business hours with the DIP Agent Advisors. The reasonable and documented fees, costs and expenses of the DIP Agent Advisors shall be paid by the DIP Borrowers and shall form part of the DIP Obligations under the DIP Facility, in each case as and to the extent set forth in the DIP Orders and other DIP Loan Documents.

| | |
|---|---|
| <u>Indemnification and Expenses:</u> | The DIP Borrowers hereby indemnify the DIP Agent and each DIP Lender, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "***Indemnified Person***") and hold them harmless from judgment of a court of competent jurisdiction to have and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to DIP Facility, the DIP Loan Documents, any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP Facility, the transactions contemplated thereby or in connection therewith; <u>provided</u>, <u>that</u>, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable resulted solely from its fraud, gross negligence or willful misconduct. |
| <u>Cash Management:</u> | The Debtors shall maintain the prepetition cash management system, including the daily cash sweeps of the collection account and the funding of New Money DIP Loans into the DIP Borrowers' general disbursement account (that is subject to a control agreement), and as otherwise approved in the order of the court granting the: Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related thereto, (C) Continue Intercompany Transactions, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (Iii) Granting Related Relief. |
| <u>Amendments:</u> | Amendments to the DIP Loan Documents shall be made with the consent of the DIP Secured Parties and Debtors. |
| <u>Governing Law and Submission to Jurisdiction:</u> | New York and, to the extent applicable, the Bankruptcy Code.  Each party hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall, to the extent permitted by law, be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. |

138102.00007/157888992v.2

DIP Orders
Control:                   To the extent that any term of these DIP Terms shall conflict with the terms of
                          any DIP Order, the relevant terms of the applicable DIP Order shall control.

138102.00007/157888992v.2

IN WITNESS WHEREOF, each Debtor, DIP Agent, and each DIP Lender have executed these DIP Terms as of July 1, 2026.

GREAT ROCK CAPITAL PARTNERS MANAGEMENT, LLC,
as DIP Agent

By: _____
Name: Andy C. Brown
Title:  Chief Risk Officer


GRC SPV INVESTMENTS, LLC,
as a DIP Lender

By: _____
Name: Andy C. Brown
Title:  Chief Risk Officer

**WINGSPIRE CAPITAL LLC,**
as a DIP Lender

By: _____

Name: Michael Westermann

Title: Managing Director

[Signature Page to DIP Terms]

**Debtors:**

**SIMPLY INTERIOR HOMES ACQUISITIONCO, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

**SIMPLY INTERIOR HOMES, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

**SIH BECKHAM BUYER, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

**SIH-BB Holdings, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

**SIH-DMD Holdings, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

**SIH-HSD Holdings, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

[Signature Page to DIP Terms]

**SIH-SR HOLDINGS, LLC**

By: _____
Name: Adam Zalev
Title: Chief Restructuring Officer

[Signature Page to DIP Terms]

13017640v.1

**Annex I**

| | |
|---|---|
| <u>Interest Rates</u>: | A percentage per annum equal to (i) the Adjusted Term SOFR Rate (as defined in the Prepetition Credit Agreement) plus (ii) 7.50%, paid in cash on the last business day of each month. |
| <u>Unused Line Fee</u>: | 0.75% on New Money DIP Commitments up to the amount permitted to be drawn under the Initial DIP Budget and paid in cash on the last business day of each month; <u>provided</u>, that, if the DIP Lenders fund New Money DIP Loans in excess of the amount permitted under the Initial DIP Budget then the unused line fee shall be retroactively earned and assessed on such excess amount. |
| <u>Collateral Monitoring Fee</u>: | $5,000/month and paid in cash on the last business day of each month |
| <u>Closing Fee</u>: | $100,000 earned and payable in full in-kind on the Closing Date. |

4

**Annex II**

**Priorities**

| Priority | DIP Collateral | Unencumbered Property | Claims |
|---|---|---|---|
| *First* | Carve Out | Carve Out | Carve Out |
| *Second* | Permitted Prior Liens | DIP Liens | DIP Superpriority Claims |
| *Third* | DIP Liens | Adequate Protection Liens | Adequate Protection Claims |
| *Fourth* | Adequate Protection Liens | N/A | N/A |
| *Fifth* | Prepetition Liens | N/A | N/A |

13009625v.1