THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN APPROVED BY THE COURT.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Simply Interior Homes, LLC, *et al.*[1] | : | Case No. 26-10922 (CTG) |
| Debtors. | : | (Jointly Administered) |

**AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF SIMPLY INTERIOR HOMES, LLC AND ITS DEBTOR AFFILIATES**

**POTTER ANDERSON & CORROON LLP**
L. Katherine Good (No. 5101)
Brett M. Haywood (No. 6166)
James R. Risener III (No. 7334)
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Tel: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
bhaywood@potteranderson.com
jrisener@potteranderson.com

**GOODWIN PROCTER LLP**
Kizzy L. Jarashow (admitted *pro hac vice*)
Barry Z. Bazian (admitted *pro hac vice*)
Stacy Dasaro (admitted *pro hac vice*)
Artem Skorostensky (admitted *pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel: (212) 813-8800
Facsimile: (212) 355-3333
Email: kjarashow@goodwinlaw.com
bbazian@goodwinlaw.com
sdasaro@goodwinlaw.com
askorostensky@goodwinlaw.com

*Counsel for Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Simply Interior Homes, LLC (8509); Simply Interior Homes AcquisitionCo, LLC (9643); SIH Beckham Buyer, LLC (5210); SIH-HSD Holdings, LLC (5402); SIH-BB Holdings, LLC (2303); SIH-DMD Holdings, LLC (2411); and SIH-SR Holdings, LLC (1835). The location of the Debtors' service address in these chapter 11 cases is 3042 Southcross Boulevard, Suite 102, Rock Hill, SC 29730.

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ....................................1
ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES ....................................18
2.1 Classification....................................18
ARTICLE III BACKGROUND AND DISCLOSURES....................................23
3.1 General Background ....................................23
3.2 The Chapter 11 Case ....................................35
ARTICLE IV CONFIRMATION AND VOTING PROCEDURES....................................41
4.1 Confirmation Procedure. ....................................41
4.2 Procedure for Objections. ....................................42
4.3 Requirements for Confirmation. ....................................42
4.4 Solicitation and Voting Procedures. ....................................42
4.5 Classification of Claims and Interests....................................44
4.6 Impaired Claims and Interests ....................................45
4.7 Confirmation Without Necessary Acceptances; Cramdown ....................................46
4.8 Feasibility....................................47
4.9 Best Interests Test and Liquidation Analysis....................................47
4.10 Acceptance of the Combined Disclosure Statement and Plan ....................................48
ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ........49
5.1 The Combined Disclosure Statement and Plan May Not Be Confirmed..............49
5.2 Distributions to Holders of Allowed Claims and Interests under the Combined Disclosure Statement and Plan May Be Inconsistent with Projections ................49
5.3 Objections to Classification of Claims ....................................50
5.4 Failure to Consummate the Combined Disclosure Statement and Plan ................51
5.5 Combined Disclosure Statement and Plan Releases May Not Be Approved ........51
5.6 Reductions to Estimated Creditor Recoveries ....................................51
5.7 Risks Related to Retained Causes of Actions ....................................51
5.8 Certain Tax Considerations....................................51
ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS....................................56
6.1 DIP Facility Claims....................................56
6.2 Administrative Claims. ....................................56
6.3 Priority Tax Claims....................................58
ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................58
7.1 Class 1: Other Secured Claims. ....................................59
7.2 Class 2: Priority Non-Tax Claims....................................59
7.3 Class 3: Prepetition Secured Claims. ....................................59
7.4 Class 4: Subordinated Sponsor Secured Note Claims. ....................................60
7.5 Class 5: General Unsecured Claims....................................60
7.6 Class 6: Intercompany Claims. ....................................60
7.7 Class 7: Intercompany Interests. ....................................61
7.8 Class 8: 510(b) Claims....................................61
7.9 Class 9: Interests. ....................................61
7.10 Reservation of Rights Regarding Claims and Interests. ....................................61
ARTICLE VIII ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN....................................62
8.1 Classes Entitled to Vote. ....................................62

8.2 Acceptance by Impaired Classes of Claims or Interests. ....62
8.3 Presumed Acceptance by Unimpaired Classes. ....62
8.4 Presumed Rejections by Impaired Classes. ....62
8.5 Confirmation Pursuant to Bankruptcy Code Section 1129(b). ....62
8.6 Controversy Concerning Impairment. ....63
8.7 Elimination of Vacant Classes. ....63
ARTICLE IX IMPLEMENTATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ....63
9.1 Implementation of the Combined Disclosure Statement and Plan. ....63
9.2 Substantive Consolidation. ....63
9.3 Source of Consideration. ....64
9.4 Preservation of Retained Causes of Action. ....65
9.5 Vesting of Assets. ....66
9.6 Directors and Officers. ....66
9.7 Liquidating Trust. ....66
9.8 Wind-Up and Dissolution of the Debtors. ....71
9.9 Cancellation of Existing Securities and Agreements. ....72
9.10 Cash Investments. ....72
9.11 Company Action. ....72
9.12 Control Provisions. ....72
9.13 Tax Consequences of the Combined Disclosure Statement and Plan. ....73
ARTICLE X PROVISIONS GOVERNING DISTRIBUTIONS ....73
10.1 Distributions for Allowed Claims. ....73
10.2 Distributions by Liquidating Trustee. ....73
10.3 Means of Payment. ....73
10.4 Claims Reserve ....74
10.5 Fractional Distributions. ....74
10.6 *De Minimis* Distributions. ....74
10.7 Delivery of Distributions; Unclaimed Distributions. ....74
10.8 Application of Distribution Record Date. ....75
10.9 Withholding, Payment and Reporting Requirements Regarding Distributions. ....75
10.10 Setoffs. ....76
10.11 Allocation of Distributions. ....76
10.12 Claims or Interests Paid and Payable by Third Parties. ....76
ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS ....76
11.1 Claims Administration Responsibility. ....76
11.2 Claims Objections. ....77
11.3 Estimation of Contingent or Unliquidated Claims. ....77
11.4 Expungement and Disallowance of Certain Claims. ....77
11.5 Adjustment to Claims and Interests Without Objection. ....77
ARTICLE XII EXECUTORY CONTRACTS ....78
12.1 Assumption and Rejection of Executory Contracts. ....78
12.2 Cure of Defaults for Assumed Executory Contracts. ....78
12.3 The TSA. ....79

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN .......... 80
13.1 Conditions Precedent to the Effective Date. .......... 80
13.2 Notice of Effective Date. .......... 80
13.3 Waiver of Conditions Precedent to the Effective Date. .......... 80
13.4 Effect of Non-Occurrence of Effective Date. .......... 81
ARTICLE XIV EFFECTS OF CONFIRMATION .......... 81
14.1 Exculpation, Releases, and Injunctions .......... 81
ARTICLE XV RETENTION OF JURISDICTION .......... 85
15.1 Jurisdiction of Bankruptcy Court. .......... 85
ARTICLE XVI MISCELLANEOUS PROVISIONS .......... 87
16.1 Modification of the Combined Disclosure Statement and Plan. .......... 87
16.2 Revocation, Withdrawal, or Non-Confirmation of the Combined Disclosure Statement and Plan. .......... 87
16.3 Binding Effect. .......... 87
16.4 Subordination Rights. .......... 88
16.5 Severability of Provisions. .......... 88
16.6 Bankruptcy Rule 2002 Notice Parties. .......... 88
16.7 Exemption from Section 1146. .......... 88
16.8 Insurance. .......... 89
16.9 Successors and Assigns. .......... 89
16.10 Governing Law. .......... 89
16.11 Exhibits and Schedules. .......... 89
16.12 Reservation of Rights. .......... 90

Exhibit A: Liquidation Analysis

**DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

# INTRODUCTION[2]

The Debtors hereby propose the following Combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of such assets to the Holders of Allowed Claims against the Debtors as set forth herein. The Debtors are proponents of the Combined Disclosure Statement and Plan within the meaning of Bankruptcy Code section 1129.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, business, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of the Combined Disclosure Statement and Plan, and certain other related matters.

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 3 (Prepetition Secured Claims), Class 4 (Subordinated Sponsor Secured Note Claims), and Class 5 (General Unsecured Claims) are entitled to vote on the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1126. To vote on the Combined Disclosure Statement and Plan, a Holder must hold a Claim in Class 3 (Prepetition Secured Claims), Class 4 (Subordinated Sponsor Secured Note Claims), or Class 5 (General Unsecured Claims). Accordingly, a Ballot for acceptance or rejection of the Combined Disclosure Statement and Plan is being provided only to Holders of Prepetition Secured Claims in Class 3, Holders of Subordinated Sponsor Secured Note Claims in Class 4, and Holders of General Unsecured Claims in Class 5.

All Holders of Claims against or Interests in the Debtors are encouraged to read the Combined Disclosure Statement and Plan in its entirety, and to consult with an attorney, before voting to accept or reject the Combined Disclosure Statement and Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and in the Combined Disclosure Statement and Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Combined Disclosure Statement and Plan, or any part thereof, at any time, including prior to its substantial consummation.

The Debtors support the Combined Disclosure Statement and Plan and recommend that all Holders of Claims in Class 3 (Prepetition Secured Claims), Class 4 (Subordinated Sponsor Secured Note Claims), and Class 5 (General Unsecured Claims) who received a Ballot vote to accept the Combined Disclosure Statement and Plan. The Debtors believe that the Combined Disclosure Statement and Plan is in the best interests of all stakeholders.

Copies of the Combined Disclosure Statement and Plan and all other documents related to the Chapter 11 Cases are available for review without charge at the Debtors' case website at (https://dm.epiq11.com/simplyinterior).

[2] Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

# ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

### A. Defined Terms

**1.1 "11th Lane"** shall mean 11th Lane Holdings SG, LLC.

**1.2 "11th Lane Unsecured Note**" shall mean that certain note, dated as of September 13, 2024, in the original principal amount of $17,000,000.

**1.3 "11th Lane Unsecured Note Claims"** shall mean any and all Claims against any of the Debtors arising under, derived from, based on, or related to the 11th Lane Unsecured Note.

**1.4 "11th Lane Unsecured Note Obligations**" shall mean any and all obligations against any of the Debtors arising under, derived from, based on, or related to the 11th Lane Unsecured Note.

**1.5 "503(b)(9) Claims"** shall mean Claims arising under Bankruptcy Code section 503(b)(9).

**1.6 "510(b) Claims"** means any Claim subject to subordination under Section 510(b) of the Bankruptcy Code.

**1.7 "Administrative Claim"** shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under Bankruptcy Code sections 503(b), 507(b) or, if applicable, 1114(e)(2), including but not limited to: (a) any actual and necessary costs and expenses of preserving the Estates and operating the business of the Debtors; (b) Allowed Professional Fee Claims; (c) DIP Facility Claims; (d) 503(b)(9) Claims; and (e) U.S. Trustee Fees.

**1.8 "Administrative Claim Bar Date"** means, as applicable, the Initial Administrative Claim Bar Date and the Final Administrative Claim Bar Date.

**1.9 "Affiliate"** shall mean "affiliate" as defined in Bankruptcy Code section 101(2).

**1.10 "Allowed"** shall mean, with regard to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) that is not Disallowed and (a) is both not Disputed and either (i) evidenced by a proof of Claim or proof of Interest filed in accordance with the Bar Date Order (or for which, under the Combined Disclosure Statement and Plan, the Bankruptcy Code, or a Final Order, a proof of Claim or proof of Interest is not or shall not be required to be Filed) or (ii) listed in the Schedules as not contingent, not unliquidated, and not disputed or listed on the List of Equity Holders, and for which no proof of Claim or proof of Interest has been Filed; (b) as to which no objection or request for estimation has been Filed on or before (i) the Claims Objection Deadline or (ii) the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) pursuant to the terms of the Combined Disclosure Statement and Plan, or (iii) by a Stipulation between the Holder of such Claim or Interest and the Liquidating Trustee on or after the Effective Date. Notwithstanding the foregoing, all DIP Facility Claims and Prepetition Secured Claims shall be deemed to be Allowed.

**1.11 "Asset Purchase Agreement(s)"** shall mean, one or more of, as applicable, (i) that certain Asset Purchase Agreement by and between the Debtors, as Sellers, and Y M F Carpets, Inc., as

Purchaser, attached as Exhibit 1 to the Eclipse IP Sale Order; (ii) that certain Asset Purchase Agreement by and between the Debtors, as Sellers, and Elegant Home Interiors Inc., as Purchaser, attached as Exhibit 1 to the Hookless IP Sale Order; or (iii) that certain Bill of Sale and Assignment Agreement by and between the Debtors, as Sellers, and Beatrice Home Fashions, Inc., as Purchaser, attached as Exhibit 1 to the Historic Charleston IP Sale Order, each including all schedules and exhibits thereto, and all ancillary agreements, documents, and instruments delivered or executed in connection therewith, as each may be further amended from time to time.

**1.12 "Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records, as set forth in section 541 of the Bankruptcy Code.

**1.13 "Avoidance Actions"** shall mean any and all actual or potential Causes of Action of the Estates under Bankruptcy Code sections 105(a), 502(d), 510, 542 through 551, and 553, or any similar federal, state, or common law causes of action.

**1.14 "Ballot"** shall mean the ballot form distributed to each Holder of a Claim in a Class that is entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

**1.15 "Bankruptcy Code"** shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.16 "Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**1.17 "Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.18 "Bar Date"** shall mean, with respect to any particular Claim (including any Administrative Claim) or Interest, the specific date set by the Bankruptcy Court as the last day for Filing proofs of Claim against or proofs of Interest in the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

**1.19 "Bar Date Order"** shall mean the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim and Requests for Allowance of Administrative Expense Claims, (II) Approving the Forms and Manner of Notice Thereof, and (III) Granting Related Relief* entered by the Bankruptcy Court on June 30, 2026, at Docket No. 162.

**1.20 "Bidding Procedures Motion"** shall mean the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors Assets, (B) Authorizing the Debtors to Designate A Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and*

*Unexpired Leases and (C) Granting Related Relief* Filed with the Bankruptcy Court on June 8, 2026, at Docket No. 12.

**1.21 "Bidding Procedures Order"** shall mean the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Designate a Stalking Horse Bidder and to Provide Bid Protections, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* entered by the Bankruptcy Court on June 23, 2026, at Docket No. 111.

**1.22 "Business Day"** shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.23 "Cash"** shall mean money that is legal tender of the United States of America.

**1.24 "Causes of Action"** shall mean any and all Claims, actions, Avoidance Actions, causes of action, choses in action, suits, debts, obligations, dues, damages, defenses, judgments, third-party claims, counterclaims, cross claims, liens, indemnities, guaranties, and franchises whether arising before, on, or after the Petition Date, that are or may be pending or existing on the Effective Date against any Entity, based on lender liability, joint liability veil piercing or alter-ego theories of liability, contribution, indemnification, or based in law, contract, tort, equity, or pursuant to any other theory of law including, but not limited to, under the Bankruptcy Code, whether direct, indirect, known or unknown, derivative, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, choate or inchoate, suspected or unsuspected. assertable directly or derivatively, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, and including any unknown Causes of Action. Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests and any Claims Objections; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

**1.25 "Chapter 11 Cases"** shall mean the chapter 11 cases of Simply Interior Homes, LLC and its Debtor affiliates, which cases are jointly administered under lead Case No. 26-10922 (CTG) in the Bankruptcy Court.

**1.26 "Claim"** shall mean a claim against the Debtors, as such term is defined in Bankruptcy Code section 101(5).

**1.27 "Claims Agent"** shall mean the Debtors' claims and noticing agent and administrative agent, Epiq Corporate Restructuring, LLC.

**1.28 "Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided, however*, that the Liquidating Trustee may seek extensions of this date from the Bankruptcy Court at any time.

**1.29 "Class"** shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article II of the Combined Disclosure Statement and Plan.

**1.30 "Closing" or "Closing Date"** shall have the meaning set forth in the Sale Order.

**1.31 "CLP IV"** shall mean Centre Lane Partners IV, L.P.

**1.32 "CLP IV Secured Note"** shall mean that certain promissory note, dated as of February 8, 2024, issued by SIH in favor of CLP IV in the original principal amount of $5,000,000, as amended and restated from time to time.

**1.33 "CLP IV Secured Note Claims"** shall mean any and all Claims against any of the Debtors arising under, derived from, based on, or related to the CLP IV Note Obligations.

**1.34 "CLP IV Note Obligations"** shall mean any and all obligations arising under, derived from, based on, or related to the CLP IV Secured Note.

**1.35 "CLP V"** shall mean Centre Lane Partners V, L.P.

**1.36 "CLP V Secured Note"** shall mean that certain promissory note, dated as of February 8, 2024, issued by SIH in favor of CLP V in the original principal amount of $42,000,000, as amended and restated from time to time.

**1.37 "CLP V Secured Note Claims"** shall mean any and all Claims against any of the Debtors arising under, derived from, based on, or related to the CLP V Note Obligations.

**1.38 "CLP V Note Obligations"** shall mean any and all obligations arising under, derived from, based on, or related to the CLP V Secured Note.

**1.39 "Combined Disclosure Statement and Plan"** shall mean this Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Simply Interior Homes, LLC and its Debtor Affiliates (as amended, modified, or supplemented from time to time, including, without limitation, by the Plan Supplement and any exhibits, supplements or documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules).

**1.40 "Committee"** shall mean the Official Committee of Unsecured Creditors appointed by the U.S. Trustee by that certain *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 93].

**1.41 "Confirmation"** shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.42 "Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.43 "Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Combined Disclosure Statement and Plan and final approval of the disclosures contained in the Combined Disclosure Statement and Plan, as such hearing may be adjourned or continued from time to time.

**1.44 "Confirmation Hearing Notice"** shall mean the notice of Confirmation Hearing to be delivered pursuant to Bankruptcy Rules 2002(b)(2) and 2002(f).

**1.45 "Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to, among others, Bankruptcy Code section 1129.

**1.46 "Consummation"** shall mean the occurrence of the Effective Date.

**1.47 "Creditor"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

**1.48 "Debtor Releases"** shall mean the releases given by the Debtors to the Released Parties under section 14.1.b of this Combined Disclosure Statement and Plan.

**1.49 "Debtors"** shall mean Simply Interior Homes, LLC; Simply Interior Homes AcquisitionCo, LLC; SIH Beckham Buyer, LLC; SIH-HSD Holdings, LLC; SIH-BB Holdings, LLC; SIH-DMD Holdings, LLC; and SIH-SR Holdings, LLC.

**1.50 "Deficiency Claims"** shall mean, collectively, (a) the Prepetition Deficiency Claims; (b) the Subordinated Sponsor Note Deficiency Claims; and (c) any and all General Unsecured Claims for the difference between the aggregate amount of an Allowed Claim and the value received on account of the portion of such Allowed Claim that is an Other Secured Claim. For the avoidance of doubt, the inclusion of the Subordinated Sponsor Note Deficiency Claims in clause (b) above shall be subject to and conditioned upon the resolution (whether by Final Order or by settlement approved by the Bankruptcy Court) of the Retained Causes of Action relating to the Subordinated Sponsor Secured Notes as described in Section 9.4 of the Combined Disclosure Statement and Plan.

**1.51 "DIP Agent"** shall mean Great Rock Capital Partners Management, LLC, in its capacity as sole and exclusive administrative agent in connection with the Debtors' debtor in possession financing.

**1.52 "DIP Budget"** shall have the meaning ascribed to such term in the DIP Order.

**1.53 "DIP Documents"** shall mean the DIP Term Sheet, together with the DIP Order, and all agreements, documents, and instruments delivered or executed in connection therewith and security documentation.

**1.54 "DIP Facility"** shall mean the financing facility provided to the Debtors pursuant to the terms of the DIP Term Sheet and the DIP Order.

**1.55 "DIP Facility Claims"** shall mean any and all Claims of the DIP Secured Parties pursuant to or arising under the DIP Facility.

**1.56 "DIP Lenders"** shall mean GRC SPV Investments, LLC and Wingspire Capital, LLC in their capacity as debtor in possession lenders to the Debtors.

**1.57 "DIP Motion"** shall mean the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral*,

*(II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, Filed with the Bankruptcy Court on June 8, 2026, at Docket No. 9.

**1.58 "DIP Order"** shall mean the *Final Order (I) Authorizing Each Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on July 2, 2026, at Docket No. 214.

**1.59 "DIP Secured Parties"** shall mean the DIP Agent and the DIP Lenders.

**1.60 "DIP Term Sheet"** shall mean that *ABL DIP Financing Term Sheet*, dated as of July 1, 2026, by and between the Debtors and the DIP Secured Parties, as the same may have been further amended, modified, ratified, extended, renewed, restated, or replaced.

**1.61 "Disallowed"** shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the Schedules as zero or as disputed, contingent or unliquidated and in respect of which a proof of Claim, has not been Filed or deemed Filed pursuant to the Combined Disclosure Statement and Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest, as applicable; (v) is unenforceable to the extent provided in Bankruptcy Code section 502(b); or (vi) where the Holder of a Claim is an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), unless such Entity or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable under Bankruptcy Code section 522(i), 542, 543, 550, or 553, and if required by the Bankruptcy Code, an Objection or adversary proceeding has been Filed. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.62 "Disbursing Agent"** shall mean the Liquidating Trustee as to any Distributions on account of Allowed Claims; provided, however, that the Liquidating Trustee may, in its discretion, retain a third party to act as Disbursing Agent.

**1.63 "Disputed"** shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of the Combined Disclosure Statement and Plan.

**1.64 "Disputed Claims Reserve"** shall mean one or more reserves for Disputed Claims, if any, which may be established and maintained by the Liquidating Trustee in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

**1.65 "Distributable Value"** shall mean an amount equal to the aggregate proceeds of the Liquidating Trust Net Assets minus the sum of the aggregate amounts required, in each case in accordance with the terms of the Combined Disclosure Statement and Plan, (a) to pay in full satisfaction all Allowed Claims required to be satisfied pursuant to section 1129 of the Bankruptcy Code to confirm the Combined Disclosure Statement and Plan (which, for the avoidance of doubt,

shall include payment of Administrative Claims, Priority Tax Claims, and Other Priority Claims, in each case, solely to the extent Allowed) and (b) to make any other required payments in order to implement the terms of the Combined Disclosure Statement and Plan.

**1.66 "Distribution"** shall mean a delivery of Cash by the Disbursing Agent to the Holders of Allowed Claims pursuant to the Combined Disclosure Statement and Plan.

**1.67 "Distribution Date"** shall mean the date on which a Distribution is made pursuant to the Combined Disclosure Statement and Plan.

**1.68 "Distribution Record Date"** means the date for determining which Holders of Claims are eligible to receive initial Distributions under the Combined Disclosure Statement and Plan, which date shall be the Confirmation Date.

**1.69 "Eclipse IP Sale Order"** shall mean the *Order (I) Approving the Sale of the Debtors' Eclipse Brand Intellectual Property Free and Clear of Liens Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]].

**1.70 "Effective Date"** shall mean the date selected by the Debtors on which (a) all conditions in Article XIII of the Combined Disclosure Statement and Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

**1.71 "Effective Date Notice"** shall mean the notice of the Effective Date.

**1.72 "Entity"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(15).

**1.73 "Estates"** shall mean the Debtors' estates created by Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases on the Petition Date.

**1.74 "Excluded Assets"** shall have the meaning set forth in the applicable Asset Purchase Agreement(s).

**1.75 "Exculpated Parties"** shall mean, collectively, and in each of their capacities as such, (a) the Debtors; (b) the Debtors' officers and directors serving at any time between the Petition Date and the Effective Date; (c) the Committee; (d) each member of the Committee in its capacity as such; (e) each Professional, consultant, or other advisor retained by the Debtors or the Committee pursuant to a Bankruptcy Court order; and (f) to the extent provided in section 1125(e) of the Bankruptcy Code, each of the Released Parties and each of their respective Related Parties. For the avoidance of doubt, no Non-Released Party shall be an Exculpated Party.

**1.76 "Executory Contract"** shall mean an executory contract or unexpired lease to which one or more of the Debtors are a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.77 "File," "Filed," or "Filing"** shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.78 "Final Administrative Claim Bar Date"** means, for any unpaid Administrative Claim arising on or between the Closing Date and the Effective Date, the date that is thirty (30) calendar days after service of the Effective Date Notice, with such date to be provided therein.

**1.79 "Final Order"** shall mean an unstayed order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or request for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors (prior to the Effective Date) or the Liquidating Trustee (on or after the Effective Date), or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

**1.80 "First Day Declaration"** shall mean the *Declaration of Adam Zalev in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 11], as supplemented by the *Supplemental Declaration of Adam Zalev in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 133].

**1.81 "First Hookless Litigation"** shall mean the case pending under the caption *Focus Products Group International, LLC, Zahner Design Group, Ltd., Hookless Systems of North America, Inc., SF Home Décor, LLC, Sure Fit Home Décor Holdings Corp., and Sure Fit Home Products, LLC v. Kartri Sales Company, Inc. and Marquis Mills, International, Inc.*, Civil Action No. 1:15-cv-10154 (PAE) (S.D.N.Y. 2015).

**1.82 "General Bar Date"** shall mean August 10, 2026 at 5:00 p.m. (prevailing Eastern Time), as set forth in the Bar Date Order.

**1.83 "General Unsecured Claim"** shall mean an unsecured Claim, including any and all Deficiency Claims (other than any Subordinated Sponsor Note Deficiency Claims that have not been finally determined pursuant to the outcome of applicable litigaiton) against a Debtor other than any Administrative Claims (including DIP Facility Claims and Professional Fee Claims), Prepetition Secured Claims, Subordinated Sponsor Secured Note Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and 510(b) Claims.

**1.84 "Governmental Bar Date"** means, December 7, 2026 at 5:00 p.m. **(**prevailing Eastern Time), as set forth in the Bar Date Order.

**1.85 "Governmental Unit"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(27).

**1.86 "Historic Charleston IP Sale Order"** shall mean the *Order (I) Approving the Sale of the Debtors' Historic Charleston Brand Intellectual Property Free and Clear of Liens Encumbrances,*

*Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]].

**1.87 "Holder"** shall mean any Person or Entity holding a Claim or Interest.

**1.88 "Hookless IP Sale Order"** shall mean the *Order (I) Approving the Sale of the Debtors' Hookless Brand Intellectual Property Free and Clear of Liens Encumbrances, Claims and Interests, (II) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. [●]].

**1.89 "Hookless Litigation"** shall mean, collectively, the First Hookless Litigation and the Second Hookless Litigation.

**1.90 "Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.91 "Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

**1.92 "Initial Administrative Claim Bar Date"** means such date and time to be set forth in that certain *Notice of Deadline for Filing Administrative Claims* and shall establish the deadline for Filing requests for allowance and payment of Administrative Claims arising in the time period between the Petition Date and the Closing Date, as set forth in the Bar Date Order.

**1.93 "Initial DIP Budget"** shall have the meaning set forth in the DIP Order.

**1.94 "Intercompany Claim"** shall mean a Claim held by any Debtor against any other Debtor, other than any Administrative Claim.

**1.95 "Intercompany Interest"** shall mean an Interest in a Debtor held by another Debtor.

**1.96 "Interests"** shall mean the common stock, preferred stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit or share of a Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of a Debtor and any other rights, options, warrants, stock appreciation rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any employment agreement and whether or not certified, transferable, preferred, common, voting, or denominated "stock" or similar security).

**1.97 "IRC"** shall mean the Internal Revenue Code of 1986, as amended.

**1.98 "IRS"** shall mean the Internal Revenue Service.

**1.99 "Liquidating Trust"** shall mean the liquidating trust established on the Effective Date pursuant to the Liquidating Trust Agreement and the Combined Disclosure Statement and Plan for the purpose of administering the Liquidating Trust Assets and to make one or more Distribution(s) to Holders of Allowed Claims against the Debtors.

**1.100 "Liquidating Trust Agreement"** shall mean the trust agreement, and related documents, that documents and governs the powers, duties, and responsibilities of the Liquidating Trustee,

and which agreement will be materially consistent with and subject to the Combined Disclosure Statement and Plan and otherwise in the substance and form included in the Plan Supplement; *provided* that the Liquidating Trust Agreement shall be in form and substance reasonably acceptable to the DIP Secured Parties and Committee.

**1.101 "Liquidating Trust Assets"** shall mean, collectively, (i) Remaining Cash, (ii) after payment of Allowed Professional Fees Claims, Cash in the Professional Fee Reserve (if any), (iii) after payment of Allowed Professional Fee Claims, any retainers, deposits, or similar instruments or agreements held by the Debtors' Professionals, (iv) the Excluded Assets, (v) the Retained Causes of Action (and proceeds thereof), (vi) all Cash in the Wind-Down Account; and (vii) any and all other Assets, including inventory, of the Debtors other than Acquired Assets.

**1.102 "Liquidating Trust Beneficiaries"** shall mean, collectively, the Holders of Allowed Claims under the Combined Disclosure Statement and Plan against the Debtors, or any successors to such Holders, or their interests in the Liquidating Trust, whether said Claims are Allowed before or after the Effective Date.

**1.103 "Liquidating Trust Expenses"** shall mean all actual and necessary fees, costs, expenses, and obligations incurred or owed by the Liquidating Trustee or its agents, employees, attorneys, advisors, or other professionals in administering the Combined Disclosure Statement and Plan and the Liquidating Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary expense incurred by the Liquidating Trustee and its agents, employees, and professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Cases, which shall be solely payable from the Liquidating Trust Assets (subject to the Liquidating Trust Agreement and the DIP Documents) prior to any Distribution to Creditors.

**1.104 "Liquidating Trust Interests"** shall mean the non-certificated beneficial interests of the Liquidating Trust allocable to Holders of Allowed Claims in accordance with the terms of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, which may or may not be transferable, which shall entitle such Holder to its *pro rata* share of Liquidating Trust Net Assets in accordance with the Waterfall Recovery.

**1.105 "Liquidating Trust Net Assets"** shall mean the proceeds of the Liquidating Trust Assets minus the aggregate amount of all Liquidating Trust Expenses.

**1.106 "Liquidating Trustee"** shall mean the Person selected by the Committee, with the consent of the Debtors and the DIP Lenders, to administer the Liquidating Trust under the Liquidating Trust Agreement and as identified in the Plan Supplement and the Liquidating Trust Agreement.

**1.107 "List of Equity Holders"** shall mean the List of Holders of Interests in the Combined Corporate Ownership Statement and Equity Holder List Pursuant to Federal Rules of Bankruptcy Procedure 1007 and 7007.1 Filed with the Debtors' petitions on the Petition Date at Docket No. 1.

**1.108 "Local Rules"** shall mean the Local Rules of the United States Bankruptcy Court for the District of Delaware.

**1.109 "Non-Debtor Affiliate"** shall mean any Affiliate of the Debtors that is not also a Debtor.

**1.110 "Non-Released Party"** shall mean, collectively: (a) Centre Lane Partners, LLC; (b) 11th Lane; (c) CLP IV; (d) CLP V; (e) Mayank Singh; (f) Quinn Morgan; (g) Live Comfortably Borrower, LLC; (h) Live Comfortably LLC; (i) Live Comfortably Holdings LLC; (j) Live Comfortably Inc.; (k) Live Comfortably Bedding Canada ULS; and (*l*) the Related Parties of each Person or Entity in clause (a) through (k) other than the Debtors; *provided*, *however*, that, notwithstanding the foregoing, the following Related Parties of the Debtors shall be Released Parties: (i) Stuart Kaufman; (ii) Adam Zalev; (iii) the Debtors' Professionals; and (iv) the Related Parties of (i) through (iii) of the foregoing.

**1.111 "Notice of Non-Voting Status"** shall mean the notice to be distributed to Holders of Claims or Interests in non-voting Classes pursuant to the Solicitation Procedures Order.

**1.112 "Objection"** shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim or Interest (including the resolution of any request for payment of any Administrative Claim).

**1.113 "Opt-In Form"** shall mean the form circulated to Holders of Claims and Interests allowing them to opt into the Third Party Releases.

**1.114 "Other Secured Claim"** shall mean any Secured Claim asserted against the Debtors other than a DIP Facility Claim, a Prepetition Secured Claim, or a Subordinated Sponsor Secured Note Claim.

**1.115 "Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.116 "Person"** shall have the meaning set forth in Bankruptcy Code section 101(41).

**1.117 "Petition Date"** shall mean June 8, 2026, the date on which the Debtors commenced their Chapter 11 Cases in the Bankruptcy Court.

**1.118 "Plan Supplement"** shall mean the ancillary documents necessary to the implementation and effectuation of the Combined Disclosure Statement and Plan, including, without limitation, (a) the Schedule of Assumed Executory Contracts, (b) the Liquidating Trust Agreement, (c) the identity and compensation of the Liquidating Trustee and special committee of the Liquidating Trust, and (d) a schedule of Retained Causes of Action (which schedule shall be in form and substance reasonably acceptable to the Committee), and Filed on or before the date that is seven (7) days prior to the Voting Deadline; provided, however, that the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Combined Disclosure Statement and Plan; provided, further, that any amendment to (x) the Liquidating Trust Agreement or (y) the schedule of Retained Causes of Action shall require the prior written consent of the DIP Secured Parties and Committee (such consent not to be unreasonably withheld, conditioned, or delayed).

**1.119 "Post-Effective Date Debtors"** shall mean the Debtors after the Effective Date.

**1.120 "Prepetition Agent"** shall mean Great Rock Capital Partners Management, LLC, acting as administrative agent and collateral agent for the Prepetition Lenders, under the Prepetition Credit Agreement.

**1.121 "Prepetition Collateral Documents"** shall mean, as amended, restated, amended and restated, or otherwise modified from time to time, that certain (a) Security Agreement, dated as of February 21, 2025, by and between the Debtors and the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties and (b) all other Collateral Documents (as defined in the Prepetition Credit Agreement).

**1.122 "Prepetition Credit Agreement"** shall mean that certain Credit Agreement, dated as of February 21, 2025 (as amended, restated, amended and restated, or otherwise modified from time to time), among certain Debtors, as the borrower and guarantors, and the Prepetition Secured Parties.

**1.123 "Prepetition Deficiency Claims"** shall mean any Claims on account of, arising under, based on, or related to the Prepetition Loan Documents that are not Secured Claims pursuant to section 506(a) of the Bankruptcy Code.

**1.124 "Prepetition Lenders"** shall mean GRC SPV Investments, LLC and Wingspire Capital, LLC, as lenders under the Prepetition Credit Agreement.

**1.125 "Prepetition Loan Documents"** shall mean the Prepetition Credit Agreement, together with all other documentation executed in connection therewith, including, without limitation, the Prepetition Collateral Documents and all other Note Documents (as defined in the Prepetition Credit Agreement).

**1.126 "Prepetition Secured Claim"** shall mean a Secured Claim of the Prepetition Secured Parties in connection with the Prepetition Secured Obligations.

**1.127 "Prepetition Secured Obligations"** shall mean any and all obligations, including, without limitation, the aggregate principal amount, plus accrued but unpaid interest, unused line fees, commitment termination fees and other fees due and payable under the Prepetition Loan Documents, including the reasonable and document fees, disbursements, and other charges of counsel to the Prepetition Secured Parties.

**1.128 "Prepetition Secured Parties"** shall mean the Prepetition Lenders and the Prepetition Agent.

**1.129 "Priority Non-Tax Claim"** shall mean any and all Claims accorded priority in right of payment under Bankruptcy Code section 507(a), other than Priority Tax Claims and Administrative Claims.

**1.130 "Priority Tax Claim"** shall mean a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code section 507(a)(8).

**1.131 "Privilege Rights"** collectively, shall mean any attorney-client privilege, attorney work-product protection or any other similar privilege or protection from disclosure belonging to or operating in favor of the Debtors and/or the Estates.

**1.132 "Professional"** shall mean an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 328, 333, 363, 1103 and to be compensated for services rendered prior to the Effective Date, pursuant to Bankruptcy Code (i) sections 327, 328, 329, 330, and 331, or (ii) an order entered by the Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**1.133 "Professional Fee Claims Bar Date"** shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the service of the Effective Date Notice.

**1.134 "Professional Fee Claims"** shall mean all fees and expenses (including but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date.

**1.135 "Professional Fee Reserve"** means the reserve established and funded by the Debtors pursuant to the DIP Documents prior to the Effective Date to satisfy the unpaid Professional Fee Claims of the Professionals.

**1.136 "Purchased Assets"** shall have the meaning set forth in the applicable Asset Purchase Agreement(s).

**1.137 "Purchaser(s)"** shall have the meaning set forth in the applicable Asset Purchase Agreement(s).

**1.138 "Related Parties"** shall mean each of, and solely in its capacity as such, current and former directors (including any independent directors, managers, officers, investment committee members, special or other committee members), equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, lenders and other financing sources, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, Professionals, and other advisors and professionals of any such Person's or Entity's respective heirs, executors, estates, and nominees. For the avoidance of doubt, no Non-Released Party shall be a Related Party with respect to the Debtor Releases, Third Party Releases, or Exculpations.

**1.139 "Released Parties"** shall mean, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Post-Effective Date Debtor; (c) each Prepetition Lender; (d) the Prepetition Agent; (e) the DIP Lenders; (f) the DIP Agent; (g) the Committee and each of its current and former members (solely in their capacity as such); and (h) the Related Parties of each Entity in clause (a) through (g), each in their capacity as such. For the avoidance of doubt, no Non-Released Party shall be a Released Party. Notwithstanding the foregoing, the inclusion of any Prepetition Lender, the Prepetition Agent, any DIP Lender, or the DIP Agent (or any of their respective Related Parties) as Released Parties, and any releases, exculpations, or injunctions inuring to their benefit under this Combined Disclosure Statement and Plan, shall be subject to and

limited by the terms and conditions of the challenge period and related provisions set forth in the DIP Order. To the extent that any challenge is timely commenced and results in a Final Order sustaining such challenge in whole or in part, each applicable Prepetition Lender, the Prepetition Agent, DIP Lenders and DIP Agent (and their respective Related Parties) shall not be Released Parties with respect to the Claim and Causes of Action that are the subject of such sucessful challenge and Final Order.

**1.140 "Releasing Parties"** shall mean, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Post-Effective Date Debtor; (c) each Prepetition Lender; (d) the Prepetition Agent; (e) the DIP Lenders; (f) the DIP Agent; (g) the Committee and each of its current and former members (solely in their capacity as such); (h) all Holders of Claims that vote to accept this Combined Disclosure Statement and Plan and that affirmatively opt into the releases provided for in this Combined Disclosure Statement and Plan; (i) all Holders of Claims that are deemed to accept this Combined Disclosure Statement and Plan and that affirmatively opt into the releases provided for in this Combined Disclosure Statement and Plan; (j) all Holders of Claims that abstain from voting on this Combined Disclosure Statement and Plan and that affirmatively opt into the releases provided for in this Combined Disclosure Statement and Plan; (k) all Holders of Claims that vote to reject this Combined Disclosure Statement and Plan and that affirmatively opt into the releases provided for in this Combined Disclosure Statement and Plan; (l) all Holders of Interests that affirmatively opt into the releases provided for in this Combined Disclosure Statement and Plan; (m) and each Related Party of each Entity in clauses (a) through the preceding clause (l) for which such Entity is legally entitled to bind such Related Party to the releases contained herein under applicable law.

**1.141 "Remaining Cash"** shall mean all of the Debtors' Cash on hand as of the Effective Date (except for Cash in the Professional Fee Reserve), plus Cash received by or on behalf of the Debtors on or after the Effective Date after payment of all Allowed Professional Fees.

**1.142 "Retained Causes of Action"** shall mean, collectively, all of the Debtors' and the Estates' Causes of Action, including any Avoidance Actions, that (i) do not constitute Acquired Assets; or (ii) are not waived, released, compromised, or settled pursuant to this Plan or a Final Order of the Bankruptcy Court, including in the DIP Order.

**1.143 "Rock Creek"** shall mean Rock Creek Advisors, LLC.

**1.144 "Sale"** shall mean the sale of certain of the Debtors' Assets to the applicable Purchaser pursuant to the applicable Asset Purchase Agreement and the Sale Orders.

**1.145 "Sale Orders"** shall mean, collectively, the Historic Charleston IP Sale Order, the Hookless IP Sale Order, and the Eclipse IP Sale Order.

**1.146 "Schedule of Assumed Executory Contracts"** shall mean a schedule that may be Filed as part of the Plan Supplement of certain Executory Contracts to be assumed by the Debtors pursuant to the Combined Disclosure Statement and Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors or the Liquidating Trustee, as applicable, in accordance with the Combined Disclosure Statement and Plan.

**1.147 "Schedules"** shall mean the schedules of assets and liabilities and statement of financial affairs Filed by the Debtors pursuant to Bankruptcy Code section 521, as the same may have been or may be amended, modified, or supplemented from time to time.

**1.148 "Second Hookless Litigation"** shall mean the case pending under the caption *Keeco LLC, Zahner Design Group, Ltd., Hookless Systems of North America, Inc., Keeco, Inc., Hollander Parent Corporation, Sure Fit Home Décor Holdings LLC, SF Home Décor, LLC, Sure Fit Home Products, LLC, Sure Fit Home Décor Holdings Corp, Sure Fit Home Décor LLC, and Focus Products Group International, LLC, v. Kartri Sales Company, Inc. and Marquis Mills, International, Inc., Civil Action No. 1:23-cv-02003 (PAE)* (S.D.N.Y. 2023).

**1.149 "Secured Claim"** shall mean, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of the Combined Disclosure Statement and Plan (subject to the Confirmation Order becoming a Final Order). The defined term "Secured Claim" includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the Debtors pursuant to Bankruptcy Code sections 506(a) and 553.

**1.150 "SIH"** shall mean Debtor Simply Interior Homes, LLC.

**1.151 "SIH Acquisition"** shall mean Debtor Simply Interior Homes AcquisitionCo, LLC.

**1.152 "SIH Intermediate"** shall mean non-Debtor Simply Interior Homes Intermediate, LLC.

**1.153 "Solicitation Date"** shall have the meaning set forth in the Solicitation Procedures Order.

**1.154 "Solicitation Package"** shall mean the package to be distributed to certain Holders of Claims for solicitation of votes on the Combined Disclosure Statement and Plan.

**1.155 "Solicitation Procedures Motion"** shall mean the *Debtors' Motion for Entry of an Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Form of Ballot; and (V) Granting Related Relief* filed contemporaneously herewith.

**1.156 "Solicitation Procedures Order"** shall mean the proposed *Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Form of Ballot; and (V) Granting Related Relief* attached to the Solicitation Procedures Motion as Exhibit A.

**1.157 "Subordinated CLP IV Note Liens"** shall mean the second-priority liens on substantially all of the Debtors' assets securing the CLP IV Note Obligations pursuant to that certain Second Lien Security Agreement, dated as of February 21, 2025, between SIH, as borrower, SIH Acquisition, as guarantor, SIH Intermediate, and CLP IV, as lender.

**1.158 "Subordinated CLP V Note Liens"** shall mean the second-priority lien on substantially all of the Debtors' assets securing the CLP V Note Obligations pursuant to that certain Second Lien Security Agreement, dated as of February 21, 2025, between SIH, as borrower, SIH Acquisition, as guarantor, SIH Intermediate, and CLP V, as lender.

**1.159 "Subordinated Sponsor Secured Notes"** shall mean the CLP IV Secured Note and the CLP V Secured Note.

**1.160 "Subordinated Sponsor Secured Note Claims"** shall mean any and all Secured Claims against any of the Debtors arising under, derived from, based on, or related to the Subordinated Sponsor Secured Notes.

**1.161 "Subordinated Sponsor Note Deficiency Claims"** shall mean any Claims on account of, arising under, based on, or related to the Subordinated Sponsor Secured Notes that are not Secured Claims pursuant to section 506(a) of the Bankruptcy Code; *provided* that the classification, voting rights, and distribution entitlements of any Subordinated Sponsor Note Deficiency Claims shall be subject to and governed by the outcome of litigation (whether by Final Order or by settlement approved by the Bankruptcy Court), including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan.

**1.162 "Subordinated Sponsor Note Liens**" shall mean the Subordinated CLP IV Note Liens and Subordinated CLP V Note Liens.

**1.163 "Subordination and Intercreditor Agreement"** shall mean that certain Subordination and Intercreditor Agreement, dated as of February 21, 2025, between CLP IV, CLP V, the Prepetition Agent, SIH, SIH Acquisition, and SIH Intermediate.

**1.164 "Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.165 "Third Party Releases"** shall mean the releases given by the Releasing Parties to the Released Parties under section 14.1.c of this Combined Disclosure Statement and Plan.

**1.166 "TOB Member"** shall mean a member of the Trust Oversight Board.

**1.167 "Trust Oversight Board"** shall mean the board established by the Liquidating Trust Agreement and tasked with oversight of the Liquidating Trust, which board shall initially comprise three (3) TOB Members two of whom shall be selected by the DIP Secured Parties and one of whom shall be selected by the Committee.

**1.168 "Unclassified Claims"** shall mean any Administrative Claims, DIP Facility Claims, Professional Fee Claims, and Priority Tax Claims.

**1.169 "Unimpaired"** shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.170 "U.S. Trustee Fees"** shall mean fees payable pursuant to 28 U.S.C. § 1930 and any interest thereon pursuant to 31 U.S.C. § 3717.

**1.171 "Voting Class"** shall mean one of Class 3 (Prepetition Secured Claims), Class 4 (Subordinated Sponsor Secured Note Claims), or Class 5 (General Unsecured Claims).

**1.172 "Voting Deadline"** shall mean **September 11, 2026 at 4:00 p.m. (prevailing Eastern Time)**, the date and time by which Ballots to accept or reject the Combined Disclosure Statement and Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

**1.173 "Voting Record Date"** shall mean the date on which the Bankruptcy Court has entered the Solicitation Procedures Order.

**1.174 "Waterfall Recovery"** shall mean the Distributable Value that shall be paid to Holders of Allowed Claims until paid in full from time to time in the following priority (in each case on a *pro rata* basis) in accordance with Article II, Article VI, and Article VII of the Combined Disclosure Statement and Plan: (a) *first*, on account of Allowed Administrative Claims and Allowed Priority Tax Claims; (b) *second*, on account of Allowed Other Secured Claims; (c) *third*, on account of Allowed Priority Non-Tax Claims; (d) *fourth*, on account of Allowed Prepetition Secured Claim; (e) *fifth*, on account of Allowed Subordinated Sponsor Secured Note Claims; and (f) *sixth*, on account of Allowed General Unsecured Claims and Allowed Deficiency Claims (subject, in the case of any Subordinated Sponsor Note Deficiency Claims, to the outcome of litigation (whether by Final Order or by settlement approved by the Bankruptcy Court), including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan).

**1.175 "Wind-Down Account"** shall mean the Debtors' bank accounts or accounts used to fund all expenses and payments required to be made by the Post-Effective Date Debtors and the Liquidating Trust, which account will be funded on the Effective Date with Cash in the amount of the Wind-Down DIP Draw.

**1.176 "Wind-Down DIP Draw"** shall mean the Debtors' final draw under the DIP Facility, which draw shall occur on the Effective Date and be in an amount sufficient to fund the Wind-Down Account.

## B. Rules of Interpretation

For purposes of the Combined Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used in the Combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (c) any reference in the Combined Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (d) any reference in the Combined Disclosure Statement and Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from

time to time, (e) unless otherwise specified, all references in the Combined Disclosure Statement and Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Combined Disclosure Statement and Plan, (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Disclosure Statement and Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Combined Disclosure Statement and Plan, (g) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Combined Disclosure Statement and Plan, and (h) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

# ARTICLE II
# CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

## 2.1 Classification

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims and Interests reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors or Holders of Interests. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Combined Disclosure Statement and Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, are placed in the Classes set forth below. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such Unclassified Claims is set forth below in Article VI of the Combined Disclosure Statement and Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Combined Disclosure Statement and Plan and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

| Class / Designation | Treatment | Estimated Amount of Claims and Interests | Status | Voting Rights | Projected Recovery[3] |
|---|---|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Liquidating Trustee, as applicable, in full and final satisfaction of and in exchange for such Allowed Other Secured Claim: (i) return of the collateral securing such Holder's Allowed Other Secured Claim; or (ii) payment in full in Cash of such Holder's Allowed Other Secured Claim; or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $1.5 million | Unimpaired / Deemed to accept | Not entitled to vote | 100% |
| **Class 2:** Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of and in exchange for such Allowed Priority Non-Tax Claim: (i) payment in full in | *de minimis* | Unimpaired / Deemed to accept | Not entitled to vote | 100% |

[3] The estimated percentage recovery is based on, among other things, an estimate of the Allowed Claims against the Debtors in the Chapter 11 Cases. As noted, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending on, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of Cash available for Distribution. Actual recoveries will depend on the ultimate litigation, settlement, or other monetization and realization of value with respect to the Retained Causes of Action. Such value is inherently unknowable and speculative and, therefore, not included in the "projected recovery" presented herein. See sections 5.7 (Risks Related to Retained Causes of Action) and 9.4 (Preservation of Retained Causes of Action) below for more discussion on this topic.

| Class / Designation | Treatment | Estimated Amount of Claims and Interests | Status | Voting Rights | Projected Recovery[3] |
|---|---|---|---|---|---|
| | Cash of such Holder's Allowed Priority Non-Tax Claim; or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | | | | |
| **Class 3:** Prepetition Secured Claims | Except to the extent that a Holder of an Allowed Prepetition Secured Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Secured Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed Prepetition Secured Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holder to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery. | $7.9 million | Impaired | Entitled to Vote | 1%-35% |
| **Class 4:** Subordinated Sponsor Secured Note Claims | Except to the extent that a Holder of an Allowed Subordinated Sponsor Secured Note Claim agrees to less favorable treatment, each Holder of an Allowed Subordinated Sponsor Secured Note Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed | $0.00 to $69.6 million[4] | Impaired | Entitled to Vote | Unknown |

[4] The actual Allowed amount of Subordinated Sponsor Secured Note Claims may be subject to the outcome of litigation, including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan.

| Class / Designation | Treatment | Estimated Amount of Claims and Interests | Status | Voting Rights | Projected Recovery[3] |
|---|---|---|---|---|---|
| | Subordinated Sponsor Secured Note Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holders to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery. | | | | |
| **Class 5:** General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holder to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery.[5] For the avoidance of doubt, for purposes of calculating each Holder's *pro rata* share of Liquidating Trust Interests and Distributable Value, no Subordinated Sponsor Note Deficiency Claim shall be included in the aggregate amount of Allowed General Unsecured Claims unless and until such Subordinated Sponsor Note Deficiency Claim has been | $28.4 million to $123.6 million | Impaired | Entitled to vote | 0%-17% |

[5] The actual Allowed amount of General Unsecured Claims may be subject to the outcome of litigation, including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan.

| Class / Designation | Treatment | Estimated Amount of Claims and Interests | Status | Voting Rights | Projected Recovery[3] |
|---|---|---|---|---|---|
| | finally determined by the outcome of litigation (whether by Final Order or by settlement approved by the Bankruptcy Court), including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan. | | | | |
| **Class 6:** Intercompany Claims | Each of the Debtors shall agree that any and all Intercompany Claims between the Debtors will be canceled on the Effective Date and the Debtors shall not receive any recovery, subject to tax considerations minimizing the Debtors' tax liabilities. | N/A | Impaired / Deemed to reject | Not entitled to vote | 0% |
| **Class 7:** Intercompany Interests | On the Effective Date, all Intercompany Interests shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Intercompany Interests. | N/A | Impaired / Deemed to reject | Not entitled to vote | 0% |
| **Class 8:** 510(b) Claims | On the Effective Date, all Allowed 510(b) Claims shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Allowed 510(b) Claims. | N/A | Impaired / Deemed to reject | Not entitled to vote | 0% |
| **Class 9:** Interests | On the Effective Date, all Interests shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no | N/A | Impaired / Deemed to reject | Not entitled to vote | 0% |

| Class / Designation | Treatment | Estimated Amount of Claims and Interests | Status | Voting Rights | Projected Recovery[3] |
|---|---|---|---|---|---|
| | Distribution on account of such Interests. | | | | |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

### 3.1 General Background[6]

#### a. Introduction

The Debtors operate a home textiles and home décor business that designs, sources and supplies fashion bedding, window treatments, bath products, decorative textiles, and related home furnishings (referred to as "soft goods") for major retailers. The Debtors were formed in early 2025 in connection with the carve-out of the soft goods business divisions from Keeco, LLC ("Keeco"), a portfolio company of Centre Lane Partners ("CLP"), and related affiliates (the "Carve Out Transaction"). Prior to the Carve-Out Transaction, Keeco was one of North America's largest home textile suppliers. Following the Carve-Out Transaction, Keeco was rebranded as "Live Comfortably."

The Debtors commenced these Chapter 11 Cases following a series of compounding and interconnected challenges: an undercapitalized opening balance sheet from the time of the Carve-Out Transaction as compared to CLP's projections (which, among other things, the Debtors intend to investigate thoroughly during these Chapter 11 Cases), the inheritance of diminished customer and supplier relationships from the prior Keeco operations, a reduction in certain major customer programs that severely impaired the Debtors' revenue base, an ongoing dispute with respect to a Transition Services Agreement with Live Comfortably, the failure of multiple recapitalization, M&A and refinancing efforts all led by the Company's sponsor, CLP, the refusal of CLP to provide necessary liquidity and capital support for the Debtors in the face of such failed transactions, and the imposition of reciprocal tariffs that eroded the Debtors' margins.

Despite these obstacles, the Debtors' core business retains real commercial value, including a portfolio of recognized home textiles brands, strong international sourcing capabilities, and close relationships with major retail partners. The Debtors commenced these Chapter 11 Cases to stabilize their operations, preserve going-concern value to the extent possible, maximize the value of their estates for the benefit of all stakeholders, pursue a value-maximizing transaction through the Chapter 11 process and consider the existence of any possible claims and causes of action as against related or other parties which contributed directly or indirectly to the circumstances for which the Debtors now find themselves in.

[6] Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration.

b. **Keeco and the Formation of the Debtors**

Keeco was one of North America's largest diversified home textiles suppliers and a CLP portfolio company, with two core business segments: 1) utility bedding, such as pillows, comforters and mattress pads, and 2) soft goods, including blankets, sheets, comforters, quilts, throws, duvets, decorative pillows, and bed-in-a-bags, and blackout and decorative window curtains and shower curtains (collectively, "Soft Goods").

Over approximately five years, CLP scaled Keeco through a series of acquisitions focused on utility bedding, and in the process of doing so, those acquisitions also added non-core Soft Goods categories that were not synergistic with the manufacturing-focused utility bedding platform.

CLP sponsored the Carve-Out Transaction of the Soft Goods division from Keeco into a standalone company, being the Debtors. The Carve-Out Transaction was effectuated through a two-step transaction structure. In the first step, the Collateral Agent under Keeco's term loan facility that was then in default, conducted a partial strict foreclosure under Article 9 of the Uniform Commercial Code with respect to certain collateral associated with the Soft Goods division. Through the foreclosure, the Collateral Agent transferred the Soft Goods collateral to designated transferee entities established by CLP, ultimately vesting such collateral in SIH, one of the Debtors. Following the Carve-Out Transaction, Keeco rebranded as "Live Comfortably" to focus exclusively on its core utility bedding business, supplying utility bedding products to major retail and hospitality customers, and maintaining licensed utility bedding brands.

In the second step, the parties completed the carve-out upon the closing of a Membership Interest Purchase Agreement (the "MIPA") among SIH Acquisition, as purchaser, Live Comfortably Borrower LLC (f/k/a Keeco Borrower LLC), as seller, and SIH, as the company. The Carve-Out Transaction, originally expected to close in late October 2024, ultimately closed approximately four months late on February 21, 2025. The majority of the cash purchase price under the MIPA was used to satisfy certain subordinated notes issued by SIH in connection with the foreclosure. Upon the closing of the MIPA, the Debtors commenced operations as an independent company from Live Comfortably, with its own management team, but with CLP (and its affiliates) remaining as the indirect sole owner and effective decision-maker of the Debtors, and with the Debtors reliant on Live Comfortably to provide the Debtors with many services essential for their operations, as set out below.

In connection with the Carve-Out Transaction, on February 21, 2025, the Debtors and Live Comfortably executed a number of ancillary agreements, including a Transition Services Agreement (the "TSA"), to facilitate the Debtors' transition to standalone operations following the separation.

c. **The Debtors, Their Business, and Their Corporate Structure**

*i.* ***Corporate Structure***

A chart depicting the organizational structure of the Debtors and their Affiliates is set forth below, with the Debtor entities shaded in gray. SIH Acquisition is the parent Debtor entity, and Debtor SIH is its direct subsidiary. The entities above SIH Acquisition in the corporate structure—

including SIH Intermediate, Simply Interior Homes Holdings, LLC, and Simply Interior Homes TopCo, LLC—are not Debtors in these Chapter 11 Cases.




Prior to the Petition Date, the Debtors maintained their principal office in Rock Hill, South Carolina. The Debtors have now exited the Rock Hill office location. In addition, the Debtors maintain a showroom in New York, New York, a former Keeco showroom space at 390 Fifth Avenue that the Debtors currently share with Live Comfortably. The Debtors also maintain overseas sourcing offices in China, Pakistan, and India, and utilize third-party warehousing facilities primarily in Reno, Nevada and Whitestown, Indiana.

### *ii.* ***Business Description and Operations***

The Debtors operate a home textiles and home décor business, serving as a business-to-business wholesale supplier and sourcing partner to major retail channels, including department stores, off-price retailers, e-commerce retailers, and home centers. The Debtors' product assortment spans multiple home categories, including: (a) bedding, including comforters, duvets, quilts, sheet sets, mattress pads, decorative pillows, and throws; (b) window treatments, including curtains, drapes, valances, curtain liners, and hardware; (c) bath products, including towels, bath mats, shower curtains, and bath rugs; and (d) furniture and décor, including accent pillows, ottomans, chairs, storage shelves, slipcovers, rugs, and floor coverings.

The Debtors' business model encompasses private label manufacturing, licensed brand development, and retail merchandising support, with a licensed and proprietary brand portfolio that includes: (i) Eclipse, a window treatment brand featuring noise-reducing and light-blocking curtain solutions carried at Walmart, HomeGoods, Amazon, and other major retailers; (ii) Hookless, an innovative bath brand featuring patented hook-free shower curtain technology carried at Lowe's, Home Depot, and other home improvement and mass merchant channels;

(iii) Historic Charleston, a bedding collection inspired by classic decorative arts; and (iv) Kate Spade Home bath accessories, a premium licensed brand. These core brands are premium product lines that represent a key component of the Debtors' strategic value and going-concern business.

As of the Petition Date, the Debtors employed approximately 27 employees across their principal office in Rock Hill, South Carolina and their showroom and sourcing locations. The Debtors rely heavily on international sourcing and manufacturing partnerships, maintaining sourcing relationships with manufacturers and suppliers in India, Pakistan, China, and Vietnam, among other countries, with overseas sourcing infrastructure enabling the Debtors to manage tariff impacts, maintain production flexibility, and achieve speed-to-market delivery for their retail partners. In the ordinary course of business, the Debtors rely on third-party logistics providers and freight carriers to ensure the timely transport and delivery of home textiles merchandise and home décor products to their retail partners and distribution centers.

*iii.* ***Transition Services Agreement***

In connection with the Debtors' separation from the operations historically associated with Keeco, the Debtors entered into the TSA with Live Comfortably. CLP and Live Comfortably's leadership negotiated and established the TSA in 2024, prior to the hiring of the Debtors' management team that would ultimately be responsible for operating under its terms. CLP appears to have effectively managed Live Comfortably and directed Live Comfortably regarding its performance under the TSA.

The services provided under the TSA span substantially all of the Debtors' back-office and certain operational functions, including: (a) corporate information technology infrastructure, cybersecurity, enterprise applications, and end-user computing support; (b) finance and accounting services, including accounts receivable, accounts payable, corporate accounting, financial planning and analysis, tax compliance, and treasury functions; (c) human resources services, including payroll processing, benefits administration, workers' compensation coverage, and recruiting; (d) operations support, including customs bond access, transportation and logistics management, and distribution center access; and (e) sales and marketing support, including demand and supply planning, account management, product development, merchandising, design, and e-commerce platform management.

The Debtors had no independent information technology systems of their own at formation and, due to delays in updating the Debtors' formal name change with the Internal Revenue Service, the Debtors were delayed in establishing new vendor accounts with certain major customers and as a result were required to rely upon Live Comfortably to receive and remit to the Debtors their customers' remittance payments throughout the entirety of 2025 and continuing with several major customers in 2026. Live Comfortably, at the direction of CLP, frequently delayed remitting such payments to the Debtors, notwithstanding the Debtors' repeated demands for timely remittance. From January to May 2026, the Debtors' customers remitted more than 75% of the Debtors' collections to Live Comfortably's bank accounts. Such amounts ranged from $300,000 to $1.5 million per week during this period. Prior to and since the Petition Date, the Debtors have been investigating and reviewing the reconciliation of all amounts owing by Live Comfortably to the Debtors.

As of the Petition Date, the Debtors remain dependent on the services provided under the TSA and have not yet completed the transition to fully independent, stand-alone operations. The Debtors lack certain internal infrastructure, systems, and personnel to perform many of the functions currently provided by Live Comfortably under the TSA, and any disruption or termination of such services would materially impair the Debtors' ability to operate their business, fulfill customer orders, maintain financial reporting, and comply with applicable legal and regulatory requirements.

The TSA imposed substantial cost burdens on the Debtors, including trailing annual charges exceeding $2.5 million. As more fully described below, the Debtors and Live Comfortably became involved in a dispute regarding amounts owing under the TSA, culminating in Live Comfortably, under the direction of CLP, threatening to terminate the TSA and discontinue the critical services provided thereunder, which contributed to the Debtors' decision to commence these Chapter 11 Cases.

d. **The Hookless Litigation**

Debtor SIH is one of the plaintiffs, along with Zahner Design Group Limited ("ZDG") and Hookless Systems of North America ("HSNA," and collectively with ZDG and SIH, the "Plaintiffs") in the First Hookless Litigation, an intellectual property infringement action pending in the United States District Court for the Southern District of New York (the "SDNY Court"). The First Hookless Litigation concerns claims that Kartri Sales Company, Inc. ("Kartri") and its manufacturer Marquis Mills International, Inc. ("Marquis," and together with Kartri, the "Defendants") infringed upon the Plaintiffs' intellectual property rights in U.S. Patent Nos. 6,494,248; 7,296,609; and 8,235,088; and U.S. Design Patent No. D746,078 through their manufacture and sale of certain shower curtains; and that Defendants engaged in trademark infringement and unfair competition, including via trade dress violations related to the HOOKLESS® Mark. On December 22, 2022, the SDNY Court issued a written Opinion and Order in favor of the Plaintiffs. The SDNY Court entered a final judgment on June 15, 2023, including an enjoinment of Defendants from infringing or unfairly competing with, among other things, the HOOKLESS® Mark. Defendants appealed to the United States Court of Appeals for the Federal Circuit (the "Federal Circuit"). The Federal Circuit upheld some of the SDNY Court's findings, reversed others, and remanded for further proceedings on the remainder of the issues. On remand, the parties have completed two stages of briefing and are awaiting the SDNY Court's ruling.

On March 8, 2023, Keeco LLC (n/k/a Live Comfortably),[7] along with HSNA and ZDG, filed the Second Hookless Litigation against Kartri. The case was filed to redress further infringements by Kartri, and to seek relief for Kartri's violation of the injunction issued under the First Hookless Litigation. Kartri has moved to dismiss the action, and that motion is currently pending before the SDNY Court. The issues in the Second Hookless Litigation center upon the trade dress issues pending in the First Hookless Litigation. Accordingly, a ruling in the First Hookless Litigation will undoubtedly expedite the decision in the Second Hookless Litigation, and the Debtors anticipate a favorable outcome in both the First Hookless Litigation and the Second

[7] Although Live Comfortably is the named plaintiff in the Second Hookless Litigation, SIH is the successor-in-interest to the licensing rights relating to the Hookless brand. Accordingly, the Debtors expect to receive their proper allocation of the award, if any, in the Second Hookless Litigation.

Hookless Litigation, with the potential for a net recovery of approximately $2 million. The Debtors plan to allocate a significant portion of the proceeds of the Hookless Litigation to payment of creditors rather than to the fees of counsel in the Hookless Litigation, as approximately 90% of such fees are paid through the assignment of royalty payments resulting from a prior successful infringement action. CLP has asserted that the Debtors do not own or hold any right, title, or interest in the Hookless Litigation. Rather, CLP asserts that it owns or holds right, title, and interest in the Hookless Litigation to the exclusion of the Debtors. The Debtors are not aware, and have not been made aware, of any documentation suggesting that is the case.

e. **The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' capital structure consists of: (i) funded debt under the Prepetition Credit Facility described below; (ii) subordinated secured and unsecured debt obligations owed to CLP affiliates under the Subordinated CLP Secured Notes described below; and (iii) general unsecured liabilities, principally trade payables and disputed TSA obligations. The Debtors' primary assets consist of inventory, accounts receivable, FF&E, brand license agreements, international product sourcing and vendor relationships, and intangible intellectual property. As of August 3, 2026, the Debtors had approximately $274,307.35 in cash on hand. These amounts are swept daily, and the Debtors receive weekly operational disbursements in accordance with their cash management system and the DIP Documents.

*i.* ***The Prepetition Credit Facility***

As of the Petition Date, the Debtors are obligors with respect to not less than $17,916,002.34 (plus accrued but unpaid interest, fees, including commitment termination fees and expenses) in funded debt obligations under a revolving credit facility (the "Prepetition Credit Facility"), governed by the Prepetition Credit Agreement, among SIH Intermediate (f/k/a Soft Goods Intermediate, LLC), SIH Acquisition and SIH (f/k/a Soft Goods Operating, LLC), as Borrowers, the other Guarantors party thereto, the Prepetition Agent, and the Prepetition Lenders.

The Prepetition Credit Facility provides for a revolving credit facility with aggregate revolving credit commitments of $30,000,000 and matures on February 21, 2029. The obligations under the Prepetition Credit Facility are secured by a first-priority lien on substantially all of the assets of the Debtors. As of the Petition Date, the aggregate principal amount, plus accrued interest, owing by the Debtors to the Prepetition Secured Parties under the Prepetition Secured Credit Agreement is not less than $17,916,002.34 plus other Prepetition Secured Obligations. As of July 31, 2026, the Debtors have paid down approximately $582k of the Prepetition Secured Obligations, which may be subject to adjustment in accordance with the Final DIP Order, and believe the approximate amount of outstanding Prepetition Secured Obligations as of July 31, 2026 is $7,700,000.

*ii.* ***The Subordinated Sponsor Secured Notes and the 11th Lane Unsecured Note***

In connection with the formation of the Debtors and subsequent capital contributions, CLP, through its affiliated funds, provided capital to the Debtors structured in the form of the Subordinated Sponsor Notes and the 11th Lane Unsecured Note. The notes are held by CLP IV, CLP V, and 11th Lane (an affiliate of Centre Lane Partners), respectively. The Subordinated

Sponsor Secured Notes are subordinated in right of payment and lien priority to the obligations under the Prepetition Credit Facility pursuant to the Subordination and Intercreditor Agreement.

The CLP IV Secured Note has been amended and restated from time to time, and as of June 30, 2025, the principal balance of the CLP IV Secured Note was $6,875,633. Under its terms, all unpaid principal and accrued interest are due and payable on August 21, 2029. The CLP IV Secured Note accrues interest at a rate of 12% per annum, compounded annually, with interest capitalized and added to outstanding principal on each anniversary of the issuance date. According to the Debtors' books and records, as of Petition Date, the total outstanding balance of the CLP IV Secured Note, inclusive of principal and accrued interest, was $7,954,818, which is comprised of the principal amount of $6,875,633 plus accrued interest. The CLP IV Note Obligations are purportedly secured by a second-priority lien on substantially all of the Debtors' assets (the "CLP IV Note Liens") pursuant to that certain Second Lien Security Agreement, dated as of February 21, 2025, between SIH, as borrower, SIH Acquisition, as guarantor, non-Debtor SIH Intermediate, as the holding company, and CLP IV, as lender.

The CLP V Secured Note issued in favor of CLP V has been amended from time to time, and as of June 30, 2025, the principal balance of the CLP V Secured Note was $53,175,734. Like the CLP IV Secured Note, the CLP V Secured Note bears interest at 12% per annum, compounded annually, with interest payable as PIK interest. Under its terms, all unpaid principal and accrued interest are due and payable on August 21, 2029. According to the Debtors' books and records, as of the Petition Date, the total outstanding balance of the CLP V Note was $61,680,012, which is comprised of the principal amount of $53,175,734 plus accrued interest. Like the CLP IV Note Obligations, the CLP V Note Obligations are purportedly secured by a second-priority lien on substantially all of the Debtors' assets (the "CLP V Note Liens") pursuant to that certain Second Lien Security Agreement, dated as of February 21, 2025, between SIH, as borrower, SIH Acquisition, as guarantor, non-Debtor SIH Intermediate, as the holding company, and CLP V, as lender.

The combined outstanding balances of the CLP IV Secured Note ($7,954,818) and the CLP V Secured Note ($61,680,012), as reflected in the Debtors' books and records, total $69,634,830.

Debtor SIH Acquisition and 11th Lane are parties to the 11th Lane Unsecured Note issued in favor of 11th Lane, dated as of September 13, 2024, in the original principal amount of $17,000,000. Under its terms, all unpaid principal and accrued interest under the 11th Lane Unsecured Note is due and payable on September 19, 2028. The 11th Lane Unsecured Note is unsecured and, while papered as a "promissory note," is not reflected as a debt obligation on the Debtors' balance sheet. Rather, the amounts advanced under the 11th Lane Unsecured Note are reflected on the Debtors' books and records as an equity contribution.

The circumstances surrounding the 11th Lane Unsecured Note raise significant concerns for the Debtors. First, the Debtors are not in possession of any duly executed copy of the 11th Lane Unsecured Note or any amendments thereto. Second, equity contributions under the 11th Lane Unsecured Note may have been improperly elevated to debt obligations under the CLP IV Secured Note without the Debtors' informed consent. Specifically, the Debtors are in possession of an unsigned amendment to the 11th Lane Unsecured Note, dated as of November 26, 2025, which alleges that on such date CLP IV paid $1,952,362 to 11th Lane on behalf of SIH Acquisition,

resulting in a purported decrease in the 11thLane Unsecured Note Obligations from $17,000,000 to $15,047,638. Upon information and belief, the amounts that CLP IV ostensibly "paid down" were then purportedly added to the secured CLP IV Secured Note – converting an equity investment to a secured debt obligation, in each case without the consent of, and with no consideration to, the Debtors.

The circumstances surrounding the negotiation and preparation of the 11th Lane Unsecured Note and the propriety of the purported paydown and resulting increase to the secured CLP IV Secured Note are among the matters that are being examined as part of the Debtors' investigation.

*iii.* ***Unsecured Claims***

As of the Petition Date, the Debtors' unsecured liabilities primarily consisted of trade payables owed to vendors, including approximately $12 million in aged payables owed to non-go-forward vendors. In addition, the Debtors' unsecured liabilities include: (a) amounts owed to go-forward trade vendors, the full scope of which the Debtors continue to assess; (b) disputed amounts asserted by Live Comfortably under the TSA (as more fully described below); (c) lease obligations relating to the Debtors' office, showroom, and other facility locations; (d) disputed amounts under the 11th Lane Unsecured Note and (e) employee-related obligations. The Debtors have since Filed their Schedules, which evidence aggregate unsecured liabilities in the amount of approximately $45 million. The Debtors continue to analyze the universe of general unsecured claims and anticipate potential updates following the passage of the General Bar Date.

*iv.* ***CLP and Live Comfortably Parties' Position***

The Debtors acknowledge that CLP and Live Comfortably disputes and deny many of the allegations, characterizations, or assertions in this Disclosure Statement to the extent they relate to CLP, Live Comfortably, or any of their respective affiliates, funds, partners, members, managers, officers, directors, employees, agents, advisors, representatives, or other related persons (collectively, the "CLP and Live Comfortably Parties"). The Debtors are advised that the CLP and Live Comfortably Parties will vigorously contest and defend against any and all claims, causes of action, equitable subordination, recharacterization, disallowance, or other proceedings that may be asserted by the Debtors, the estates, any committee, the Liquidating Trust, or any other party in interest arising out of or relating to the matters described herein. Creditors and other stakeholders are cautioned that the allegations and statements in this Disclosure Statement are contested and should not be relied upon as established facts, admissions, or evidence of the truth of any matter asserted, or as any indication of the merits, likelihood of success, or potential recoveries from any actual or potential litigation involving any CLP and Live Comfortably Party. The CLP and Live Comfortably Parties expressly reserve all rights, remedies, defenses, objections, claims, counterclaims, setoff, recoupment, privileges, and immunities with respect to the statements contained in this Disclosure Statement.

f. **Events Leading to These Chapter 11 Cases**

The Debtors' path to these Chapter 11 Cases was shaped by a series of compounding and interconnected challenges: an undercapitalized opening balance sheet from the time of the carve-out transaction as compared to CLP's projections, the inheritance of diminished customer and supplier relationships from the prior Keeco operations, a reduction in certain major customer

programs that severely impaired the Debtors' revenue base, an ongoing dispute with respect to a Transition Services Agreement with Live Comfortably, the failure of multiple recapitalization, M&A transaction and refinancing efforts led by CLP, the refusal of CLP to provide necessary liquidity and capital support for the Debtors in the face of such failed transactions, and the imposition of reciprocal tariffs that eroded the Debtors' margins. Each of these factors is described in detail below.

### *i.* ***An Undercapitalized Opening Balance Sheet***

As described above, the Debtors were formed by way of a carve-out of the Soft Goods divisions historically associated with Keeco. In connection with the formation of the Debtors, CLP projected the Soft Goods business would generate significant sales and EBITDA in its first year of operations (2025), and scaling approximately two-fold thereafter. In terms of liquidity, CLP projected that the new company would have $5 million of cash when it commenced operations and would have approximately $49 million of finished goods inventory at closing of the Carve-Out Transaction.

The Carve-Out Transaction, originally expected to close in late October 2024, was delayed until February 21, 2025, and due to the delay in closing, CLP pre-funded a portion of the purchase price, releasing inventory and enabling CLP's other portfolio company, Live Comfortably, to recognize approximately $21 million of revenue from the Soft Good Business for January and February 2025 prior to the Debtors' formation. As a result, the Debtors' actual opening balance sheet differed drastically from CLP's projections (which projections were relied upon by the Debtors' prospective lenders to underwrite its financing): the Debtors started with no cash on hand, but did draw on the prepetition revolving facility, and received only approximately $29 million of inventory (of which approximately $22 million consisted of excess and obsolete inventory). In addition, accounts payable assumed by the Debtors, including payables in connection with the above-noted sales, were approximately $32 million versus the projected $25 million. This delay and resulting change in the opening financial position of the Debtors upon their formation negatively impacted their ability to manage working capital and maintain the historical profitability of the underlying Soft Goods business. The ultimate assets and liabilities delivered upon closing were, in the case of the assets, significantly lower, and in the case of the liabilities, significantly higher, than what was forecast and represented by CLP to the Prepetition Lenders and the Company's incoming management team during their respective diligence investigations.

Due to the negative change in the opening financial position of the Debtors and Keeco's prior fill rate failures, the newly hired management of the Debtors were required to immediately revise the Debtors' revenue plan for 2025 from $185 million ultimately down to $86 million.

In sum, the Debtors began their existence as an undercapitalized business with a damaged customer base, excess and obsolete inventory, no cash, and more debt and payables than anticipated, creating fundamental deficits from which the Debtors operated for more than a year but from which they were never able to fully recover.

*ii.* ***Inherited Operational Deficiencies and Customer Program Losses***

In fiscal year 2025, the Debtors' first full year of operations as a stand-alone company, the Debtors generated approximately $84.7 million in gross revenue and approximately $3.4 million in Adjusted EBITDA, substantially below projections.

The Debtors' underperformance was driven in significant part by the poor customer service levels and inventory mix inherited from Keeco: on the first day of the Debtors' operations, fill rates were approximately 30–40% for most product categories, far below the 95% or greater fill rates expected by the Debtors' retail partners. As a direct consequence, the Debtors lost material sales programs with certain major customers, including Wal-Mart.

In light of these deficiencies, the Debtors implemented a comprehensive sales and operations planning and improvement process, which rebounded fill rates to over 90% by the fourth quarter of 2025. However, the damage to customer relationships had already taken effect and certain programs were not recommenced, which permanently impaired the Debtors' revenue base and made it impossible to achieve the financial performance originally projected.

The Debtors' liquidity constraints also compounded the deterioration of their vendor relationships. As a consequence of the Debtors' inability to make timely payments to their supplier base, many vendors moved the Debtors to cash-in-advance or prepayment terms, while others significantly reduced or eliminated trade credit previously extended to the Debtors. These diminished trade terms placed additional strain on the Debtors already limited working capital, creating a self-reinforcing cycle in which reduced liquidity led to further vendor restrictions, which in turn further constrained the Debtors' ability to procure inventory and fulfill customer orders. This situation was due, in part, to Live Comfortably's failure to remit to SIH the receivables owed to SIH that were collected by Live Comfortably under the TSA.

Due to ongoing liquidity shortages, as of the Petition Date, the Debtors had gone more than twelve (12) weeks without making material payments to suppliers, including customs and duties, which resulted in service providers and customs brokers holding the Debtors' inventories at ports and in transit. As a result, the majority of the Debtors' supplier base, including key overseas manufacturing partners, suspended shipments to the Debtors pending receipt of outstanding payments, further impairing the Debtors' ability to maintain adequate inventory levels and service their customers.

*iii.* ***Impact of Tariffs and Failed Tariff Exemption Strategy***

In addition to the foregoing challenges facing the newly formed Debtors, reciprocal tariffs went into effect on April 15, 2025, further reducing the Debtors' margins. Despite management's requests for adequate capital to address the tariff impact, CLP provided limited financial support; instead, CLP directed the Debtors to forgo passing tariff cost increases on to customers based on CLP's expectation that it would be able to secure an exemption from all applicable tariffs. The compounding effect of the tariff burden further deteriorated the Debtors' financial position throughout the second half of 2025 and into 2026.

### *iv.* ***Failed Recapitalization and Refinancing Efforts***

Over the course of 2025 and into 2026, the Debtors and their stakeholders pursued multiple out-of-court alternatives to address the Debtors' deteriorating financial condition, none of which provided a sustainable solution.

In early 2026, in a further attempt to address the Debtors' capital needs, CLP advised the Debtors and the Prepetition Lenders that it planned to acquire a new business and roll it into the Debtors' existing business on an accelerated timeline in order to provide additional liquidity to the Debtors through the combined business and additional availability from term financing. To facilitate the transaction, CLP formed new entities, being the Debtors called SIH Beckham Buyer, LLC and its Debtor subsidiaries SIH-HSD Holdings, LLC, SIH-BB Holdings, LLC, SIH-DMD Holdings, LLC and SIH-SR Holdings, LLC.[8]

Ultimately, that transaction could not close due to unavailability of financing. The failure of that transaction eliminated the Debtors' potential path to recapitalization, utilizing significant resources, and left the Debtors without any viable out-of-court restructuring path; a dire situation that CLP determined not to resolve through additional financing or capital support.

Following the failure of that transaction, the Debtors and Reflect were required to evaluate all remaining options.

### *v.* ***TSA Disputes with Live Comfortably***

On April 28, 2026, Live Comfortably delivered a formal notice of breach to the Debtors, asserting that the Debtors had failed to pay for transition services under the TSA in the amount of approximately $5.1 million, and reserving the right to terminate the TSA and to suspend or cease providing services to the Debtors.

The Debtors dispute Live Comfortably's characterization of the amounts owed and have demanded a comprehensive reconciliation of all amounts due to and from the parties under the TSA, including a full accounting for all historical wrong-pockets payments received by Live Comfortably on behalf of the Debtors and all setoffs applied by Live Comfortably. Although the reconciliation has not been completed, the Debtors believe that Live Comfortably, at the direction of CLP, may have inappropriately set off a significant amount of cash collections rightly belonging to the Debtors, including customer remittance payments collected by Live Comfortably on the Debtors' behalf throughout 2025 and into 2026 that have not been credited for the account of the Debtors' in the reconciliation between amounts due to and from Live Comfortably and the Debtors.

The threatened termination of the TSA by Live Comfortably would not only effectively shut down substantially all of the Debtors' back-office operations, which would be potentially catastrophic to the Debtors' business and operations, but also would likely trigger an event of default under the Prepetition Credit Facility. After good faith efforts by the Debtors to resolve the dispute with Live Comfortably, the Debtors determined that these severe risks could not be mitigated through any available out-of-court mechanism.

---

[8] However, as described herein, the transaction never closed and, therefore, these entities never operated.

*vi.* ***The ABL Default and Proxy Exercise***

Beginning in June 2025 and through April 2026, the Prepetition Agent under the Prepetition Credit Facility, on behalf of the Prepetition Lenders, delivered to the Debtors and/or CLP various notices asserting defaults and events of default under the Credit Agreement. Among other things, the Debtors' borrowing base in respect of their borrowing facility from the lenders was in an overadvance position, such that the Debtors had no available financing. As a result, since December 2025, the Prepetition Lenders have provided funding to the Debtors in their permitted discretion, for critical obligations such as payroll, lease payments, vendor payments and payments to the Debtors' third-party logistics provider notwithstanding multiple and extensive events of default under the Prepetition Credit Facility. The lack of available liquidity placed even greater strain on the Debtors' ability to maintain their operations on a going concern basis, exacerbating the Debtors' already significant issues in paying their vendors and servicing their customers on time.

After repeated refusal by CLP to provide requested liquidity and capital support to the Debtors, on April 27, 2026, the Administrative Agent delivered to the Debtors a Notice of Exercise of Proxy Rights (the "Proxy Exercise"), pursuant to which the Prepetition Agent, acting as SIH Intermediate's and SIH's proxy and attorney-in-fact under the Prepetition Collateral Documents, exercised its voting rights and adopted a written consent removing SIH Intermediate as the sole member of SIH Acquisition and appointing Stuart Kaufman, Managing Director of Arete Capital Partners, LLC, as Independent Manager of SIH Acquisition, vested with sole and exclusive decision-making authority.

Following the Proxy Exercise, the newly constituted management of the Debtors, acting through Goodwin Procter LLP as replacement counsel, directed CLP and its affiliates, including Live Comfortably, to (i) immediately cease engaging with customers, vendors, lenders, and other counterparties on the Debtors' behalf and (ii) cooperate fully with the Independent Manager and the Debtors' officers and advisors in connection with the orderly transition of management of the business, while expressly demanding Live Comfortably to continue performing all of its obligations under the TSA.

Following the Proxy Exercise, the Prepetition Lenders provided additional funding under the Prepetition Credit Facility to fund critical obligations such as payroll, lease payments, and payments to the Debtors' third-party logistics provider. However, such funding was not sufficient to satisfy the Debtors' outstanding obligations to their vendors or to sustain the Debtors' ongoing operations through the Petition Date.

g. **Determination to File These Chapter 11 Cases**

Against this backdrop, the Debtors evaluated all available alternatives to a chapter 11 filing. At every instance, the efforts undertaken by CLP failed on their face and CLP's promises to provide liquidity or financial support to the Debtors did not materialize. Every out-of-court option that was pursued failed to provide a sustainable solution to the Debtors' original structural undercapitalization and ongoing deteriorating financial condition. The Debtors were left with critical liquidity needs that could not be funded outside of a formal restructuring process, a disputed TSA whose termination would destroy the Debtors' ability to operate, damaged supplier relationships, and existing defaults under the Prepetition Credit Facility. After careful

consideration of all available alternatives and deliberation with their advisors, the Debtors determined that filing these Chapter 11 Cases and pursuing a value-maximizing sale and liquidation process is in the best interest of the Debtors, their estates, and all of their stakeholders. The Debtors' core business retains real value, and these Chapter 11 Cases are intended to provide a stable platform from which the Debtors can preserve and maximize that value for the benefit of all parties in interest.

Together with their advisors, the Debtors determined that preservation of value for all stakeholders would be best accomplished by: (1) commencing an orderly liquidation of the Debtors' inventory and other working capital assets, and (2) pursuing a sale of the Debtors' business and/or assets as a going concern or otherwise.

To that end, prior to the Petition Date, and after soliciting proposals from four (4) liquidation firms, the Debtors engaged SB360 Capital Partners, LLC ("SB360") to serve as the Debtors' liquidation consultant to conduct liquidation sales of the Debtors' Inventory, Receivables, FF&E, and Intellectual Property (each as defined in Docket No. 215), subject to Court approval ("Liquidation Process").

In addition, the Debtors engaged Rock Creek to serve as their sales agent to develop and implement a comprehensive sale and marketing process designed to maximize the value of the Debtors' business and assets on a going concern basis, for the benefit of their estates and creditors, and to conduct lender outreach to ensure the Debtors had access to competitive debtor in possession financing to support the Chapter 11 process.

## 3.2 The Chapter 11 Case

### a. Generally

As set forth above, on the Petition Date, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of the Chapter 11 Cases created an estate of each of the Debtors that is comprised of all of the legal and equitable interests of the applicable Debtor as of that date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Prior to the Sale, the Debtors continued to operate their business and manage their properties as debtors and debtors in possession. On June 18, 2026, the U.S. Trustee appointed the Committee. No trustee or examiner has been appointed in the Chapter 11 Cases.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under Bankruptcy Code section 362, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Combined Disclosure Statement and Plan.

### b. "First Day" Motions and Related Applications

Commencing on the Petition Date, the Debtors Filed the following "first-day" motions and applications (collectively, the "First Day Motions") designed to ease the Debtors' transition into

chapter 11, maximize the value of the Assets, and minimize the effects of the commencement of these Chapter 11 Cases on their business:

i. Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases [Docket No. 2] (the "Joint Administration Motion");

ii. Application of Debtors for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief [Docket No. 3] (the "Claims Agent Retention Application");

iii. Motion of Debtors for Entry of Order (A) Authorizing the Debtors to Redact Certain Personally Identifiable Information and (B) Granting Related Relief [Docket No. 4] (the "PII Redaction Motion");

iv. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Programs and Surety Coverage and Pay all Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, or Enter into New Insurance Programs and Surety Bonds; (II) Authorizing All Banks to Honor Payments of Insurance Obligations; and (III) Granting Related Relief [Docket No. 5] (the "Insurance Motion");

v. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief [Docket No. 6] (the "Taxes Motion");

vi. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but Not Directing, the Debtors to (I) Pay Prepetition Wages, Compensation, Employee Benefits, and Other Employee Obligations (II) Continue Certain Employee Benefit Programs in the Ordinary Course; (B) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (C) Granting Related Relief [Docket No. 7] (the "Wages Motion");

vii. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Intercompany Transactions, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief [Docket No. 8] (the "Cash Management Motion");

viii. Debtors' Motion for Entry of an Interim and Final Orders (I) authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties,

(III) Modifying the Automatic Stay, (I) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 9] (the "DIP Motion");

ix. Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors Assets, (B) Authorizing the Debtors to Designate A Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief [Docket No. 12] (the "Bidding Procedures Motion"); and

x. Motion of Debtors for Interim and Final Orders (I)(A) Confirming, on an Interim Basis, That the Services Agreement is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Services Agreement; (II) Authorizing and Approving the Sales of Liquidation Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief [Docket No. 15] (the "Liquidation Services Agreement Motion").

Also on the Petition Date, the Debtors filed the Debtors' Motion for Entry of Order Shortening and Limiting Notice with Respect to the Debtors' Bidding Procedures Motion [Docket No. 14] (the "Motion to Shorten").

On June 9, 2026, the Bankruptcy Court entered orders (i) approving the relief requested in the Joint Administration Motion [Docket No. 48], the Claims Agent Retention Application [Docket No. 49], and the PII Redaction Motion [Docket No. 50] on a final basis, and (ii) approving the relief requested in the Insurance Motion [Docket No. 52], the Wages Motion [Docket No. 53], the Taxes Motion [Docket No. 54], the Cash Management Motion [Docket No. 55], the DIP Motion [Docket No. 58], and the Liquidation Services Agreement Motion [Docket 59] on an interim basis.

On June 30, 2026, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Taxes Motion [Docket No. 160], the Wages Motion [Docket No. 161], and the Insurance Motion [Docket No. 163].

On July 1, 2026, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Cash Management Motion [Docket No. 213], the DIP Motion [Docket No. 214], and the Liquidation Services Motion [Docket No. 215].

c. **Retention of Professional Advisors**

In the wake of the Debtors' liquidity constraints, Independent Manager and the CRO began to increasingly consider the need for the Debtors to restructure to ensure that the Debtors could maximize value for their stakeholders. In May of 2026, the Debtors engaged with Goodwin Procter LLP, as restructuring counsel, and Potter Anderson & Corroon LLP, as restructuring co-

counsel, and Reflect Advisors, LLC to provide the Debtors with a chief restructuring officer and restructuring staff. In June of 2026, the Debtors engaged Rock Creek as sales agent.

Pursuant to orders entered on June 30, 2026, the Bankruptcy Court authorized the Debtors to retain and employ (i) Potter Anderson & Corroon LLP as restructuring co-counsel [Docket No. 159]; (ii) Reflect Advisors, LLC to provide the Debtors with chief restructuring officer and restructuring staff [Docket No. 158]; and, (iii) Rock Creek as sales agent [Docket No. 165]. On June 30, 2026, the Bankruptcy Court authorized the Debtors to retain Epiq Corporate Restructuring, LLC as their administrative advisor [Docket No. 157]. On July 1, 2026, the Bankruptcy Court authorized the Debtors to retain and employ Goodwin Procter LLP as restructuring counsel [Docket No. 176].

On July 6, 2026, the Committee filed applications to retain and employ (i) Lowenstein Sandler LLP as counsel to the Committee [Docket No. 217]; (ii) Foresight Restructuring LLC as co-financial advisor to the Committee [Docket No. 218]; and (iii) Dundon Advisers LLC as co-financial advisor to the Committee [Docket No. 219].

d. **Debtor in Possession Financing**

Prior to the Petition Date, Rock Creek reached out to several parties, in addition to the eventual DIP Secured Parties, regarding the potential provision of debtor in possession financing, as the Debtors did not otherwise have the necessary liquidity to continue their business in the ordinary course while funding these Chapter 11 Cases. None of these parties were willing to provide such financing on both better and executable terms than the DIP Secured Parties. The financing the DIP Secured Parties are providing through the DIP Facility has furnished the Debtors with the necessary liquidity to prosecute these Chapter 11 Cases and conduct a value-maximizing sale process. Without the proceeds of the DIP Facility, the Debtors would be unable to fund payroll obligations or services from vendors, run the necessary sale process, or administer these Chapter 11 Cases, thereby dissipating value to the detriment of the Debtors' Estates and stakeholders.

e. **The Liquidation Process**

As set forth above, the Debtors retained SB360 to manage the liquidation of certain of the Debtors' assets through the Liquidation Process. Proceeds from the Asset Sales have been critical to the success and ongoing funding of the Debtors' Chapter 11 Cases and will remain so until the Closing of any Sale, the process for which is discussed below. Further detail on the Liquidation Process may be found in the Liquidation Services Agreement Motion. As of the beginning of August 2026, the Debtors have generated and collected approximately $2,000,000 in gross sales and receivables from the Liquidation Process.

f. **The Asset Sales**[9]

As set forth above, the Debtor engaged Rock Creek prior to the Petition Date to provide various sale-related services. Upon commencing its engagement and in parallel with SB360's Liquidation Process, Rock Creek began outreach to a broad universe of relevant strategic and

[9] Capitalized terms used in this section and not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion or the Bidding Procedures Order, as applicable.

financial parties to assess interest in an acquisition of all, or substantially all, of the Debtors' Assets.

In total, Rock Creek reached out to approximately 200 parties (65 strategic and 135 financial), sent marketing materials, set up a comprehensive data room, offered advisor and management calls, and made themselves available to answer diligence questions. Throughout the process, Rock Creek provided updates to the Debtors' management regarding the marketing efforts and the status of discussions with potentially interested parties.

On June 23, 2026, the Court entered the Bidding Procedures Order, setting the timeline for the sale process, including setting July 1, 2026 at 4:00 p.m. (ET) as the deadline for selection of a Stalking Horse Bidder (subsequently extended by notice to July 13, 2026 at 4:00 p.m. (ET)), July 27, 2026 at 5:00 pm (ET) as the deadline to submit Qualified Bids, and July 29, 2026 as the deadline to designate Qualified Bids or to cancel the Auction, as applicable. The Debtors did not designate a Stalking Horse Bidder.

The Cash proceeds from the Sales and the Liquidation Process will form the preliminary basis for the Distributions contemplated under the Combined Disclosure Statement and Plan, to be augmented by the monetization of other Liquidating Trust Assets.

The Debtors received six (6) Qualified Bids for certain of the Assets. In accordance with the Bidding Procedures, the Debtors held an Auction for the Assets on July 30, 2026. Following the Auction, the Debtors declared the Successful Bidders and the Backup Bidder. The results of the Auction are summarized in the *Notice of Auction Results* [Docket No. 305] and in the following chart:

| ASSETS | SUCCESSFUL BIDDER | SUCCESSFUL BID | BACKUP BIDDER | BACKUP BID |
|---|---|---|---|---|
| Debtors' intellectual property related to the Eclipse brand | YMF Carpets, Inc. d/b/a Creative Home Ideas ("YMF") | (i) An upfront cash payment of $2.3 million; and<br>(ii) a 2% royalty on net sales through December 31, 2029, including guaranteed minimum royalty payments totaling $600,000 payable in equal quarterly installments from 2027-2029, which the Debtors, in consultation with the Consultation Parties. valued together at $2,963,600 | S. Lichtenberg & Co., Inc. | (i) An upfront cash payment of $2.4 million; and<br>(ii) a 2% royalty on net sales through December 31, 2029, including guaranteed minimum royalty payments totaling $150,000 comprised of $50,000 installments payable each year from 2027-2029, which the Debtors valued together at $2,924,700 |

| | | | | |
|---|---|---|---|---|
| Debtors' intellectual property related to the Hookless brand | Elegant Home Interiors Inc. ("EHI") | (i) An upfront cash payment of $100,000; and<br>(ii) a 3% royalty on net sales up to a cap of $900,000, including guaranteed minimum royalty payments of $100,000 each year from 2027-2029 (totaling $300,000), which the Debtors, in consultation with the Consultation Parties, valued together at $403,000 | N/A | N/A |
| Debtors' intellectual property related to the Historic Charleston brand | Beatrice Home Fashions, Inc. ("Beatrice," and together with YMF and EHI, the "Successful Bidders") | (i) Upfront cash payment of $40,000, which the Debtors, in consultation with the Consultation Parties, valued at $40,000 | N/A | N/A |

After the Sale Hearing, the Bankruptcy Court entered the Sale Orders approving each of the Asset Purchase Agreements and Sales to the respective Purchasers. The Debtors anticipate the Closing of the Sales occurring no later than August 21, 2026. The Debtors anticipate generating approximately $3,000,000 of cash to the Estates following the Closing of the Sales and payment of the minumum guaranteed royalty payments described above.

g. **Schedules and Bar Dates**

On July 1, 2026, the Debtors Filed the Schedules. Among other things, the Schedules set forth the Claims of known or putative Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

On June 18, 2026, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Establishing Deadlines for the Filing of Proofs of Claim and Requests for Allowance of Administrative Expense Claims; (II) Approving the Forms and Manner of Notice Thereof; and (III) Granting Related Relief* [Docket No. 104] (the "Bar Date Motion"). On June 30, 2026, the Court entered the Bar Date Order [Docket No. 162], granting the relief requested in the Bar Date Motion. The Bar Date Order established the General Bar Date as August 10, 2026 at 5:00 p.m. (prevailing Eastern Time), the Governmental Bar Date as December 7, 2026 at 5:00 p.m. (prevailing Eastern Time), and will establish the Initial Administrative Claim Bar Date. As described in detail below, the Combined Disclosure Statement and Plan contemplates the

establishment of a Final Administrative Claim Bar Date and Professional Fee Claims Bar Date pursuant to the Confirmation Order.

The projected recoveries set forth in the Combined Disclosure Statement and Plan are based on certain assumptions, including the Debtors' estimates of the Claims and Interests that will eventually be Allowed in various Classes. There is no guarantee that the ultimate amount of each of such categories of Claims and Interests will correspond to the Debtors' estimates. The Debtors or the Liquidating Trustee, as applicable, and their professionals will investigate Claims and Interests Filed against the Debtors to determine the validity of such Claims. The Debtors or the Liquidating Trustee, as applicable, may File objections to Claims and Interests that are Filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

h. **The Wind-Down of the Estate**

Following the Closing of the Sale, if any, and the conclusion of the Liquidation Process, the Debtors will be focused on efficiently winding down their business, preserving Cash, and monetizing their remaining Assets. The Debtors' remaining Assets (which, upon the Effective Date, shall constitute the Liquidating Trust Assets) shall consist of (i) Remaining Cash, (ii) after payment of Allowed Professional Fees Claims, Cash in the Professional Fee Reserve (if any), (iii) after payment of Allowed Professional Fee Claims, any retainers, deposits, or similar instruments or agreements held by the Debtors' Professionals, (iv) the Excluded Assets, (v) the Retained Causes of Action, (vi) all Cash in the Wind-Down Account; and (vii) any and all other Assets, including inventory and accounts receivable, of the Debtors other than Acquired Assets. This Combined Disclosure Statement and Plan provides for the Liquidating Trust Assets, to the extent not already liquidated, to be liquidated over time and the proceeds thereof to be distributed to holders of Allowed Claims in accordance with the terms of the Combined Disclosure Statement and Plan and the treatment of Allowed Claims described more fully herein. The Liquidating Trustee will effect such liquidation and distributions subject to the governance terms of the Liquidating Trust Agreement.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

### 4.1 Confirmation Procedure.

The Solicitation Procedures Order, among other things, conditionally approves the Combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Combined Disclosure Statement and Plan. The Confirmation Hearing has been scheduled for **September 18, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom 7, Wilmington, Delaware 19801 to consider (a) final approval of the disclosures contained in the Combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 and (b) confirmation of the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice with the Bankruptcy Court.

**4.2 Procedure for Objections.**

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 or confirmation of the Combined Disclosure Statement and Plan must be made in writing and Filed with the Bankruptcy Court and served so that it is received by the following parties no later than **September 11, 2026 at 4:00 p.m. (prevailing Eastern Time)**: (i) counsel to the Debtors: (a) Goodwin Procter LLP, 620 Eighth Ave., New York, NY 10018 (Attn: Kizzy L. Jarashow (kjarashow@goodwinlaw.com) and Barry Z. Bazian (bbazian@goodwinlaw.com)) and (b) Potter Anderson & Corroon LLP 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: L. Katherine Good (kgood@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com)); (ii) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin A. Hackman, Esq. (benjamin.a.hackman@usdoj.gov)); (iii) counsel to the DIP Secured Parties: (a) Paul Hastings, LLP 200 Park Avenue, New York, New York 10166 (Attn: Roger Schwartz (rogerschwartz@paulhastings.com), Peter Montoni (petermontoni@paulhastings.com), William Reily (williamreily@paulhastings.com), and Alison Sikes (alisonsikes@paulhastings.com)) and (b) Young Conaway Stargatt & Taylor, LLP 1000 North King Street, Wilmington, DE 19801 (Attn: Joseph Barry (jbarry@ycst.com) and Joseph Mulvihill (jmulvihill@ycst.com) and (c) Parker, Hudson, Rainer & Dobbs LLP 303 Peachtree Street NE, Suite 3600, Atlanta, Georgia 30308 (Attn: Harris Winsberg (hwinsberg@phrd.com)); and (iv) counsel to the Committee: (a) Lowenstein Sandler LLP (1) 1251 Avenue of the Americas, 17th Floor, New York, NY 10020 (Attn: Jeffrey L. Cohen (jcohen@lowenstein.com), Gianfranco Finizio (gfinizio@lowenstein.com), and Eric Seltzer (eseltzer@lowenstein.com); and (2) 1000 N. West Street, Suite 1200, Wilmington, DE 19801 (Attn: Shanti M. Katona (skatona@lowenstein.com) and Michael V. DiPietro (mdipietro@lowenstein.com). Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3 Requirements for Confirmation.**

The Bankruptcy Court will confirm the Combined Disclosure Statement and Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129. Among other requirements, the Combined Disclosure Statement and Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Combined Disclosure Statement and Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to, such Class; and (ii) must be feasible. The Bankruptcy Court must also find that the Combined Disclosure Statement and Plan: (i) has classified Claims and Interests in a permissible manner; (ii) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) has been proposed in good faith.

**4.4 Solicitation and Voting Procedures.**

Classes 3 (Prepetition Secured Claims), 4 (Subordinated Sponsor Secured Note Claims), and 5 (General Unsecured Claims) are the Voting Classes. Except as otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 3, 4, and 5 against the Debtors may vote on the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code section 1126.

Accordingly, a Ballot for acceptance or rejection of the Combined Disclosure Statement and Plan was provided only to Holders of Allowed Claims in Classes 3 (Prepetition Secured Claims), 4 (Subordinated Sponsor Secured Note Claims), and 5 (General Unsecured Claims).

The Solicitation Packages provided to Holders of Prepetition Secured Claims, Subordinated Secured Sponsor Note Claims, and General Unsecured Claims in the Voting Classes contain: (a) this Combined Disclosure Statement and Plan; (b) the Confirmation Hearing Notice; (c) a Ballot, including voting instructions and a preaddressed, postage prepaid return envelope; (d) the Solicitation Procedures Order (without exhibits); (e) an Opt-In Form; and (f) such other materials as the Bankruptcy Court may have directed or approved, or that the Debtors deemed appropriate. Holders of all other Claims and Interests in non-voting classes that were deemed to either accept or reject the Combined Disclosure Statement and Plan and other parties in interest received only the Confirmation Hearing Notice, a Notice of Non-Voting Status, and/or a copy of the Combined Disclosure Statement and Plan. Copies of the Combined Disclosure Statement and Plan and any exhibits annexed thereto are available on the Claims Agent's website at https://dm.epiq11.com/case/simplyinterior. Any Creditor or party-in-interest can request a hard copy of the Combined Disclosure Statement and Plan be sent to them by regular mail by contacting the Claims Agent by email at simplyinteriorinfo@epiqglobal.com.

Pursuant to the Solicitation Procedures Order, the Voting Record Date for determining which Holders of Claims in Classes 3, 4, and 5 could vote on the Combined Disclosure Statement and Plan was August 10, 2026.

The Voting Deadline by which the Claims Agent must have **ACTUALLY RECEIVED original Ballots is September 11, 2026 at 4:00 p.m. (prevailing Eastern Time)**. To be counted as votes to accept or reject the Combined Disclosure Statement and Plan, Ballots must have been properly executed, completed, and delivered to the Claims Agent at the following address, if by first class mail: Simply Interior Homes, *et al.*, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422; or if by overnight courier, messenger, or hand delivery: Simply Interior Homes, *et al.*, c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005. In addition to accepting paper Ballots by mail, overnight courier, and personal delivery, Ballots from Holders of Claims in the Voting Classes may be submitted electronically (an "E-Ballot") and transmitted solely through a customized online balloting portal at https://dm.epiq11.com/simplyinterior and under the "Case Actions" section by clicking on "E-Ballot" (the "E-Balloting Portal"). Parties entitled to vote may have cast an electronic Ballot and electronically signed and submitted the Ballot instantly by utilizing the E-Balloting Portal, which allows a Holder to submit an electronic signature. The instructions for submission of E-Ballots were set forth on the Ballot. The encrypted Ballot data and audit trail created by such electronic submission became part of the record of any Ballot submitted in this manner and the Holder's electronic signature were deemed to be immediately legally valid and effective.

If you were entitled to vote to accept or reject the Combined Disclosure Statement and Plan, a Ballot was enclosed in your Solicitation Package. Subject to the Tabulation Procedures (as defined in the Solicitation Procedures Order), which are incorporated into this Combined Disclosure Statement and Plan by reference, any Ballot that was timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection, or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

### 4.5 Classification of Claims and Interests.

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Bankruptcy Code section 1123, the Combined Disclosure Statement and Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to Bankruptcy Code section 1123(a)(1) need not be and have not been classified). The Debtors are required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Combined Disclosure Statement and Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Combined Disclosure Statement and Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Combined Disclosure Statement and Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Combined Disclosure Statement and Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Combined Disclosure Statement and Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Combined Disclosure Statement and Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Combined Disclosure Statement and Plan, to make such permissible modifications to the Combined Disclosure Statement and Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims or Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Disclosure Statement and Plan.

**EXCEPT AS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF**

**THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim or Interest that ultimately is Allowed by the Bankruptcy Court may vary from any estimated amount of such Claim or Interest and, accordingly, the total Claims or Interests that are ultimately Allowed by the Bankruptcy Court with respect to each Class of Claims or Interests may also vary from any estimates contained herein with respect to the aggregate Claims or Interests in any Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors and Holders of Interests. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Combined Disclosure Statement and Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests taking into account the differing nature and priority (including any applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined Disclosure Statement and Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Combined Disclosure Statement and Plan, or do not vote to accept the Combined Disclosure Statement and Plan, but who will be bound by the provisions of the Combined Disclosure Statement and Plan if it is confirmed by the Bankruptcy Court.

### 4.6 Impaired Claims and Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Bankruptcy Code section 1124) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under Bankruptcy Code section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

As of the Solicitation Date, under the Combined Disclosure Statement and Plan, Holders of Intercompany Claims in Class 6, Intercompany Interests in Class 7, 510(b) Claims in Class 8, and Interests in Class 9 were Impaired and do not stand to receive or retain any property under the Combined Disclosure Statement and Plan on account of such Claims or Interests and, therefore, were not entitled to vote on the Combined Disclosure Statement and Plan and were deemed to reject the Combined Disclosure Statement and Plan. Under the Combined Disclosure Statement and Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, are not entitled to vote on the Combined Disclosure Statement and Plan and were deemed to accept the Combined Disclosure Statement and Plan. Holders of Class 3 Prepetition Secured Claims, Class 4 Subordinated Sponsor Secured Note Claims, and Class 5 General Unsecured Claims are Impaired and entitled to vote on the Combined Disclosure Statement and Plan.

### 4.7 Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. Under section 1129(a)(10) of the Bankruptcy Code, a plan may be confirmed, even if it is not accepted by all impaired classes of claims (as opposed to interests), if the plan has been accepted by at least one impaired class of claims (if any), and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b)(2)(A) or (b)(2)(B), as applicable. Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Intercompany Claims in Class 6, Intercompany Interests in Class 7, 510(b) Claims in Class 8, and Interests in Class 9 are deemed to reject the Combined Disclosure Statement and Plan and, as of the Solicitation Date, are not expected to receive any payment or retain any property hereunder on account of any Intercompany Claims, Intercompany Interests, 510(b) Claims, or Interests, the Debtors will seek confirmation of the Combined Disclosure Statement and Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in Bankruptcy Code section 1129(b)(2)(B).

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Combined Disclosure Statement and Plan, all Impaired Classes are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class. Accordingly, the Debtors believe that the Combined Disclosure Statement and Plan does not discriminate unfairly as to any Impaired Class.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

a. ***Secured Creditors***. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b. ***Unsecured Creditors***. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c. ***Interests***. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference

to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the Distributions provided under the Combined Disclosure Statement and Plan satisfy the absolute priority rule, where required.

### 4.8 Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Combined Disclosure Statement and Plan). Inasmuch as the Liquidating Trust Assets have been, or will be, liquidated and the Combined Disclosure Statement and Plan provides for the Distribution of all of the Cash proceeds of the Liquidating Trust Assets to Holders of Claims that are Allowed in accordance with the Combined Disclosure Statement and Plan, for purposes of this test, the Debtors have analyzed the ability of the Liquidating Trustee to meet its obligations under the Combined Disclosure Statement and Plan. Based on the Debtors' analysis, the Liquidating Trustee will have sufficient assets to accomplish its tasks under the Combined Disclosure Statement and Plan. Therefore, the Debtors believe that the liquidation pursuant to the Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

### 4.9 Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Combined Disclosure Statement and Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by

the Combined Disclosure Statement and Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in chapter 7 cases.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Combined Disclosure Statement and Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Liquidating Trust Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals) that are allowed in the chapter 7 cases.

Attached hereto as **Exhibit A** is a hypothetical chapter 7 liquidation analysis, reflecting a greater distribution to Creditors pursuant to the Combined Disclosure Statement and Plan than Creditors would receive in a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Combined Disclosure Statement and Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Combined Disclosure Statement and Plan complies with Bankruptcy Code section 1129(a)(7).

### 4.10 Acceptance of the Combined Disclosure Statement and Plan

The rules and procedures governing eligibility to vote on the Combined Disclosure Statement and Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order. For the Combined Disclosure Statement and Plan to be accepted by an Impaired Class of Claims, at least two-thirds in the amount of the Claims voting in such Class and at least one-half in number of the Claims in such Class must vote to accept the Combined Disclosure Statement and Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY CAST YOUR VOTE BY EITHER DELIVERING YOUR BALLOT TO THE CLAIM AGENT AT THE ADDRESS IDENTIFIED ON YOUR BALLOT OR BY SUBMITTING AN E-BALLOT ON THE CLAIMS AGENT'S E-BALLOTING PORTAL. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, PLEASE CONTACT THE CLAIMS AGENT BY EMAIL AT: SIMPLYINTERIORINFO@EPIQGLOBAL.COM. THE CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

# ARTICLE V
# CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF GENERAL UNSECURED CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION.

## 5.1 The Combined Disclosure Statement and Plan May Not Be Confirmed

Even if the Debtors receive the requisite acceptances, or otherwise meets the applicable legal requirements for cramdown, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Disclosure Statement and Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined Disclosure Statement and Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Disclosure Statement and Plan is not confirmed, it is unclear what Distributions Holders of Allowed Claims (to the extent entitled to Distributions) ultimately would receive with respect to such Claims or Interests in a subsequent plan of liquidation.

If the Combined Disclosure Statement and Plan is not confirmed, the Combined Disclosure Statement and Plan will need to be revised and it is unclear whether a chapter 11 liquidation of the Debtors' remaining Assets could be implemented and what Distribution the Holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining Assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Disclosure Statement and Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' Creditors as those proposed in the Combined Disclosure Statement and Plan.

## 5.2 Distributions to Holders of Allowed Claims and Interests under the Combined Disclosure Statement and Plan May Be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Disclosure Statement and Plan are correct.

These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims and in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.3 Objections to Classification of Claims

Bankruptcy Code section 1122 requires that the Combined Disclosure Statement and Plan classify Claims and Interests. The Bankruptcy Code also provides that the Combined Disclosure Statement and Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Combined Disclosure Statement and Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Combined Disclosure Statement and Plan to be confirmed, the Debtors may seek to (i) modify the Combined Disclosure Statement and Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims or Interests in a Voting Class pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims or Interests, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Combined Disclosure Statement and Plan, by changing the composition of such Class and the vote required for consensual approval of the Combined Disclosure Statement and Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Disclosure Statement and Plan based upon such reclassification. Except to the extent that modification of classification in the Combined Disclosure Statement and Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined Disclosure Statement and Plan by any Holder of Claims or Interests pursuant to this solicitation will constitute a consent to the Combined Disclosure Statement and Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Combined Disclosure Statement and Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder in a Voting Class.

The Bankruptcy Code also requires that the Combined Disclosure Statement and Plan provide the same treatment for each Claim of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that the Combined Disclosure Statement and Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined Disclosure Statement and Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Combined Disclosure Statement and Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Combined Disclosure Statement and Plan and could increase the risk that the Combined Disclosure Statement and Plan will not be consummated.

### 5.4 Failure to Consummate the Combined Disclosure Statement and Plan

The Combined Disclosure Statement and Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Combined Disclosure Statement and Plan, there can be no assurance that any or all of the conditions in the Combined Disclosure Statement and Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Combined Disclosure Statement and Plan will be confirmed by the Bankruptcy Court. Further, if the Combined Disclosure Statement and Plan is confirmed, there can be no assurance that the Combined Disclosure Statement and Plan will be consummated.

### 5.5 Combined Disclosure Statement and Plan Releases May Not Be Approved

There can be no assurance that the releases, as provided in Article XIV of the Combined Disclosure Statement and Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Combined Disclosure Statement and Plan, or the Combined Disclosure Statement and Plan not being confirmed.

### 5.6 Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims or Interests in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to Creditors or Interest Holders in such Class to be reduced substantially. Additionally, the amount of Cash realized from the liquidation of the Liquidating Trust Assets could be less than anticipated, which could cause the amount of Distributions to Creditors to be reduced substantially.

### 5.7 Risks Related to Retained Causes of Actions

There is no guarantee that any of the Retained Causes of Action will be prosecuted, or that any such Retained Causes of Action are viable as a matter of fact and/or law. Furthermore, to the extent the Liquidating Trustee determines to prosecute any potential Retained Causes of Action, there is no guarantee as to the success of pursuing such Retained Causes of Action or that, if successful, that there will be an increase in the funds available for Distribution. The success in pursuing any Retained Causes of Action, as well as the expenses incurred in investigating and prosecuting the Retained Causes of Action, may materially affect the recoveries for the Holders of Allowed Claims. For purposes of the Combined Disclosure Statement and Plan, no value has been ascribed to the Retained Causes of Action.

### 5.8 Certain Tax Considerations

**HOLDERS OF CLAIMS OR INTERESTS CONCERNED WITH HOW THE COMBINED DISCLOSURE STATEMENT AND PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND ADVISORS. THE BELOW TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX**

**CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

The following discussion summarizes certain U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to the Debtors and to certain holders of Claims or Interests. This discussion is based on the IRC, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below. Furthermore, this discussion is not binding on the IRS or any other tax authority. There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Combined Disclosure Statement and Plan that differs from the tax consequences described below. No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Combined Disclosure Statement and Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, traders that mark-to-market their securities, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim or Interest as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims or Interest through a partnership or other pass-through entity, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-U.S. tax consequences of the Combined Disclosure Statement and Plan. In addition, this summary does not address federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are unimpaired under the Combined Disclosure Statement and Plan or that are not entitled to receive or retain any property under the Combined Disclosure Statement and Plan or to Persons who are deemed to have rejected the Combined Disclosure Statement and Plan.

a. **Federal Income Tax Consequences to the Debtors.**

(i) Sale of Assets. The Sale constituted taxable dispositions of the Debtors' assets. The Debtors will recognize gain or loss equal to the difference between the amount received for those assets in the Sale and the Debtors' adjusted tax basis in those assets. The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale. The Debtors also expect to have net operating losses ("NOLs") from prior taxable years available that may be carried forward to offset a portion of the gain from the Sale. For NOLs arising prior to 2018, such NOLs can generally be carried forward for 20 years to offset taxable income. As a result of the enactment of the Tax Cuts and Jobs Act of 2017,

NOLs arising in 2018 and thereafter can be carried forward indefinitely but can only offset 80% of taxable income for a taxable year. The Debtors have not done an analysis of the amount of pre-2018 NOLs and NOLs arising in 2018 and thereafter to determine if all taxable income arising from the Debtors' assets sales can be offset with prior NOLs. To the extent current year losses and NOLs and other tax deductions are not available to offset the Debtors' gain from the Sale, the Debtors will owe tax on such gains. Any such tax will be an Administrative Claim.

(ii) Cancellation of Indebtedness and Reduction of Tax Attributes. For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("COD"). In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Combined Disclosure Statement and Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income. COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax attributes (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge. Existing NOLs will therefore be available to offset gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

b. **Exemption from Certain Transfer Taxes.**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by the Debtors, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Combined Disclosure Statement and Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Combined Disclosure Statement and Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Combined Disclosure Statement and Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

c. **Federal Income Tax Consequences to Holders of Claims or Interests.**

(i) Characterization. The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Combined

Disclosure Statement and Plan and any Distributions pursuant to the Combined Disclosure Statement and Plan may vary, depending upon, among other things: (A) whether the Claim (or a portion of the Claim) is for principal or interest; (B) the type of consideration the Holder receives for the Claim or Interest, (C) whether the Holder receives Distributions under the Combined Disclosure Statement and Plan in more than one taxable year; (D) the manner in which the Holder acquired the Claim or Interest; (E) the length of time that the Claim or Interest has been held; (vi) whether the Claim or Interest was acquired at a discount; (F) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (G) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (H) the Holder's method of tax accounting; (I) whether the Claim is an installment obligation for U.S. federal income tax purposes; (J) whether the Claim or Interest, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (K) whether and the manner in which the "market discount" rules of the IRC apply to the Holder of the Claim or Interest.

(ii) Gain and Loss Recognition. Holders that receive cash and property other than stock and securities for their Claim or Interest will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim or Interest. The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under the Combined Disclosure Statement and Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim or Interest (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder. Such gain or loss may be long-term capital gain or loss if the Claim or Interest disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder is urged to consult such Holder's own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

(iii) Interest Issues. Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under the Combined Disclosure Statement and Plan. Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder. The Combined Disclosure Statement and Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim has been Paid in Full. The Debtors' tax returns will be filed in a manner consistent with this allocation, but it is uncertain whether this allocation will be respected by the IRS. The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If

the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to such Holder's Claims. Each Holder is urged to consult such Holder's own tax advisor regarding the amount of such Holder's Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the holder previously included in income.

(iv) Bad Debt and Worthless Security Deductions. A Holder who receives, in respect of such Holder's Claim or Interest, an amount that is less than such Holder's tax basis in the Claim or Interest may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of such Holder's Claim or Interest may be required to include in income amounts received under the Combined Disclosure Statement and Plan that exceed the Holder's adjusted basis in its Claim or Interest.

(iv) Installment Obligations. A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Combined Disclosure Statement and Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

(v) Market Discount. A Holder of a Claim or Interest that acquires a Claim or Interest at a market discount generally is required to treat any gain realized on the disposition of the Claim or Interest as ordinary income to the extent of the market discount that accrued during the period the Claim or Interest was held by the Holder and that was not previously included in income by the Holder.

(vi) Withholding. Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules. The Combined Disclosure Statement and Plan authorizes the Debtors and the Liquidating Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder. Holders are required to provide the Debtors and the Liquidating Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Combined Disclosure Statement and Plan, holders of Claims or Interests that receive a Distribution pursuant to the Combined Disclosure Statement and Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with

respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Liquidating Trustee, as applicable, for the payment and satisfaction of such obligations.

(vii) Backup Withholding. Holders may be subject to backup withholding on payments pursuant to the Combined Disclosure Statement and Plan unless the Holder (A) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

(viii) Certain Disclosure Requirements. Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Combined Disclosure Statement and Plan would be subject to these regulations and would require such disclosure.

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

### 6.1 DIP Facility Claims

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable or alternative treatment, on or before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Facility Claims, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) has consented to receive and shall receive, payment in full in Cash in the amount of such Holder's *pro rata* share of the Distributable Value in accordance with the Waterfall Recovery, which Distributable Value shall be applied in accordance with the terms of the DIP Documents. For the avoidance of doubt, the provisions of the DIP Order survive the entry of the Confirmation Order.

### 6.2 Administrative Claims.

Except as otherwise set forth in this Article VI, as soon as practicable after the Effective Date, each Holder of an Allowed Administrative Claim (including Allowed Professional Fee Claims) shall receive, from the Liquidating Trust Assets, in full and final satisfaction of and in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other treatment as to which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(a) ***Final Administrative Claim Bar Date***. Holders of Administrative Claims, other than Professional Fee Claims, accruing on or between the Closing Date and the Effective

Date shall File with the Claims Agent and serve on the Liquidating Trustee requests for allowance and payment of such Administrative Claims, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date. The Effective Date Notice shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date. Absent further Court order, any such Administrative Claim (which, for the avoidance of doubt, excludes Professional Fee Claims) not Filed by the Final Administrative Claim Bar Date shall be deemed waived and the Holder of such Final Administrative Claim shall be forever barred from receiving payment on account thereof.

(b) ***Objections***. Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

(c) ***Professional Fee Claims***. All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The Effective Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Professional Fee Claim Bar Date. Objections to any Professional Fee Claims must be Filed and served on the Liquidating Trustee and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims. Allowed Professional Fee Claims shall be paid from (i) Remaining Cash, (ii) the Professional Fee Reserve, or (iii) Liquidating Trust Assets, or any combination thereof in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable.

The Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date to prepare final fee applications; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Retained Professionals' final request for payment of Filed Professional Fee Claims. The Debtors shall fund and reserve the Professional Fee Reserve until payment in full of all Allowed Professional Fee Claims. The Professional Fee Reserve may be held, at the Debtors' option, in an escrow account. If the Professional Fee Reserve is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims, to extent permitted under the DIP Order, shall be paid by the Liquidating Trustee as Allowed Administrative Claims. The Professional Fee Reserve cannot be used to pay any Secured, Priority, or Administrative Claims, or to make any other Distribution, until all Professional Fee Claims are satisfied or otherwise reserved for.

(d) ***U.S. Trustee Fees***. U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. After the Effective Date, the Post-Effective Date Debtors and the Liquidating Trust shall be jointly and severally

liable to pay any and all U.S. Trustee Fees in full in Cash when due and payable. The Debtors shall file all monthly operating reports covering the time period before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidating Trustee, on behalf of each of the Post-Effective Date Debtors and the Liquidating Trust, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each of the Post-Effective Date Debtors and the Liquidating Trust shall remain obligated to pay U.S. Trustee Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. U.S. Trustee Fees are Allowed. The U.S. Trustee shall not be required to file any Proof of Claim in these cases and shall not be treated as providing any release under the Combined Disclosure Statement and Plan. Notwithstanding anything in the Combined Disclosure Statement and Plan and/or Plan Supplement to the contrary, nothing in the Combined Disclosure Statement and Plan and/or Plan Supplement shall: (i) constitute a determination (judicial or otherwise) that future distributions in the Chapter 11 Cases are not disbursements under 28 U.S.C. § 1930; (ii) otherwise exempt or shelter future distributions in the Chapter 11 Cases from 28 U.S.C. § 1930; nor (iii) in any way prejudice the U.S. Trustee's rights under 28 U.S.C. § 1930 (which rights are fully reserved and preserved).

### 6.3 Priority Tax Claims.

Within the time period provided in Article X of the Combined Disclosure Statement and Plan, each Holder of an Allowed Priority Tax Claim shall receive, from the Liquidating Trust Assets, in full and final satisfaction of and in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which the Debtors or the Liquidating Trustee, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

## ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

All Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is classified in a particular Class for the purpose of receiving distributions under the Combined Disclosure Statement and Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Unless the Holder of an Allowed Claim and the Debtors, or the Liquidating Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Combined Disclosure Statement and Plan:

**7.1 Class 1: Other Secured Claims.**

a. Classification. Class 1 consists of Other Secured Claims against the Debtors.

b. Impairment and Voting. Class 1 is Unimpaired by the Combined Disclosure Statement and Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Liquidating Trustee, as applicable, in full and final satisfaction of and in exchange for such Allowed Other Secured Claim: (i) return of the collateral securing such Holder's Allowed Other Secured Claim; or (ii) payment in full in Cash of such Holder's Allowed Other Secured Claim; or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

**7.2 Class 2: Priority Non-Tax Claims.**

a. Classification. Class 2 consists of Priority Non-Tax Claims against the Debtors.

b. Impairment and Voting. Class 2 is Unimpaired by the Combined Disclosure Statement and Plan. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of and in exchange for such Allowed Priority Non-Tax Claim: (i) payment in full in Cash of such Holder's Allowed Priority Non-Tax Claim; or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**7.3 Class 3: Prepetition Secured Claims.**

a. Classification. Class 3 consists of Prepetition Secured Claims against the Debtors.

b. Impairment and Voting. Class 3 is Impaired by the Combined Disclosure Statement and Plan. Holders of Prepetition Secured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. Except to the extent that a Holder of an Allowed Prepetition Secured Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Secured Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed Prepetition Secured Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holder to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery.

**7.4 Class 4: Subordinated Sponsor Secured Note Claims.**

**a.** Classification. Class 4 consists of Subordinated Sponsor Secured Note Claims against the Debtors.

**b.** Impairment and Voting. Class 4 is Impaired by the Combined Disclosure Statement and Plan. Holders of Subordinated Sponsor Secured Note Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

**c.** Treatment. Except to the extent that a Holder of an Allowed Subordinated Sponsor Secured Note Claim agrees to less favorable treatment, each Holder of an Allowed Subordinated Sponsor Secured Note Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed Subordinated Sponsor Secured Note Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holders to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery.

**7.5 Class 5: General Unsecured Claims.**

a. Classification. Class 5 consists of General Unsecured Claims against the Debtors.

b. Impairment and Voting. Class 5 is Impaired by the Combined Disclosure Statement and Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in exchange for the full and final satisfaction, settlement, and release of such Allowed General Unsecured Claim, its *pro rata* share of Liquidating Trust Interests which shall entitle such Holder to its *pro rata* distribution of Distributable Value in accordance with the Waterfall Recovery. For the avoidance of doubt, for purposes of calculating each Holder's *pro rata* share of Liquidating Trust Interests and Distributable Value, no Subordinated Sponsor Note Deficiency Claim shall be included in the aggregate amount of Allowed General Unsecured Claims unless and until such Subordinated Sponsor Note Deficiency Claim has been finally determined by the outcome of litigation (whether by Final Order or by settlement approved by the Bankruptcy Court), including with respect to the Retained Causes of Action, described in more detail in Section 9.4 of the Combined Disclosure Statement and Plan.

**7.6 Class 6: Intercompany Claims.**

a. Classification. Class 6 consists of the Intercompany Claims.

b. Impairment and Voting. Class 6 is Impaired by the Combined Disclosure Statement and Plan. Holders of Intercompany Claims are conclusively presumed to have

rejected the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. Each of the Debtors shall agree that any and all Intercompany Claims between the Debtors will be canceled on the Effective Date and the Debtors shall not receive any recovery, subject to tax considerations minimizing the Debtors' tax liabilities.

**7.7 Class 7: Intercompany Interests.**

a. Classification. Class 7 consists of all Intercompany Interests.

b. Impairment and Voting. Class 7 is Impaired by the Combined Disclosure Statement and Plan. Holders of Intercompany Interests are conclusively presumed to have rejected the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. On the Effective Date, all Intercompany Interests shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Intercompany Interests.

**7.8 Class 8: 510(b) Claims.**

a. Classification. Class 8 consists of 510(b) Claims against the Debtors.

b. Impairment and Voting. Class 8 is Impaired by the Combined Disclosure Statement and Plan. Holders of 510(b) Claims are conclusively presumed to have rejected the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

**c.** Treatment. On the Effective Date, all 510(b) Claims shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such 510(b) Claims.

**7.9 Class 9: Interests.**

a. Classification. Class 9 consists of Interests in the Debtors.

b. Impairment and Voting. Class 9 is Impaired by the Combined Disclosure Statement and Plan. Holders of Interests are conclusively presumed to have rejected the Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

c. Treatment. On the Effective Date, all Interests shall be canceled and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Interests.

**7.10 Reservation of Rights Regarding Claims and Interests.**

Except as otherwise explicitly provided in the Combined Disclosure Statement and Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any

Claims or Interests, including any Claims and Interests that are Unimpaired, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

### 8.1 Classes Entitled to Vote.

Class 3 (Prepetition Secured Claims), Class 4 (Subordinated Sponsor Secured Note Claims), and Class 5 (General Unsecured Claims) are Impaired and entitled to vote on the Combined Disclosure Statement and Plan.

### 8.2 Acceptance by Impaired Classes of Claims or Interests.

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Combined Disclosure Statement and Plan if the Combined Disclosure Statement and Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Combined Disclosure Statement and Plan. In accordance with Bankruptcy Code section 1126(d) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Interests shall have accepted the Combined Disclosure Statement and Plan if such Combined Disclosure Statement and Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Combined Disclosure Statement and Plan.

### 8.3 Presumed Acceptance by Unimpaired Classes.

Because Claims in Classes 1 and 2 are Unimpaired pursuant to Bankruptcy Code section 1126(f), Holders of Claims in Classes 1 and 2 are deemed to have accepted the Combined Disclosure Statement and Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

### 8.4 Presumed Rejections by Impaired Classes.

Because Holders of Intercompany Claims in Class 6, Intercompany Interests in Class 7, 510(b) Claims in Class 8, and Interests in Class 9 are not entitled to receive or retain any property under the Combined Disclosure Statement and Plan, pursuant to Bankruptcy Code section 1126(g), such Holders of Claims and Interests are presumed to have rejected the Combined Disclosure Statement and Plan and are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

### 8.5 Confirmation Pursuant to Bankruptcy Code Section 1129(b).

To the extent that any Impaired Class rejects the Combined Disclosure Statement and Plan or is deemed to have rejected the Combined Disclosure Statement and Plan, the Debtors reserve the right to request confirmation of the Combined Disclosure Statement and Plan, as it may be

modified from time to time, under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Combined Disclosure Statement and Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**8.6 Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or Interest is Impaired under the Combined Disclosure Statement and Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.7 Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Allowed Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Combined Disclosure Statement and Plan for all purposes, including for purposes of determining acceptance of the Combined Disclosure Statement and Plan by such Class under Bankruptcy Code section 1129(a)(8).

## ARTICLE IX
## IMPLEMENTATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

**9.1 Implementation of the Combined Disclosure Statement and Plan.**

The Combined Disclosure Statement and Plan will be implemented by, among other things, (i) the establishment of the Liquidating Trust, the appointment of the Trust Oversight Board, and the appointment of the Liquidating Trustee as of the Effective Date; and (ii) the making of Distributions to Holders of Allowed Claims from the Liquidating Trust Assets.

**9.2 Substantive Consolidation.**

This Combined Disclosure Statement and Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors. The Combined Disclosure Statement and Plan provides for the limited substantive consolidation of the Debtors' Estates, but solely for the purposes of this Combined Disclosure Statement and Plan, including voting on this Combined Disclosure Statement and Plan by the Holders of Claims and making any distributions to Holders of Claims. Specifically, on the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims filed or to be filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor shall be eliminated and canceled, (v) all transfers, disbursements and distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of all of the Debtors' Estates, and (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims entitled to distributions under this Combined Disclosure Statement and Plan shall be entitled to their share of assets available for distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein,

such limited substantive consolidation shall not (other than for purposes related to this Combined Disclosure Statement and Plan) affect the legal and corporate structures of the Debtors.

Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the cases of affiliated debtors, among other instances. When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single debtor. The United States Court of Appeals for the Third Circuit (the "Third Circuit Court of Appeals"), the circuit in which the Chapter 11 Cases are pending, articulated a test in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), for determining whether substantive consolidation is warranted. In setting forth the test, the Third Circuit Court of Appeals looked to five principles behind substantive consolidation: (i) limiting the cross-creep of liability by respecting entity separateness is a fundamental ground rule; (ii) the harms substantive consolidation addresses are nearly always those caused by debtors; (iii) mere benefit of administration of the case is hardly a harm calling for substantive consolidation into play; (iv) substantive consolidation should be a rare remedy and one of last resort after considering and rejecting other remedies; and (v) while substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively. Id. at 211. Based on these principles, the Third Circuit Court of Appeals held that, in the Third Circuit, the party calling for substantive consolidation must prove: (i) that prepetition, the entities to be consolidated disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) that postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* Substantive consolidation is appropriate if either factor is justified. *Id.*

The Debtors believe that the limited substantive consolidation provided for under the Combined Disclosure Statement and Plan is appropriate under the standards set forth by the Third Circuit Court of Appeals in the *Owens Corning* case for several reasons. First, the Debtors believe that, prepetition, many of their Creditors effectively treated the Debtors as a single entity. Second, the Debtors believe that while they did observe appropriate corporate formalities and separateness during the prepetition period, as a practical matter the Debtors' business was operated as an integrated enterprise. Third, given the nominal amount of assets held by certain of the Debtors, and the expense of generating separate chapter 11 plans for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be beneficial to Creditors and will allow for greater efficiencies and simplification in administering the Combined Disclosure Statement and Plan. Accordingly, the Debtors believe that this limited substantive consolidation structure is beneficial to Creditors.

The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the limited substantive consolidation of the Debtors and their respective Estates solely for the purposes of this Combined Disclosure Statement and Plan, including voting on this Combined Disclosure Statement and Plan by the Holders of Claims and making any distributions to Holders of Claims.

**9.3 Source of Consideration.**

All consideration necessary to make all monetary payments in accordance with the Combined Disclosure Statement and Plan shall, as applicable, be obtained from the Liquidating Trust Assets to be monetized by the Liquidating Trustee.

### 9.4 Preservation of Retained Causes of Action.

The Bankruptcy Code preserves the Debtors' rights to prosecute Claims and Causes of Action that exist outside of bankruptcy and empowers the Debtors to prosecute certain Claims and Causes of Action that are established by the Bankruptcy Code, including, among other things, Claims and Causes of Action to recover certain preferential transfers and fraudulent conveyances. The Combined Disclosure Statement and Plan provides for all Retained Causes of Action to vest in the Liquidating Trust.

Except as provided in the Combined Disclosure Statement and Plan or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Combined Disclosure Statement and Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Retained Causes of Action that the Debtors or the Estates may hold against any Person or Entity to the extent not released under section 14.1(b) of the Combined Disclosure Statement and Plan or otherwise, and all Privilege Rights with respect to any of the foregoing, are Liquidating Trust Assets that shall be deemed to automatically vest in the Liquidating Trust on the Effective Date. A non-exclusive schedule of Retained Causes of Action shall be filed with the Plan Supplement. The inclusion or failure to include any Causes of Action in the Plan Supplement shall not be deemed an admission, denial, or waiver of any claims, rights, or causes of action that the Debtors or Estates may have against any Person or Entity. Causes of Action against any and all Non-Debtor Affiliates shall be Retained Causes of Action. No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Combined Disclosure Statement and Plan, or the Plan Supplement, to any Cause of Action against it as any indication that the Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Liquidating Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Combined Disclosure Statement and Plan.

The vesting of the Retained Causes of Action in the Liquidating Trust, and further investigation and prosecution of the Retained Causes of Action, is a critical and integral component of this Combined Disclosure Statement and Plan. The Retained Causes of Action, which are set forth in greater detail in the Plan Supplement, included Causes of Action against the Non-Released Parties. The Retained Causes of Action related to, among other things, the Carve Out Transaction, transactions between the Debtors and Live Comfortably, including related to the TSA, the Subordinated Sponsor Secured Notes, and the 11th Lane Unsecured Note.

The Retained Causes of Action and related rights constitute the majority of the Liquidating Trust Assets that will be vested in the Liquidating Trust for the benefit of Holders of Allowed Claims entitled to the Distributable Value of the Liquidating Trust Net Assets. It is expected that the Holders of Allowed Claims Class 3 (Prepetition Secured Claims) and Class 5 (General Unsecured Claims) would not vote in favor of the Combined Disclosure Statement and Plan absent the Liquidating Trust's express responsibility and authority to investigate and pursue any and all such Retained Causes of Action in order to facilitate and maximize distributions to Holders of Allowed Claims. As such, the Liquidating Trust's ability to pursue the Retained Causes of Action is fundamental to the implementation of the Combined Disclosure Statement and Plan and administration of the Estates and the Liquidating Trust.

**9.5 Vesting of Assets.**

Except as otherwise provided herein, on the Effective Date, the Liquidating Trust Assets shall immediately vest in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries. On and after the Effective Date, except as otherwise provided herein, the Liquidating Trustee may use, acquire, or dispose of Liquidating Trust Assets and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust and/or the Liquidating Trustee shall be transferred free and clear of all Claims, Interests, Liens, encumbrances, charges, and other interests, except as may otherwise be expressly provided for in this Combined Disclosure Statement and Plan.

**9.6 Directors and Officers.**

On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be deemed to have resigned. Following such terminations and reorganizations, the Liquidating Trustee shall be the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.

**9.7 Liquidating Trust.**

a. Purpose of Liquidating Trust

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code (excluding any Disputed Claims Reserve), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for U. S. federal income tax purposes. The Liquidating Trust shall be governed by the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure the continued treatment of the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving all Net Liquidating Trust Assets and distributing any such assets pursuant to the Combined Disclosure Statement and Plan.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the sole representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Combined Disclosure Statement and Plan and Liquidating Trust

Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code.

b. Governance

The Liquidating Trustee shall be overseen and managed by the Trust Oversight Board, consisting of three (3) TOB Members. Great Rock Capital Partners Management, LLC, Wingspire Capital, LLC, and the Committee shall each have authority to appoint one (1) TOB Member to the Trust Oversight Board. The initial TOB Members are to be identified in the Plan Supplement, and each TOB Member shall have one (1) vote. The Trust Oversight Board shall be responsible for overseeing and directing the Liquidating Trustee in accordance with the Liquidating Trust Agreement, whom shall also be identified in the Plan Supplement and approved in connection with confirmation of the Combined Disclosure Statement and Plan, and her/his implementation and administration of the Liquidating Trust.

The Liquidating Trustee shall perform the day-to-day activities implementing the Liquidating Trust. The Trust Oversight Board shall have the responsibility to oversee the administration of the Liquidating Trust and the activities of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement filed with the Plan Supplement.

The Liquidating Trustee shall hold meetings with the Trust Oversight Board at least quarterly for the purpose of consulting in good faith with the Trust Oversight Board regarding all material issues affecting the Liquidating Trust, including the resolution of Claims and the disposition of Liquidating Trust Assets. The Liquidating Trustee may provide periodic reports regarding the Liquidating Trust's activities. The Trust Oversight Board may request additional meetings as may be required and reasonable under the circumstances.

The Liquidating Trustee shall seek approval for material decisions from the Trust Oversight Board, as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall provide reasonable advance notice to the Trust Oversight Board of: (a) any proposed sale, transfer, or exchange of Liquidating Trust Assets above $150,000; (b) any settlements of Causes of Action asserted in an amount in excess of $250,000, or asserted in an unliquidated amount but which the Liquidating Trustee in consultation with the Trust Oversight Board reasonably estimates could be asserted in an amount in excess of $250,000; (c) any claims resolutions that result in an Allowed Claim in excess of $250,000; (d) any decision to abandon a Retained Cause of Action; and (e) any proposed material modifications to the Liquidating Trust Agreement, including, but not limited to, any adjustment to the compensation of the Liquidating Trustee.

c. Books and Records and Privileges

The Liquidating Trust shall be given access by the Debtors and their professionals (at the expense of the Liquidating Trust with respect to any expenditure of resources that is more than de minimis) to all information the Liquidating Trustee determines is necessary to prosecute, investigate, sell, transfer, or convey any of the Retained Causes of Action and to benefit from any relevant Privileges.

Prior to the Effective Date, at the sole cost of the Debtors, the Debtors shall deliver or cause to be delivered to the Liquidating Trust any and all books and records and all other documents, files, electronic data, tangible objects, and communications, or copies of the same (the "Debtors'

Records”). The Debtors shall not destroy, abandon, or otherwise render the Debtors’ Records unavailable; *provided, however,* that the Liquidating Trustee shall be authorized pursuant to Bankruptcy Code section 554, in its sole discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors and which the Liquidating Trustee reasonably concludes are burdensome or of inconsequential value and benefit.

The Liquidating Trust shall stand in the same position as the Debtors and their estates and the Committee as to all evidentiary privileges of any type or nature whatsoever, including attorney-client privilege, the work product privilege or doctrine, any other privilege or immunity attaching to any documents or communications in any form, including electronic data hosted on remote servers, and any other applicable evidentiary privileges of each of the foregoing (collectively, the “Privileges”), and shall succeed to all of the rights of the Debtors and their estates and the Committee to preserve, assert, or waive any such Privileges, and shall be deemed to be the assignee by each Debtor and its respective Estate and the Committee of each such Privilege as of the latter of (a) the Effective Date, or (b) the formation of the Liquidating Trust.

For the avoidance of doubt, the Privileges shall be shared with, and shall vest in, the Liquidating Trust. Notwithstanding the Debtors, the Committee, or any party-in-interest providing any privileged information to the Liquidating Trust, the Liquidating Trustee, or the Trust Oversight Board, including any member thereof, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Retained Causes of Action and shall remain privileged.

d. Liquidating Trust Assets

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Combined Disclosure Statement and Plan and for the benefit of the Liquidating Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors’ Estates’ rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, or interests, subject to the terms of this Plan and the Liquidating Trust Agreement. The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors. The Liquidating Trustee may abandon or otherwise not accept any assets that the Liquidating Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Any assets that the Liquidating Trustee abandons or otherwise does not accept shall not be property of the Liquidating Trust.

e. Role of the Liquidating Trustee

In furtherance of and consistent with the purpose of the Liquidating Trust and the Combined Disclosure Statement and Plan, the Liquidating Trustee shall: (i) hold the assets of the

Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the Liquidating Trust obtained through the exercise of its power and authority in accordance with the Combined Disclosure Statement and Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors and/or the name of the Liquidating Trustee, any Retained Causes of Action and to enter into arrangements to fund such litigation with third parties and/or certain holders of beneficial interests in such Liquidating Trust on such terms as are determined to be reasonable and in the interest of the Liquidating Trust (*provided*, that any such funding with respect to the Retained Causes of Action shall have recourse solely to the proceeds of the Retained Causes of Action); (iv) have the power and authority to perform such other functions as are provided in the Combined Disclosure Statement and Plan; and (v) have the power and authority to administer the closure of the Chapter 11 Cases. Under the supervision of the Trust Oversight Board, the Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

The Liquidating Trust shall have sole authority to investigate, prosecute, settle, or abandon the Retained Causes of Action. The Liquidating Trust shall consult with the Trust Oversight Board with respect to any decision to abandon a Retained Cause of Action. In pursuing any claim, right, or Retained Cause of Action, the Liquidating Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Retained Cause of Action may be brought under the Bankruptcy Code. Moreover, any holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or applicable law, to commence or continue any action in a non-bankruptcy forum in order to further toll or satisfy any limitations period with respect to any such holder's Claim that had not expired prior to the Petition Date.

The Liquidating Trustee shall file tax returns for the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with this Plan and comply with any other applicable tax reporting obligations imposed on the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction, or credit (other than such items attributable to any Disputed Claims Reserve) will be allocated to each of the Liquidating Trust Beneficiaries in accordance with their relative beneficial interest in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trustee shall make (or cause to be made) a good faith valuation of the assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for U.S. federal income tax purposes.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Liquidating Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Liquidating Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the Liquidating Trustee by the Combined Disclosure Statement and Plan or the Confirmation Order; *provided, however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the Liquidating Trustee for any actions taken by such members

which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Combined Disclosure Statement and Plan or the Confirmation Order. Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Liquidating Trust, including, if available, any insurance maintained by the Liquidating Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future Liquidating Trustee or the estate of any decedent. The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party to any pending litigation in which any Debtor is a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for such Debtor. Such substitution shall not result in holders of Claims receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Combined Disclosure Statement and Plan and Liquidating Trust Agreement on account of such Claims.

f. Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

g. Retention of Professionals by the Liquidating Trustee

The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval. The Liquidating Trustee may, upon notice to the Trust Oversight Board, retain any professional who represented parties in interest in the Chapter 11 Cases. The Liquidating Trustee shall provide reasonable advance notice of any change in compensation to the Trust Oversight Board.

h. Tax Treatment; No Successor in Interest

The Liquidating Trust (excluding any Disputed Claims Reserve) is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d). Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust (a) in part as the transfer of Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such Assets, by the Debtors to the holders of Allowed General Unsecured Claims, followed by the transfer of such Assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for the Liquidating Trust Units, and (b) in part as the transfer of such Assets by the Debtors to one or more Disputed Claims Reserves, and to the extent permitted by applicable law, all relevant parties shall report consistently for state and local income tax purposes. Notwithstanding the foregoing, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does

not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust (excluding any Disputed Claims Reserve) be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust (excluding any Disputed Claims Reserve) to be treated as such a partnership.

i. Disputed Claims Reserves

The Liquidating Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Liquidating Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the Liquidating Trust (including any taxes imposed on any Disputed Claims Reserve) from Liquidating Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the Liquidating Trust).

j. Dissolution of the Liquidating Trust

The Liquidating Trustee, the Trust Oversight Board, and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Liquidating Trust Assets have been liquidated and (ii) all distributions required to be made by the Liquidating Trustee under the Combined Disclosure Statement and Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary of the Effective Date (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, absent a favorable letter ruling from the IRS providing that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

k. Securities Exempt

The issuance of any beneficial interests of the Liquidating Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act, as amended, and any state or local law requiring registration.

**9.8 Wind-Up and Dissolution of the Debtors.**

The Liquidating Trustee is authorized to take any and all actions necessary to effect the Debtors' dissolution, termination, or cancellation for all purposes under applicable state law. The

filing of the Debtors' certificate of dissolution, termination, or cancellation, as applicable, shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders, members, or board of directors of the Debtors. Further, the Liquidating Trustee is authorized to file the required documents providing for such dissolution or cancellation, as applicable. In addition, the Liquidating Trustee shall be authorized without any action by the stockholders, members, or board of directors of the Debtors, in the name of and on behalf of the Debtors, to complete and file the Debtors' final federal, state, and local tax return.

**9.9 Cancellation of Existing Securities and Agreements.**

On the Effective Date, except to the extent otherwise provided in the Combined Disclosure Statement and Plan, all notes, instruments, certificates, and other documents directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest, shall be deemed cancelled and surrendered without any need for the Debtors or a Holder to take further action with respect thereto; *provided, however*, that notwithstanding Confirmation or Consummation of the Combined Disclosure Statement and Plan, any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of allowing Holders to receive Distributions under the Combined Disclosure Statement and Plan; *provided further, however*, that the preceding proviso shall not affect the treatment of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Combined Disclosure Statement and Plan, or result in any expense or liability to the Debtors.

Notwithstanding the foregoing, no Executory Contract that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code, including pursuant to this Combined Disclosure Statement and Plan, shall be terminated or cancelled on the Effective Date.

**9.10 Cash Investments.**

Cash shall be invested in demand-and-time deposits in banks or other savings institutions, or in other temporary, liquid investments, such as Treasury bills, consistent with the liquidity needs of the Liquidating Trustee as determined by the Liquidating Trustee in accordance with Bankruptcy Code section 345, unless the Bankruptcy Court otherwise requires.

**9.11 Company Action.** All matters expressly provided for under this Combined Disclosure Statement and Plan that would otherwise require approval of the equity holders, directors or officers of the Debtors, including but not limited to, the dissolution of the Debtors, shall be deemed to be approved and in effect from and after the Effective Date pursuant to the applicable law of Delaware without any requirement of action by the equity holders, directors or officers of the Debtors.

**9.12 Control Provisions.** To the extent there is any inconsistency between the Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Combined Disclosure Statement and Plan (other than the Liquidating Trust Agreement), the terms of the Combined Disclosure Statement and Plan shall control. Notwithstanding the foregoing or any other provision of the Combined Disclosure Statement and Plan and the Liquidating Trust

Agreement with respect to (a) governance, powers, duties, or authority of the Liquidating Trustee; (b) administration of the Liquidating Trust or the Liquidating Trust Assets; (c) investigation, prosecution, settlement, or other resolution of Retained Causes of Action; and (d) oversight responsibilities and authority of the Trust Oversight Board, the terms of the Liquidating Trust Agreement shall govern and control.

**9.13 Tax Consequences of the Combined Disclosure Statement and Plan.**

THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL WITH RESPECT TO ANY OF THE FEDERAL, STATE, LOCAL, OR OTHER TAX ASPECTS OR CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS AS A RESULT OF CONFIRMATION OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## ARTICLE X
## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1 Distributions for Allowed Claims.**

The Liquidating Trustee or the Disbursing Agent, if any, shall make all distributions under the Combined Disclosure Statement and Plan on account of Allowed Claims against the Debtors pursuant to the terms of the Combined Disclosure Statement and Plan, the Liquidating Trust Agreement, and Confirmation Order. For the avoidance of doubt, all Distributions shall be made in accordance with the Waterfall Recovery, and no Distributions on account of Allowed General Unsecured Claims shall be made unless and until all Allowed Claims of a higher priority under the Bankruptcy Code have been Paid in Full or reserved for and all Liquidating Trust Expenses have been Paid in Full or reserved for.

**10.2 Distributions by Liquidating Trustee.**

From and after the Effective Date, the Liquidating Trustee shall serve as the Disbursing Agent under the Combined Disclosure Statement and Plan with respect to Distributions to Holders of Allowed Claims. The Liquidating Trustee may hire professionals or consultants to assist with making disbursements or to act as the Disbursing Agent. The Liquidating Trustee shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of the Liquidating Trustee's duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court.

**10.3 Means of Payment.**

Cash payments to Holders of Allowed Claims under the Combined Disclosure Statement and Plan shall be made, at the option, and in the sole discretion, of the Liquidating Trustee by wire,

check, or such other method as the Liquidating Trustee deems appropriate under the circumstances. Cash payments to foreign Creditors may be made, at the option, and in the sole discretion, of the Liquidating Trustee in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. For purposes of effectuating Distributions under the Combined Disclosure Statement and Plan, any Claim or Interest denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**10.4 Claims Reserve**

On any date that Distributions are to be made under the terms of the Combined Disclosure Statement and Plan, the Liquidating Trustee shall reserve Cash or property equal to one-hundred percent (100%) of the Cash or property that would be Distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto, unless otherwise Ordered by the Bankruptcy Court following notice to the affected Claim Holder. Such Cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

**10.5 Fractional Distributions.**

Notwithstanding anything in the Combined Disclosure Statement and Plan to the contrary, no payment of fractional cents shall be made pursuant to the Combined Disclosure Statement and Plan. Whenever any payment of a fraction of a cent under the Combined Disclosure Statement and Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6 *De Minimis* Distributions.**

Notwithstanding anything to the contrary contained in the Combined Disclosure Statement and Plan, the Liquidating Trustee shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against the Liquidating Trust Assets.

**10.7 Delivery of Distributions; Unclaimed Distributions.**

In the event a Distribution is returned as undeliverable, or no address for a particular Holder is found in the Debtors' records, no further Distributions to such Holder shall be made unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address, at which time a Distribution shall be made to such Holder. The Liquidating Trustee shall reasonably attempt to locate the Holders entitled to receive undeliverable Distributions. Any Distributions returned to the Liquidating Trustee as undeliverable shall remain in the possession of the Liquidating Trustee until such time as a Distribution becomes deliverable. Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance. Requests for reissuance of any voided check shall be made directly to the Liquidating Trustee by the Person or Entity to whom such check was originally issued. Any claim in respect of a voided check shall be made within thirty (30) days after the date upon which such check was deemed void.

If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be forever barred. Notwithstanding any federal or state escheat laws to the contrary, any Distribution that remains undeliverable for ninety (90) days or is represented by a voided check shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, shall revert to and shall revest in the Liquidating Trust and shall constitute Liquidating Trust Assets for all purposes, including, but not limited to, for the purpose of redistribution to other Holders of Allowed Claims, and the corresponding Claim or Interest shall be deemed disallowed, expunged and forever barred without order of the Bankruptcy Court. The Liquidating Trustee, the Liquidating Trust, and the Post-Effective Date Debtors shall not incur any liability whatsoever on account of any Distributions made or undeliverable under the Combined Disclosure Statement and Plan.

**10.8 Application of Distribution Record Date.**

At the close of business on the Distribution Record Date, the claims registers shall be closed, and there shall be no further changes in the record holders of Claims or Interests. Such Claims or Interests shall be non-transferable except upon death of the interest holder or by operation of law. Except as provided herein, no party shall have any obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Combined Disclosure Statement and Plan to such Entities or the date of such Distributions.

**10.9 Withholding, Payment and Reporting Requirements Regarding Distributions.**

To the extent applicable, in connection with making Distributions, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on the Liquidating Trustee by any governmental unit. All Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Combined Disclosure Statement and Plan to the contrary, the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements. The Liquidating Trustee shall be authorized to require each Holder of a Claim or Interest to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The Liquidating Trustee shall provide advance written notice of such requirement to each Holder of a Claim or Interest. The notice shall provide each Holder with a period of no less than ninety (90) days after first request to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Liquidating Trustee. If a Holder of any Claim or Interest does not provide the Liquidating Trustee with an executed Form W-9, Form W-8 or other tax form or documentation within the ninety (90)-day time period specified in such notice, or such later time period agreed to by the Liquidating Trustee in writing in its sole discretion, then the Liquidating Trustee, in its sole discretion, may (i) make a Distribution net of any applicable withholding or (ii) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution. In such event: (i) any Distribution shall revert to the Liquidating Trust and shall constitute Liquidating Trust Assets for all purposes, including but not limited to, for the purpose of Distribution on account of other Allowed Claims; and (ii) the Claim or Interest of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court, notwithstanding any federal, state

or provincial escheat, unclaimed or abandoned property law to the contrary. The Liquidating Trustee shall have the right to allocate all Distributions in compliance with applicable withholding requirements, wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

**10.10 Setoffs.**

Except as otherwise expressly provided for in this Combined Disclosure Statement and Plan, the Debtors or the Liquidating Trustee pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code) or applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the Distributions to be made pursuant to this Combined Disclosure Statement and Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any Claims, rights and Causes of Action of any nature that the Debtors or the Liquidating Trustee, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Combined Disclosure Statement and Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Combined Disclosure Statement and Plan shall constitute a waiver or release of any such Claims, rights and Causes of Action that the Debtors or the Liquidating Trustee may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right or Cause of Action of the Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date. For the avoidance of doubt, the Filing of a proof of Claim is sufficient to preserve a right of setoff hereunder.

**10.11 Allocation of Distributions.**

The Liquidating Trustee may make Distributions jointly to any Holder of a Claim or Interest and any other Entity who has asserted, or whom the Liquidating Trustee has determined to have, an interest in such Claim or Interest; *provided, however*, that the Liquidating Trustee shall provide notice of such Distribution to any Holder of a Claim or Interest or other Entity that has asserted an interest in such Claim or Interest.

**10.12 Claims or Interests Paid and Payable by Third Parties.**

To the extent that a Holder of an Allowed Claim or Interest receives a payment from a third party, including the Purchaser, the Liquidating Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim or Interest by the amount of such payment.

## ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1 Claims Administration Responsibility.**

Except as otherwise specifically provided in the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the sole authority on behalf of the Debtors and the Liquidating Trust (a) to File, withdraw, or

litigate to judgment objections to Claims and Interests, (b) to settle, compromise, or Allow any Claim or Disputed Claim or Disputed Interest without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. Any agreement entered into by the Liquidating Trustee (acting in accordance with the terms of the Liquidating Trust Agreement) with respect to the Allowance of any Claim or Interest shall be conclusive evidence and a final determination of the Allowance of such Claim or Interest.

**11.2 Claims Objections**.

All objections to Claims shall be Filed by the Liquidating Trustee on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion Filed by the Liquidating Trustee with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the Filing of such objection. If a timely objection has not been Filed to a proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3 Estimation of Contingent or Unliquidated Claims**.

The Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim. All of the aforementioned Claim or Interest objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4 Expungement and Disallowance of Certain Claims.**

Any Claim that has been paid, satisfied, duplicated, or otherwise dealt with or treated in the Combined Disclosure Statement and Plan, may be adjusted or expunged on the Claims Register at the direction of the Liquidating Trustee on or after fourteen (14) calendar days after the date on which notice of such adjustment or expungement has been Filed with the Bankruptcy Court, without an objection to such Claim having to be Filed, and without any further action, order or approval of the Bankruptcy Court.

**11.5 Adjustment to Claims and Interests Without Objection.**

Any Claim or Interest that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Liquidating Trustee, including by the Filing of a notice that such Claim or Interest has been satisfied, and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE XII
## EXECUTORY CONTRACTS

### 12.1 Assumption and Rejection of Executory Contracts.

On the Effective Date, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except to the extent: (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract; (b) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled; or (c) the Executory contract is specifically described in the Combined Disclosure Statement and Plan as to be assumed in connection with confirmation of the Combined Disclosure Statement and Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Combined Disclosure Statement and Plan or the Plan Supplement (including, without limitation, by being listed on the Schedule of Assumed Executory Contracts). Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of Executory Contracts as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any and all Claims arising from the rejection of Executory Contracts under this Combined Disclosure Statement and Plan must be Filed and served on the Liquidating Trustee no later than thirty (30) days after service of notice of the Effective Date, provided that the foregoing deadline shall apply only to Executory Contracts that are rejected automatically by operation of this Article XII of the Combined Disclosure Statement and Plan. For any Executory Contract previously rejected, the Bar Date Order governs.

### 12.2 Cure of Defaults for Assumed Executory Contracts

The Debtors or the Liquidating Trustee, as applicable, shall pay Cures, if any, on the Effective Date. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Liquidating Trustee shall be dealt with in the ordinary course of business and, if needed, shall be Filed with the Claims Agent on or before thirty (30) days after the Effective Date. **If any counterparty to an Executory Contract does not receive a notice of assumption and applicable cure amount, such counterparty shall have until on or before thirty (30) days after the Effective Date to bring forth and File a request for payment of Cure.** Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or the Liquidating Trustee, without the need for any objection by the Liquidating Trustee or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied and released upon payment by the Debtors or the Liquidating Trustee of the Cure in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract counterparty); provided, however, that nothing herein shall prevent the Liquidating Trustee from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure. The Liquidating Trustee may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract under the Combined Disclosure Statement and Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the

Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract that fails to timely object to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption.

In the event of a dispute regarding: (1) the amount of any Cure Claim, (2) the ability of the Debtors, the Post Effective Date Debtors, the Liquidating Trustee, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed (or assumed and assigned, as applicable), or (3) any other matter pertaining to assumption or assignment, then any disputed Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made as soon as reasonably practicable following, and in accordance with, the entry of a Final Order of the Bankruptcy Court resolving such dispute or as may be agreed upon by the Debtors or the Liquidating Trustee, as applicable, and the counterparty to the Executory Contract, and any such unresolved dispute shall not prevent or delay implementation of the Combined Disclosure Statement and Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract pursuant to the Combined Disclosure Statement and Plan or otherwise and full payment of any applicable Cure pursuant to this Article XII.2, or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract counterparty), shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article XII.2, in the amount and at the time in the ordinary course of business or upon and in accordance with any resolution of a Cure dispute (whether by order of the Bankruptcy Court or through settlement with the applicable Executory Contract counterparty), shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in the event that any counterparty to an Executory Contract receives a notice of assumption and applicable proposed Cure amount, and disputes the Debtors' proposed Cure amount, such party shall not be required to File a Proof of Claim with respect to such dispute. Any counterparty to an Executory Contract that does not receive a notice or applicable proposed Cure amount, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount, which Claim shall not be expunged until such Cure dispute is resolved.**

### 12.3 The TSA

Notwithstanding anything to the contrary in the Combined Disclosure Statement and Plan or the Sale Transactions Documentation, the Post-Effective Date Debtors and the Liquidating Trustee, as applicable, shall have up to sixty (60) days from the Effective Date (as may be extended, the "TSA Deadline") to reject the TSA. The TSA Deadline may be extended in additional thirty (30) day increments upon the prior written consent of Live Comfortably (such

consent not to be unreasonably withheld) or by further order of the Court. Notwithstanding anything to the contrary set forth herein, nothing herein shall preclude the Post-Effective Date Debtors and the Liquidating Trustee, as applicable, and Live Comfortably from modifying the terms of the TSA subject to the express approval from the Trust Oversight Board. All parties' rights with respect to the TSA, including, without limitation, the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, the Liquidating Trustee, and Live Comfortably, are expressly preserved.

## ARTICLE XIII
## CONFIRMATION AND CONSUMMATION
## OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

### 13.1 Conditions Precedent to the Effective Date.

Each of the following is a condition precedent to the occurrence of the Effective Date:

(a) the Confirmation Order shall have become a Final Order in full force and effect;

(b) no stay of the Confirmation Order is then in effect;

(c) all actions, documents, and agreements necessary to implement this Combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Disclosure Statement and Plan, shall have been effectuated or executed;

(d) the Wind-Down DIP Draw shall have been funded into the Wind-Down Account;

(e) the schedule of Retained Causes of Action shall be in form and substance reasonably acceptable to the DIP Secured Parties and Committee; and

(f) the Liquidating Trust Agreement shall be executed in form and substance reasonably acceptable to the DIP Secured Parties, Committee and the Liquidating Trustee shall have been selected.

### 13.2 Notice of Effective Date.

On or before five (5) Business Days after the Effective Date, the Liquidating Trustee shall mail or cause to be mailed to all Holders of Claims and Interests the Effective Date Notice that informs such Entities of (a) the occurrence of the Effective Date, (b) notice of the Final Administrative Claim Bar Date and Professional Fee Claim Bar Date, (c) the deadline to File Claims arising from the rejection of Executory Contracts under Article XII of the Combined Disclosure Statement and Plan, and (d) such other matters as the Liquidating Trustee deems appropriate or as may be ordered by the Bankruptcy Court.

### 13.3 Waiver of Conditions Precedent to the Effective Date.

The Debtors may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity; *provided, however*,

that the conditions specified in Sections 13.1(a), 13.1(e), and 13.1(f) may not be waived without the prior written consent of the Committee. The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Combined Disclosure Statement and Plan.

### 13.4 Effect of Non-Occurrence of Effective Date.

If each of the conditions specified in Section 13.1 have not been satisfied or waived in the manner provided herein within sixty (60) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors in their reasonable business judgment, then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Combined Disclosure Statement and Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Combined Disclosure Statement and Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims or Interests by, against, or in the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Combined Disclosure Statement and Plan shall be deemed withdrawn. Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## ARTICLE XIV
## <u>EFFECTS OF CONFIRMATION</u>

### 14.1 Exculpation, Releases, and Injunctions

**The exculpations, releases, and injunctions provided for in section 14.1 of the Combined Disclosure Statement and Plan shall be effective upon the Effective Date.**

a. <u>Exculpation and Limitation of Liability</u>. **Notwithstanding any other provision of the Combined Disclosure Statement and Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission occurring between the Petition Date and the Effective Date relating to, in any way, or arising from the Chapter 11 Cases, including but not limited to (i) formulating, negotiating or implementing the Combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Combined Disclosure Statement and Plan; (ii) the Sale and/or Liquidation Process; (iii) the review by the Debtors' board of managers or other similar management structure of the Debtors' strategic alternatives leading up to the Sale and/or Liquidation Process; (iv) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale, or liquidation of the Debtors; (v) the solicitation of acceptances of the Combined Disclosure Statement and Plan, the pursuit of confirmation of the Combined Disclosure Statement and Plan, the Confirmation of the Combined Disclosure Statement and Plan, the Consummation of the Combined Disclosure Statement and Plan; or (vi) the administration of the Combined**

**Disclosure Statement and Plan or the property to be distributed under the Combined Disclosure Statement and Plan, except for their fraud, gross negligence, or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as an injunction against any Entity seeking to enforce any Claim or Cause of Action against the Exculpated Parties that has been exculpated pursuant to Section 14.1(a) of the Combined Disclosure Statement and Plan. Notwithstanding the foregoing, nothing in this Section 14.1(a) shall exculpate any Non-Released Party, or release, bar, limit, or otherwise impair (x) any Retained Causes of Action, or (y) any claims, rights, causes of action, or defenses that the Debtors, the Estates, the Liquidating Trust, or any other Entity may hold or assert against any Non-Released Party under the Combined Disclosure Statement and Plan or applicable law.**

b. **<u>Releases by the Debtors</u>. Except as otherwise expressly provided in the Combined Disclosure Statement and Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors and their estates, on their own behalf and as a representative of their Estates, to the fullest extent permitted under applicable law, shall, and shall be deemed to, completely and forever release, waive, void and extinguish unconditionally, as against each and all of the Released Parties, any and all Claims, Causes of Action, interests, obligations, suits, judgments, damages, debts, rights, remedies, set offs, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, tort, contract, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, occurrence, or other circumstance, whether direct or derivative, taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtors or their operations, their Assets, the Estates, in or out-of-court restructuring efforts, the Prepetition Loan Documents, DIP Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or the Chapter 11 Cases and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, that may be asserted by or on behalf of the Debtors or their Estates, against any of the Released Parties, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, gross negligence, or willful misconduct. Notwithstanding the foregoing, nothing in this Section 14.1(b) shall release, waive, or impair (x) any Retained Causes of Action, including any Retained Causes of Action that may be asserted by the Liquidating Trust or the Liquidating Trustee, or (y) any claims, rights, causes of action, or defenses that the Debtors, the Estates, the Liquidating Trust, or the Liquidating Trustee may hold or assert against any Non-Released Party, all of which are expressly**

**preserved and shall vest in the Liquidating Trust in accordance with Section 9.4 of the Combined Disclosure Statement and Plan.**

c. <u>Third Party Releases by Holders of Claims and Interests</u>. **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to forever release and waive, as against each and all of the Released Parties, any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever in connection with or related to the Debtors or their operations, their Assets, the Estates, in or out-of-court restructuring efforts, the Prepetition Loan Documents, DIP Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or the Chapter 11 Cases and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, whether liquidated or Unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date (including prior to the Petition Date, but other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and the Combined Disclosure Statement and Plan). Notwithstanding the foregoing, nothing in this Section 14.1(c) shall release, waive, or impair (x) any Retained Causes of Action, including any Retained Causes of Action that may be asserted by the Liquidating Trust or the Liquidating Trustee, or (y) any claims, rights, causes of action, or defenses that any Entity may hold or assert against any Non-Released Party, all of which are expressly preserved. For the avoidance of doubt, no Releasing Party shall be deemed to have released any claim or cause of action against any Non-Released Party by virtue of this Section 14.1(c).**

d. **<u>Non-Discharge of the Debtors; Injunction</u>. In accordance with Bankruptcy Code section 1141(d)(3), the Combined Disclosure Statement and Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Combined Disclosure Statement and Plan is free and clear of all Claims and Interests against the Debtors. As such, no Entity holding a Claim against or Interest in the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Combined Disclosure Statement and Plan other than assets required to be distributed to that Entity under the Combined Disclosure Statement and Plan. Distributions to any such Holder of any such Claim or Interest shall be as expressly set forth in the Combined Disclosure Statement and Plan. All Entities are precluded from asserting against any property to be distributed under the Combined Disclosure Statement and Plan any Claims, rights, Causes of Action, Liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Combined Disclosure Statement and Plan or the Confirmation Order.**

**Except as otherwise provided in the Combined Disclosure Statement and Plan or to the extent necessary to enforce the terms and conditions of the Combined Disclosure Statement and Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Debtors, all**

**Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests have been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Combined Disclosure Statement and Plan or are presumed to have accepted or deemed to have rejected the Combined Disclosure Statement and Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are enjoined, on and after the Effective Date through and until the date upon which all Liquidating Trust Assets have been liquidated and distributed to Creditors or Interest Holders or otherwise in accordance with the terms of the Combined Disclosure Statement and Plan and the Liquidating Trustee Agreement and the Combined Disclosure Statement and Plan has been fully administered, subject to further extension or reduction by motion on notice, with all parties' rights with respect to such extension or reduction reserved, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Combined Disclosure Statement and Plan from taking any of the following actions against the Debtors, the Post-Effective Date Debtors, the Liquidating Trustee, the Exculpated Parties, or the Released Parties (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a right of setoff, other than any rights of setoff that were exercised prior to the Petition Date; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan; *provided, however,* that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Combined Disclosure Statement and Plan or the Confirmation Order; *provided, further,* that the foregoing shall not apply to any acts, omissions, Claims, Causes of Action, or other obligations expressly set forth in and preserved by the Combined Disclosure Statement and Plan or any defenses thereto. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend or supersede any injunctions or stays granted in the Sale Order.**

**Notwithstanding anything in this Section 14.1(d) to the contrary, the injunctions set forth in this Section 14.1(d) shall not apply to, and shall not be construed to bar, limit, or otherwise impair: (x) any Retained Causes of Action, including the investigation, prosecution, litigation, settlement, or other resolution thereof by the Liquidating Trust or the Liquidating Trustee; (y) any claims, rights, causes of action, or defenses that the Debtors, the Estates, the Liquidating Trust, the Liquidating Trustee, or any other Entity may hold or assert against any Non-Released Party; or (z) the enforcement of any judgment, order, or settlement obtained in connection with the foregoing. For the avoidance of doubt, no Non-Released Party shall be entitled to assert or invoke any injunction, release, exculpation, or other protection under this Article XIV to bar, limit, or impair the assertion or prosecution of any Retained Cause of Action or any claim, right, or cause of action against such Non-Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims or Interests and their respective current and former employees, agents, officers, directors, principals, and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Combined Disclosure Statement and Plan.**

# ARTICLE XV
# RETENTION OF JURISDICTION

**15.1 Jurisdiction of Bankruptcy Court.**

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Combined Disclosure Statement and Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

a. allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether Filed before or after the Effective Date and whether or not contingent, disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

b. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Combined Disclosure Statement and Plan, for periods ending on or before the Effective Date;

c. hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, the Retained Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

d. determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the one or more of the Debtors is a party or with respect to which one or more of the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

e. ensure that all Distributions to Holders of Allowed Claims under the Combined Disclosure Statement and Plan and the performance of the provisions of the Combined Disclosure Statement and Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Combined Disclosure Statement and Plan;

f. construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and Consummation of the Combined Disclosure Statement and Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Combined Disclosure Statement and Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the

Combined Disclosure Statement and Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

g. determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Combined Disclosure Statement and Plan (and all exhibits and schedules thereto) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Combined Disclosure Statement and Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

h. determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Liquidation Process, Sale or Asset Purchase Agreement, or any entity's rights arising under or obligations incurred in connection therewith;

i. modify the Combined Disclosure Statement and Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Combined Disclosure Statement and Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Combined Disclosure Statement and Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Combined Disclosure Statement and Plan, to the extent authorized by the Bankruptcy Code and the Combined Disclosure Statement and Plan;

j. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Combined Disclosure Statement and Plan or the Confirmation Order;

k. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

l. determine any other matters that may arise in connection with or relating to the Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Combined Disclosure Statement and Plan or the Confirmation Order;

m. determine such other matters and for such other purposes as may be provided in the Confirmation Order;

n. hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

o. enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

p. determine and resolve controversies related to the Estates, the Debtors, or the Liquidating Trustee from and after the Effective Date;

q. hear and determine any other matter relating to the Combined Disclosure Statement and Plan; and

r. enter a final decree closing the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

### 16.1 Modification of the Combined Disclosure Statement and Plan.

The Debtors may alter, amend, or modify the Combined Disclosure Statement and Plan or any exhibits or schedules hereto under Bankruptcy Code section 1127(a) at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Combined Disclosure Statement and Plan; *provided*, *however*, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Combined Disclosure Statement and Plan. Any Holder of a Claim or Interest that has accepted the Combined Disclosure Statement and Plan shall be deemed to have accepted the Combined Disclosure Statement and Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### 16.2 Revocation, Withdrawal, or Non-Confirmation of the Combined Disclosure Statement and Plan.

The Debtors reserve the right to revoke or withdraw the Combined Disclosure Statement and Plan prior to the Confirmation Hearing. If the Combined Disclosure Statement and Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Combined Disclosure Statement and Plan is not confirmed by the Bankruptcy Court, then:

a. the Combined Disclosure Statement and Plan shall be null and void in all respects, and

b. nothing contained in the Combined Disclosure Statement and Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

### 16.3 Binding Effect.

Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Combined Disclosure Statement and Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Combined Disclosure Statement and Plan and whether or not such Holder has accepted the Combined Disclosure Statement and Plan.

**16.4 Subordination Rights.**

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Bankruptcy Code section 510(b) Code or otherwise. All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Combined Disclosure Statement and Plan shall be implemented through the Combined Disclosure Statement and Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Liquidating Trustee on behalf of the Estates after the occurrence of the Effective Date. Without limitation hereunder, the Liquidating Trustee, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under Bankruptcy Code section 510, which rights are deemed transferred to, remain and are preserved in the Liquidating Trustee except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5 Severability of Provisions.**

If, prior to Confirmation, any term or provision of the Combined Disclosure Statement and Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Combined Disclosure Statement and Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Combined Disclosure Statement and Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6 Bankruptcy Rule 2002 Notice Parties.**

After the Effective Date, the Debtors, the Post-Effective Date Debtors and the Liquidating Trustee, as applicable, are authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to (i) those Entities who have Filed a renewed request after the Effective Date to receive documents pursuant to Bankruptcy Rule 2002 and (ii) those Entities whose rights are affected by such documents. The Effective Date Notice shall apprise parties in interest of the need to file such a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

**16.7 Exemption from Section 1146.**

Pursuant to Bankruptcy Code section 1146(a), under the Combined Disclosure Statement and Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other

interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Combined Disclosure Statement and Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Combined Disclosure Statement and Plan, shall not be taxed under any law imposing a stamp tax or similar tax. To the extent that the Debtors or the Liquidating Trustee elect to sell any property on or after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with Bankruptcy Code section 1146(a). All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Combined Disclosure Statement and Plan.

**16.8 Insurance.**

Confirmation of the Combined Disclosure Statement and Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were an insured party. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, the Combined Disclosure Statement and Plan or any provision within the Combined Disclosure Statement and Plan, including the treatment or means of liquidation set out within the Combined Disclosure Statement and Plan for insured Claims.

**16.9 Successors and Assigns.**

The rights, benefits and obligations of any Entity named or referred to in the Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.10 Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Combined Disclosure Statement and Plan, the construction, implementation and enforcement of the Combined Disclosure Statement and Plan and all rights and obligations arising under the Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.11 Exhibits and Schedules.** All exhibits and schedules annexed hereto, and all documents submitted in support hereof, including, without limitation, the Plan Supplement, are incorporated into and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein. Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours. The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. To the extent any exhibit or schedule annexed hereto is inconsistent with the

Combined Disclosure Statement and Plan, the contents of the Combined Disclosure Statement and Plan shall control.

**16.12 Reservation of Rights.**

The Filing of the Combined Disclosure Statement and Plan, any statement or provision contained in the Combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to the Combined Disclosure Statement and Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: August 7, 2026

**Simply Interior Homes, LLC, *et al.***

*/s/ Adam Zalev*
Name: Adam Zalev
Title: Chief Restructuring Officer

# **Exhibit A**

## Liquidation Analysis