**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Simply Interior Homes, LLC, *et al.*,[1] | Case No. 26-10922 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 11, 2026, at 11:00 a.m. (ET)**<br>**Objection Deadline: At the Hearing** |

**JOINDER OF GREAT ROCK CAPITAL PARTNERS MANAGEMENT, LLC TO THE DEBTORS' SECOND EMERGENCY MOTION PURSUANT TO SECTIONS 105(a), 362, AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER (I) COMPELLING PERFORMANCE OF ITS LOGISTICS, LLC'S OBLIGATIONS UNDER AN EXECUTORY CONTRACT, (II) ENFORCING THE AUTOMATIC STAY, (III) AWARDING DAMAGES TO THE DEBTORS, AND (IV) GRANTING RELATED RELIEF**

Great Rock Capital Partners Management, LLC, in its capacities as the DIP Agent and Prepetition Agent as defined in the Final DIP Order (together, the "Agent"), by and through their undersigned counsel, hereby join (this "Joinder") in the *Debtors' Second Emergency Motion Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code for Entry of an Order (I) Compelling Performance of ITS Logistics, LLC's Obligations Under an Executory Contract, (II) Enforcing the Automatic Stay, (III) Awarding Damages to the Debtors, and (IV) Granting Related Relief* [Docket No. 405] (the "Motion").[2] In support of the Joinder, the Agent respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Simply Interior Homes, LLC (8509); Simply Interior Homes AcquisitionCo, LLC (9643); SIH Beckham Buyer, LLC (5210); SIH-HSD Holdings, LLC (5402); SIH-BB Holdings, LLC (2303); SIH-DMD Holdings, LLC (2411); and SIH-SR Holdings, LLC (1835). The location of the Debtors' service address in these chapter 11 cases is 3042 Southcross Boulevard, Suite 102, Rock Hill, SC 29730.

[2] Unless otherwise stated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## JOINDER

1. The Agent joins fully in the Motion and incorporates it as if fully set forth herein. The Agent files this Joinder to emphasize a few critical points.

## I. THE ITS SETTLEMENT AGREEMENT AND FIRST BREACH OF THE WAREHOUSE AGREEMENT AND AUTOMATIC STAY

2. As briefed more fully in the Motion, at the outset of these Chapter 11 Cases, ITS Logistics, LLC ("ITS") conditioned its continued performance under the Warehouse Agreement, including the release of inventory, upon the payment of its $1.1 million prepetition claim—a blatant violation of the automatic stay under Section 362(a)(6) to collect on a prepetition debt. The Debtors were forced to seek emergency relief from the Court and, after a hearing on the motion, ITS agreed to continue performing under the Warehouse Agreement after receiving the following accommodations in the settlement agreement approved by the Court [ECF Nos. 174 and 175] (together, the "ITS Settlement"): (a) ITS's prepetition claim was allowed in the amount of $1,100,429.42 (the "ITS Prepetition Claim"), (b) ITS received payment on account of the ITS Prepetition Claim in the amount of $150,000, (c) ITS received weekly accounting reports from the Debtors detailing what inventory was sold from the ITS facilities until the $150,000 was paid in full and (d) replacement liens on the proceeds from the sale of all inventory housed in the ITS facilities. In connection with the ITS Settlement, and upon the belief that ITS would continue in good faith to perform its obligations under the Warehouse Agreement in accordance with the terms of the Settlement Agreement, the Debtors withdrew their motion for sanctions and damages against ITS for its willful violation of the automatic stay. ITS's stay relief violations resulted in the Debtors and DIP Lenders incurring excessive amounts of litigation costs, all of which are paid from the DIP Loan proceeds and other Cash Collateral, to compel ITS to perform under the Warehouse Agreement, which it should have in the first place. Unfortunately, ITS has sought other improper

avenues to obtain payment now of all disputed amounts, estimated future amounts and a portion of its prepetition claim.

## II. ITS HAS BREACHED THE SETTLEMENT AGREEMENT AND AUTOMATIC STAY

3. Following the ITS Settlement, ITS embarked on a strategy to maximize its postpetition fees and expenses in order to further recoup its losses on the ITS Prepetition Claim. The Agent bases this assertion on the Zalev Declaration and the history of charges prior to and after the bankruptcy was filed, and fully expects that it will be borne out entirely as part of any discovery. In particular, ITS's strategy appears to have included: (a) converting inventory in its data management systems from "dark storage" to "active" storage without any legitimate need or commercial reason, thereby approximately doubling the rental charges and under the justification of internal system constraints and limitations, (b) incurring unnecessary handling charges moving inventory that was ready to ship and then returning the inventory to its former location, (c) slow walking preparation of inventory for shipping so as to retain possession of inventory (and continue charging storage fees thereon) for longer periods than necessary and (d) undertaking other unnecessary services that the Debtors did not request that resulted in additional charges. These "services" conferred no cognizable benefit on the Debtors' estates and only served to inflate ITS's postpetition invoices at the expense of the Debtors, the Prepetition Secured Lenders, the DIP Lenders, the general unsecured creditors and all other stakeholders in these Chapter 11 Cases.

4. In the periodic calls between Reflect Advisors, the Debtors' financial advisor, and ITS, we understand that the Debtors have repeatedly taken issue with these unusual and non-ordinary-course charges (and the underlying inappropriate and non-commercial inventory management practices that generated them). By the week ended August 21, ITS invoices had exceeded the entire amount of their charges ($1.675 million) budgeted under the DIP Budget (the

"Budgeted ITS Amount")—which they were provided in connection with the Settlement Agreement and raised no objection to—and once again conditioned shipping of critical inventory orders upon receipt of additional funds and assurances before they would continue performing. These ITS shipping delays, together with earlier delays, resulted in delayed receipts from sales under the ongoing liquidation process which cumulatively resulted in the Debtors breaching the collections and receipts variance covenants on weeks ended August 8 and August 29, respectively. When asked for an estimate of charges for the remainder of the case, ITS projected an additional $1.5 million in charges through the end of September (the "ITS Estimated Charges") which is when the Debtors were targeting to have sold and shipped out all remaining inventory in the ITS warehouses. To provide assurance that availability under the DIP Facility would be reserved to pay the ITS Estimated Charges, the DIP Lenders agreed to approve a new DIP Budget that increased the ITS line item in the amount of the ITS Estimated Charges, subject to the right of the Debtors and other estate fiduciaries to dispute such charges.

5. ITS accepted the assurances and inventory continued to ship and the Debtors continue to pay the undisputed portions of the ITS invoices with the intent that any disputed portions will be addressed in the claims reconciliation process. Indeed, in the Combined Disclosure Statement and Plan,[3] the Debtors, DIP Lenders and Committee agreed (as part of their Global Settlement) to create a separate funding facility for the liquidating trust of up to $1.5 million (i.e. the "Liquidating Trust Commitment") to fund payment of the ITS Estimated Charges (to the extent not paid prior to the Effective Date), including any disputed charges, subject to the claims reconciliation process under the Combined Disclosure Statement and Plan.

[3] "Combined Disclosure Statement and Plan" means the Second Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Simply Interior Homes, LLC and Its Debtor Affiliates [Docket No. 400].

6. On September 9, approximately a week after the Debtors had delivered a detailed information request to ITS regarding the disputed charges, and one day after the Debtors had delivered a subsequent information request regarding additional disputed charges, the Debtors informed the DIP Lenders that ITS had "suspended all further account activity" and refused to resume work or ship any inventory and will not perform unless it is paid approximately $2.4 million (which, as set forth in the Motion, includes all disputed invoice amounts, the ITS Estimated Charges and certain prepetition amounts). After the Debtors formally requested the information from ITS to substantiate certain "services" and "charges" they purport to have rendered for the benefit of the Debtors' estates (to which ITS has not provided satisfactory responses), ITS chose not to seek relief from the Court but instead retaliated by again taking the Debtors' assets hostage, this time in an attempt to avoid the claims reconciliation process under the Combined Plan and Disclosure Statement by demanding payment immediately.

7. The Debtors, DIP Lenders and Committee have gone out of their way in these Chapter 11 Cases to accommodate ITS's excesses and provide assurance that, despite all disputes over their enlarged invoices, the Debtors and the Liquidating Trust would reserve sufficient liquidity to pay the disputed amounts if the Court ultimately allowed them. ITS should not have pursued self-help remedies in breach of the automatic stay, but instead continued to perform under the Warehouse Agreement which, as discussed below, is an enforceable executory contract.

8. ITS understands that for the Debtors and their stakeholders, time is of the essence to ship all inventory from the ITS warehouses and complete the liquidation by the case milestones. ITS has seen an opportunity to exert leverage, likely assuming that at best it will get paid and at worst, it will be told simply to start performing. ITS has grown more brazen in response to efforts to reach accommodation and has repeatedly used delays, and the threat of delays, to extract value

from the Debtors' estates by prolonging the liquidation process to permit ITS to continue charging excessive fees. This Court's intervention is necessary against this repeat offender. The continued losses to the estate caused by ITS holding inventory hostage while demanding payment of its inflated invoices have accumulated, are mounting with each day ITS refuses to perform and are detailed further in the Motion.

9. To be clear, ITS had other options available to it—notably seeking this Court's assistance. It evidently thought that it and not this Court was in the best position to give ITS the relief that ITS wants. That is wholly improper and wrongful.

## II. THE WAREHOUSE AGREEMENT IS AN ENFORCEABLE EXECUTORY CONTRACT REQUIRING PERFORMANCE FROM ITS

10. As set forth in the Motion, the Debtors have not assumed the Warehouse Agreement which remains an executory contract pursuant to which the Debtors have performed their undisputed obligations postpetition and exercised their rights to dispute the amounts invoiced thereunder due to ITS's bad faith actions. Accordingly, ITS cannot condition its performance under the Warehouse Agreement upon payment of these disputed amounts.

11. Indeed, counterparties to executory contracts must perform their obligations under those contracts while the debtor determines whether to assume or reject such contracts. Moreover, the case law makes clear that an unassumed executory contract, while not enforceable *against* the debtor, s*ee NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984), is still enforceable by the debtor against the counterparty. *See e.g., McLean Indus., Inc. v. Medical Laboratory Automation, Inc. (In re McLean Indus., Inc.*), 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("a debtor-in-possession's ability to continue to perform and to compel performance with respect to an assumable executory contract is usually the life blood of its reorganization."); *Public Ser. Co. of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Ser. Co. of New*

60249892.5



LEGAL_AMERICAS # 603405892.7

*Hampshire*), 884 F.2d 11, 14 (1st Cir. 1989) ("Ordinarily, the debtor need not commit itself to assumption or rejection of such a contract until a reorganization plan is confirmed. In the meantime, the executory contract remains in effect and creditors are bound to honor it.") (citation omitted); *In re Continental Energy Assocs. LP*, 178 B.R. 405, 408 (Bankr. M.D.Pa. 1995) ("The only reasonable conclusion is that this court . . . can issue an order that would allow such debtor to enforce the contract until such time that it accepts or rejects the contract . . .").

**III. ITS REFUSAL TO PERFORM THREATENS GLOBAL SETTLEMENT**

12. Unfortunately, the timing of ITS's latest hostage maneuver is the week before the hearing is scheduled to confirm the Combined Disclosure Statement and Plan and threatens the viability of the Global Settlement (as defined therein) upon which the entire Combined Disclosure Statement and Plan relies. The DIP Lenders have funded these Chapter 11 Cases from the outset and after weeks of negotiations with the Committee have reached the Global Settlement that provides *significant* value to the general unsecured creditors. The Wind-Down Budget supporting the post-Effective Date litigation relies on the receipt of the proceeds that ITS is holding as leverage to receive payment of the disputed portions of its postpetition invoices. Moreover, payment of the disputed amounts that ITS seeks payment of diverts recovery from the general unsecured creditors to ITS to compensate ITS for "services" it provided that, upon information and belief, conferred no measurable benefit on the Debtors estates.

13. As a result, the Debtors, DIP Lenders and Committee are forced to bring this costly and unnecessary litigation against ITS on the eve of plan confirmation to compel ITS to comply with its obligations under the Warehouse Contract, seek damages for the delays and losses sustained by the Debtors as a result thereof and seek sanctions for their blatant and bad faith breaches of the automatic stay.

## CONCLUSION

14. For the reasons set forth herein and in the Motion, the Agent respectfully requests that the Court (a) grant the Motion; and (b) grant such other and further relief as the Court may deem just and appropriate.

Dated: September 11, 2026
Wilmington, Delaware

*/s/ Joseph Mulvihill*

Joseph Barry (No. 4221)
Joseph Mulvihill (No. 6061)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 North King Street
Wilmington, Delaware 19801
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
Email: jbarry@ycst.com
jmulvihill@ycst.com

– and –

Roger Schwartz
Peter Montoni
William Reily
Alison Sikes
**PAUL HASTINGS, LLP**
200 Park Avenue
New York, New York 10166
Tel: (212) 318-6000
Email: rogerschwartz@paulhastings.com
petermontoni@paulhastings.com
williamreily@paulhastings.com

*Counsel to the Agent*